Appendix 3



Copyright (c) 2011 William & Mary Law Review
William & Mary Law Review

October, 2011

William & Mary Law Review

*53 Wm. & Mary L. Rev. 111*

**LENGTH:** 22196 words

ARTICLE: TWO FACES: DEMYSTIFYING THE MORTGAGE ELECTRONIC REGISTRATION SYSTEM'S LAND TITLE THEORY

**NAME:** Christopher L. Peterson*

**BIO:**

> * Associate Dean for Academic Affairs and Professor of Law, University of Utah, S.J. Quinney College of Law. The author wishes to thank the following people for helpful conversations, comments, encouragement, research assistance, or suggestions: Richard Aaron, Abraham Bates, Gregory Clark, Thomas Cox, Lynn Drysdale, Christian Johnson, Max Gardner, Kathleen Keest, Robert Hager, Rebecca Holt, Tera Peterson, Rylee McDermott, Nancy McLaughlin, Mark Monacelli, Steven Ramirez, Michael Wolf, Alan White, and Nick Wooten.

**LEXISNEXIS SUMMARY:**
... First, given recent cases questioning MERS's ownership interests in loans registered in its database, do security agreements naming MERS as a mortgagee or deed of trust beneficiary actually succeed in conveying a property interest?   ... Second, because financial institutions used MERS to avoid paying billions of dollars in recording fees to county and state governments, should these governments-many of which are facing dire financial crises- be entitled to recoup unpaid recording fees?   ...   MERS's rights vis-a-vis mortgages registered on the MERSCORP database have created a conundrum for courts, borrowers, and foreclosure attorneys.   ... MERS invites financial companies to enter names of their own employees into a MERS web page that then automatically regurgitates boilerplate corporate resolutions that purport to name the employees of other companies as certifying officers of MERS.   ... These servicer and law firm employees then sign and record documents such as mortgage assignments, substitution of deed of trust trustees, substitutions of deed of trust beneficiaries, and mortgage releases-all including the representation that they are MERS vice presidents or assistant secretaries.   ... Those recorders who agree that the MERS system poses a threat to real property records have an obligation arising from their office to reclaim and restore faith in land title records.

**HIGHLIGHT:** Abstract

In the mid-1990s, mortgage bankers created Mortgage Electronic Registration Systems, Inc. (MERS) to escape the costs associated with recording mortgage transfers. To accomplish this, lenders permanently list MERS as the mortgagee of record instead of themselves to avoid the expense of recording any subsequent transfers. MERS's claim that it is both an agent of the lender and the mortgagee, and the huge gaps left in the public record, give rise to a range of legal issues. This Article addresses whether security agreements naming MERS as a mortgagee meet traditional conveyance requirements and discusses the rights of counties to recover unpaid recording fees. The author explores the challenges facing judges, legislators, county recorders, and investors who must resolve these issues to rebuild confidence in real property recording systems.

**TEXT:**
[*113]

Introduction

In Roman mythology, the god Janus, for whom each year's first month is named, was the deity of beginnings and endings. n1 According to legend, the titan Saturn gave the two-faced god the power to see both the future and the past. n2 Romans carved both of Janus' two faces on gates and doorways to solemnize momentous transitions. n3 Most notably, in the Roman Forum, the Senate erected the ritual gates called the Janus Geminus, which the Romans opened in times of conflict. n4 At war's outset, priests made sacrifices here to curry favor from the gods and forecast the prospects of success. n5

No deity better symbolizes what financiers hoped to create when they founded the Mortgage Electronic Registration System (MERS). MERS sits as a dichotomous, enigmatic gatekeeper on the vestibule of our nation's complex and turbulent mortgage finance industry. Financiers invoked MERS's name at the beginning of millions of subprime and exotic mortgage loan transactions and again invoke its name as they attempt to terminate so many of these loans through foreclosure. Like Janus, MERS is two-faced: impenetrably claiming to both own mortgages and act as an agent for others who also claim ownership.

This Article examines recent case law developments in an update to an earlier article on the legal problems associated with MERS. n6 In particular, this Article looks at several of the most fundamental unanswered legal issues regarding MERS's role in mortgage lending. First, given recent cases questioning MERS's ownership interests in loans registered in its database, do security agreements naming MERS as a mortgagee or deed of trust beneficiary actually   [*114] succeed in conveying a property interest? Second, because financial institutions used MERS to avoid paying billions of dollars in recording fees to county and state governments, should these governments-many of which are facing dire financial crises- be entitled to recoup unpaid recording fees? Third, and perhaps most importantly, does the fact that such fundamental issues remain live controversies tell us something more about the commercial norms our country needs in order to rebuild a trustworthy financial system?

This Article begins with a short introduction to MERS's role in residential mortgage finance, including the still evolving legal foundation of the company's business model. Part II ponders the long-term effects of MERS on land title. Part III explores whether security agreements naming MERS as a mortgagee or deed of trust beneficiary meet traditional common law title conveyance requirements. Part IV explores the financial industry's exposure to county and state government lawsuits seeking to recoup unpaid recording fees. This Article concludes by reflecting on the difficult position facing appellate judges and legislators who will be responsible for resolving these controversies, and that of investors contemplating the purchase of MERS-recorded mortgages.

I. The Evolving Legal Foundation of MERS

Since the founding of the American republic, each county in the United States has maintained records of who owns the land within that county. n7 Most states track changes in ownership of land, including mortgages and deeds of trust, by maintaining records indexed through the names of grantors and grantees. n8 These grantor-grantee indexes allow individuals and businesses contemplating the purchase or financing of land to investigate-or hire a title insurer to investigate- whether a seller or mortgagor actually owns the land being offered for sale or mortgage. n9 Communities traditionally have elected their county recorders or registers of deed;   [*115]  these elections provide an important democratic check and balance in the preservation of property rights. n10 A public, enduring, authoritative, and transparent record of all land ownership provides a vital information infrastructure that has proven indispensible in facilitating not only mortgage finance, but virtually all forms of commerce. n11 County real property records are the oldest and most stable metric tracking the "American dream" of family homeownership. n12

To facilitate their service, county recorders charge modest fees on documents they record. n13 Although the amount and the method of calculating these fees varies considerably, a charge of about thirty-five dollars for a mortgage is typical. n14 County recorders use these fees to fund their offices and to contribute to county and state revenue. n15 Some counties use real property recording fees to fund other county departments such as courts, legal aid offices, schools, and police. n16

For centuries, American mortgage lenders eagerly recorded their mortgages with county recorders because state land title laws created incentives for recording and disincentives for not recording. n17 For example, if a mortgagee fails to record its mortgage properly and then someone subsequently buys or lends against the home and records its in-

terest, the subsequent purchaser or lender often can take priority over the first mortgagee. n18 Similarly, if a mortgagee assigns a mortgage to an investor, that investor eagerly would record documentation reflecting the assignment to protect against the possibility that the original mortgagee would assign the same mortgage to a different investor. n19

[*116]

In the mid-1990s, some mortgage bankers decided they no longer wanted to pay recording fees for assigning mortgages. n20 Securitization-a process of pooling many mortgages into a trust and selling income from the trust to investors on Wall Street n21 -drove this decision. Securitization, also sometimes called "structured finance," usually required several successive mortgage assignments to different companies. n22 To avoid the hassle and expense of paying county recording fees, these mortgage bankers formed a plan to create a single shell company that would pretend to own all the mortgages in the country. n23 According to the plan, the mortgage bankers would never have to record assignments again because the same company would always "own" all the mortgages. n24 They incorporated the shell company in Delaware and called it Mortgage Electronic Registration Systems, Inc. n25

Even though not a single state legislature or appellate court had authorized this change in real property recording, investors interested in subprime and exotic mortgage-backed securities were still willing to buy mortgages recorded through this new proxy system. n26   [*117]   Because the new system cut out payment of county recording fees, recording was significantly cheaper for intermediary mortgage companies and the investment banks that packaged mortgage securities. Acting on the impulse to maximize profits by avoiding payment of fees to county governments, much of the national residential mortgage market shifted to the new proxy recording system in only a few years. Now, about 60 percent of the nation's residential mortgages are recorded in the name of MERS Inc., rather than the bank, trust, or company that actually has a meaningful economic interest in the repayment of the debt. n27 For the first time in the nation's history, there is no longer an authoritative, public record of who owns land in each county.

Instead, MERSCORP Inc., a company closely affiliated with MERS Inc., now maintains an electronic database that tracks mortgage servicing rights-in other words, the right of a company to collect monthly payments on behalf of the actual economic owner or owners of a loan. In lieu of paying county governments, financial institutions pay MER-SCORP membership fees and per-transaction fees for access to the MERS database and to compensate MERS Inc. for pretending to own the mortgages these financial institutions register on the MERSCORP database. n28 Sometimes MERSCORP also tracks beneficial ownership rights-actual assignments-but only if investors willingly volunteer this information. n29 Financial institutions have been cavalier about informing MERSCORP of changes in servicing and ownership rights of mortgages, apparently because these institutions believe no legal penalties exist for neglecting to make this information available.

[*118]

MERS's rights vis-a-vis mortgages registered on the MERSCORP database have created a conundrum for courts, borrowers, and foreclosure attorneys. In boilerplate security agreements included in mortgages all around the country, lenders include the following clause:

"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. n30

This passage, and a similar passage naming MERS the beneficiary in deeds of trust, n31 is confusing at best. On the one hand, MERS purports to act purely as a "nominee"-a form of an agent. On the other hand, MERS also claims to be an actual mortgagee, which is to say an owner of the real property right to foreclose upon the security interest. That a company cannot be both an agent and a principal with respect to the same right is axiomatic. n32 In litigation all across the country, attorneys representing MERS frequently take inconsistent positions on the legal status of the company, depending on the legal issue at hand.

Both the MERS-as-an-agent and the MERS-as-an-actual-mortgagee theories have significant legal problems. If MERS is merely an agent of the actual lender, the source of its authority to list itself as a mortgagee or deed of trust beneficiary under state land title recording acts is unclear. These statutes do not have provisions authorizing financial institutions to use the name of a shell company, nominee, or some other form of an agent instead of the   [*119]   actual owner of the interest in the land. After all, the point of these statutes is to provide a transparent, reliable record of actual-as opposed to nominal-land ownership. n33

Conversely, if MERS is actually a mortgagee, then while MERS may have authority to record mortgages in its own name, both MERS and financial institutions investing in MERS-recorded mortgages run afoul of long-standing precedent on the inseparability of promissory notes and mortgages. Since the nineteenth century, a long and still- vital line of cases has held that mortgages and deeds of trust may not be separated from the promissory notes that create the underlying obligation triggering foreclosure rights. n34  [*120]  These cases do not merely hold that mortgages follow notes as a matter of default law, but that mortgages legally cannot be separated from notes. **Thus, in Carpenter v. Longan, the United States Supreme Court announced the classic statement of this rule: "The note and mortgage are inseparable... An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity." n35**

As a practical matter, the incoherence of MERS's legal position is exacerbated by a corporate structure that is so unorthodox as to be considered arguably fraudulent. Because MERSCORP is a company of relatively modest size, it does not have the personnel to deal with legal problems that its purported ownership of millions of home mortgages creates. n36 To accommodate the massive amount of paperwork and litigation involved with its business model, MERSCORP simply farms out the MERS Inc. identity to employees of mortgage servicers, originators, debt collectors, and foreclosure law firms. n37 MERS invites financial companies to enter names of their own employees into a MERS web page that then automatically regurgitates boilerplate corporate resolutions that purport to name the employees of other companies as certifying officers of MERS. n38 These certifying officers also take job titles from MERS and stylize themselves as either assistant secretaries or vice presidents of MERS, rather than taking titles from the company that actually employs them. n39 These employees of the servicers, debt collectors, and law  [*121]  firms sign documents pretending to be vice presidents or assistant secretaries of MERS Inc. even though neither MERSCORP Inc. nor MERS Inc. pays compensation or provides benefits to them. n40 Astonishingly, MERS "vice presidents" are simply paralegals, customer service representatives, and foreclosure attorneys employed by other companies. MERS even sells its corporate seal to nonemployees on its Internet site for twenty-five dollars each. n41 Ironically, MERS Inc.-a company that nominally owns 50 percent of the nation's residential mortgages-does not have any of its own employees, but still purports to have over twenty thousand assistant secretaries and vice presidents. n42 This corporate structure leads to inconsistent positions, conflicts of interest, and confusion. n43

As millions of foreclosures have worked their way through the judicial system, appellate courts finally have had some opportunities to analyze MERS-based recording. An increasing number of courts are taking a dim view of MERS-recorded mortgages and deeds of trust. To date, every state supreme court that has looked at the issue has concluded that, despite its boilerplate language, MERS is not a mortgagee or deed of trust beneficiary. For example, in Mortgage Electronic Registration System, Inc. v. Southwest Homes of Arkansas, Inc., a first-position lender named MERS as the beneficiary on its deed of trust. n44 Later the borrower took out a second mortgage that did not use the MERS system. n45 When the borrower  [*122]  fell behind on the second mortgage, the subsequent lender's assignee foreclosed without notifying either MERS or the real owner of the first mortgage. n46 When MERS, acting through local counsel, attempted to set aside the foreclosure, a unanimous Supreme Court of Arkansas, with Chief Justice Hannah writing, held that MERS had no property rights with respect to the loan. n47 Even though MERS never had service of process, the court allowed the foreclosure to stand because MERS had lost nothing. n48 In the court's words, "MERS is not the beneficiary, even though it is so designated in the deed of trust." n49

Similarly, the Kansas Supreme Court also has refused to allow MERS to set aside a first mortgagee's default judgment in a foreclosure action. n50 In its opinion, the court diagnosed MERS's schizophrenic self-characterization as a nominee and stated the following:

What meaning is this court to attach to MERS's designation as nominee for Millennia? The parties appear to have defined the word in much the same way that the blind men of Indian legend described an elephant-their description depended on which part they were touching at any given time. n51

In response to both statutory and constitutional arguments, Kansas followed Arkansas's skepticism regarding whether MERS actually owns anything: "MERS did not demonstrate, in fact, did not attempt to demonstrate, that it possessed any tangible interest in the mortgage beyond a nominal designation." n52

While the Arkansas and Kansas cases both involved late efforts by MERS to set aside earlier dispositions, the Supreme Court of Maine reached similar results when MERS itself filed a foreclosure complaint. In Mortgage Electronic Registration System, Inc. v. Saunders, MERS filed a foreclosure complaint, but during the  [*123]  pending case, Deutsche Bank attempted to substitute itself into the action instead of MERS. n53 When the trial court awarded summary judgment to Deutsche Bank, the borrower appealed, arguing that MERS lacked standing and that substitution of

another party during the pending case could not cure this jurisdictional defect. n54 The appeal forced the court to look at the simple question of whether MERS had standing to bring a foreclosure action on behalf of the real economic loan owner. n55 Despite contrary boilerplate language in the security agreement, the court flatly rejected MERS's ownership claim, stating: "MERS is not a mortgagee ... because it has no enforceable right in the debt giving securing the mortgage." n56 Because MERS lacked standing, the court reversed summary judgment to give the borrower an opportunity to "appropriately defend the foreclosure action against the real party in interest." n57

In Missouri, appellate courts have gone a step further in challenging MERS's ownership claims vis-a-vis mortgages tracked on its database. In Bellistri v. Ocwen Loan Servicing, L.L.C., MERS's involvement in the loan effectively led to the stripping of a deed of trust lien from the land. n58 In this case, a debtor borrowed money from a mortgage lending company named BNC Mortgage and signed a deed of trust naming MERS as beneficiary of the trust. n59 After the loan closed, no one paid property taxes on the residence for several years. n60 Eventually the local government established a tax lien and sold the property at auction to Bellistri. n61 Bellistri sent notice of the sale to the original mortgage lender, BNC. n62 While the facts of the case are silent on this point, BNC probably sold the loan to an investment bank for securitization shortly after origination and had no appetite whatsoever for facilitating repayment. Hoping to make [*124]  his rights clear, Bellistri sued in state court to quiet title on the land he had purchased. n63 Because the borrower still had not repaid the debt, Ocwen, a mortgage loan servicing company and alleged successor to MERS, attempted to set aside the tax sale. n64 Ocwen produced an assignment of the deed of trust from MERS to Ocwen that an Ocwen employee, apparently designated as a vice president of MERS, had recorded. The Missouri Court of Appeals treated the recorded assignment as a legal nullity. n65 Unlike many courts that have sidestepped the troubling issues behind the purported severance of mortgages and notes in MERS security agreements, the Missouri Court of Appeals attempted to analyze the issue. Looking to the American Law Institute's Third Restatement of Property Law, the court stated the following:

Typically, the same person holds both the note and the deed of trust. In the event that the note and the deed of trust are split, the note, as a practical matter becomes unsecured. The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note. Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. The mortgage loan became ineffectual when the note holder did not also hold the deed of trust. n66

Ultimately, the court held that "MERS never held the promissory note, thus its assignment of the deed of trust to Ocwen separate from the note had no force." n67 The court effectively quieted title in favor of Bellistri, stripping off the lien.

Collectively, these cases in Arkansas, Kansas, Maine, and Missouri, as well as a growing number of trial court decisions in other states, have cracked the edifice of the Janus-masked fa ade of  [*125]  MERS-recorded mortgages and deeds of trust. Whether financiers will prevail upon courts to grant MERS the power to both own mortgages and represent owners of mortgages at the same time is now legally unclear.

II. Gathering Storm Clouds of Title

While cases successfully challenging MERS's status as a mortgagee or deed of trust beneficiary were litigated in the context of standing to foreclose, they also foreshadow tempestuous title disputes. MERS describes itself as "an innovative process that ... eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans." n68 This phrase, which the company uses both in legal briefs and public relations material, hints that recording assignments in public records is merely a useless, archaic formality. n69 Whether state appellate courts will agree that MERS eliminates the need to publicly record assignments is unclear.

But even if MERS does eliminate the need to record, it most certainly does not eliminate the need for records. The policy justifications behind recording statutes are as germane today as they were hundreds of years ago, when the first American colonies began adopting the statutes. Society needs an authoritative, transparent source of information about who owns land to protect property rights, encourage commerce, expose fraud, and avoid disputes. Recent case law has begun to show gathering judicial skepticism regarding the privatized record keeping system that is displacing public county systems. n70

Apologists for MERS argue that so long as MERS's name appears in county records as a lien holder, prospective purchasers will be on notice that they must inquire further before lending against or buying the land. n71 But who ex-

actly are these purchasers to consult?   [*126]   MERS has maintained a toll-free phone number where homeowners can inquire who holds the servicing rights to their mortgage. n72 But servicers themselves do not always have accurate records of their own. Even if they did, talking to mortgage servicing company customer service representatives, whose business incentives are focused on cutting costs, is often unproductive, slow, and unreliable. n73 In recent years, mortgage servicing and origination companies have gone in and out of business in cycles recalling the permanence of a strobe light. n74 Even federally insured banks have been collapsing by the hundreds. n75 After seeing many loans in her courtroom with incomplete documentation and incoherent transactional records, Judge Jennifer Bailey, a circuit court judge in Miami, recently stated: "[T]here are 60,000 foreclosures filed last year. Every single one of them- ... almost every single one of them ... -represents a situation where the bank's position is constantly shifting and changing because they don't know what the Sam Hill is going on in their files." n76 The MERS database of servicing rights simply does not provide a commercially reliable, authoritative source of lien information because servicers, who are in business to make profit through providing financial services, do not have an incentive to maintain permanent, transparent, publicly available records of mortgage ownership. n77

MERS does not systematically track all beneficial ownership rights of the mortgages registered on its system. n78 Recall that MERS maintains a database that is only updated with information if its members choose to do so. n79 When the beneficial ownership interest   [*127]   in a loan changes hands, such as through negotiation of a promissory note and a written assignment of the mortgage, the parties to that transaction can send an electronic message to MERS updating a field in the database. n80 MERS calls this process an "electronic handshake." n81 But, unlike most county real property recorders, MERS does not keep digital or hard copies of documents that embody such an agreement, n82 making it much more difficult to track fraud and errors through their record keeping system. Even more troubling, it is unclear whether MERS members are legally bound to update this information on the database. n83 In the words of MERS's CEO, the system "is capable of being used to track [beneficial ownership interests] if the members utilize it for that reason." n84 But if the MERS members choose not to use the database to reveal themselves, MERS does not investigate further or otherwise insist that members actually use this feature of the database. n85 Instead, MERS leaves this decision to the business model of the financial institution. n86 When asked whether MERS expects financial institutions to update the MERS database regarding changes in loan ownership, the company's CEO replied, "not so much." n87

MERS appears to recognize that its own database is not reliable. MERS gives the following disclaimer on all search results obtained from its system:

DISCLAIMER: MERS makes no representations or warranties regarding the accuracy or reliability of the information provided. MERS disclaims responsibility or liability for errors, omissions, and the accuracy of any information provided. MERS does not   [*128]   input any of the information found on the MERS System, but rather the MERS Members have that responsibility regarding mortgage loans in which they hold an interest. Users of this information have the responsibility to verify the accuracy, currency and completeness of the information. The information does not constitute the official legal record and is for informational purposes only. The servicer listed should be contacted for further information. n88

In contrast, the public records maintained by county governments do provide a record upon which one can rely, because the act of recording with the county is recognized as legally authoritative under state land title statutes. n89

Moreover, instead of disclaiming all possible liability, most elected county recorders have a tremendous sense of responsibility and pride in maintaining public access to the records that define American property rights. For example, the transcript of a 1994 meeting where MERS proponents pitched the MERS clearinghouse concept to the National Association of Counties illustrates county recorders' perspective. The remarks of an elected recorder from Kentucky provides a compelling contrast between MERS's disclaimer and an elected official's sense of responsibility:

But you see, I am the official custodian of that data base and everything that goes in there is required by Kentucky statutes that says this is what goes in that database that I am officially responsible for, and I'm held accountable for that. If what I am officially responsible for is the assignments then my next door neighbor is going to come in to see his record of assignment... Now, I can provide him access to that... This should be public record and all of a sudden it is no longer a public record. It's an inconclusive file. It went in this black hole called a clearinghouse. n90

   [*129]

At the same 1994 meeting, another county recorder presciently pointed out that "[i]t is a huge project to put this all together, handling this for everybody, all over the nation. If you don't do it 100 [percent] right, it's going to be one big awful mess." n91

In a laudable, but ultimately anemic, effort to respond to these concerns and to mounting criticism of the system's lack of transparency, MERS recently announced a new feature of its Internet web page servicer identification system that allows borrowers to inquire as to the identity of a loan's investor. n92 However, this feature of MERS's interaction with the public has several basic problems. First, unlike the traditional public system, MERS does not reveal to consumers the chain of ownership linking the original lender to the current owner of the loan. MERS also does not provide copies of the documents that purport to transfer ownership interests in the land, making it difficult to spot forgery or errors. n93

Second, the company's press release is somewhat misleading in that, for securitized mortgages, MERS only reveals the name of the securitization trustee, rather than the trust it serves. Private correspondence from MERS's communications manager explains that "the MERS System only has the name of the trustee in the Investor field and does not capture information about the trust." n94 Learning the name of a borrower's securitization trustee does not allow the borrower to research the pooling and servicing agreement that controls a servicer's or trustee's authority to negotiate loan modifications. It also does not identify the name of the trust that could be liable for purchasing loans that violate the Home Ownership and Equity Protection Act or other state predatory lending laws. n95 Even when the borrower knows the name of a securitization trustee, this search result is still not a legally authoritative search upon which a searcher may rely in ruling out the possibility of other potential purchasers that could achieve priority in an ownership dispute. Rather, the search is simply a query to see whether any [*130] companies happened to have used an optional electronic handshake to enter assignment information on a private database. n96

Third, the MERS servicer identification system often does not produce any information on beneficial ownership of loans at all and instead gives the following message: "Investor: This investor has chosen not to display their information. For assistance, please contact the servicer." n97 Note that this sentence is ambiguous as to whether MERS even knows who owns the loan or whether the owner of the loan actually refuses to be identified. The former possibility is disturbing in that it illustrates that we, as a society, no longer have a record keeping system that actually tracks legally recognized ownership interests in land back to the root of title. The latter possibility is disturbing because it reveals how the MERS system has abated an important legal incentive to provide public notice of land ownership interests.

Both updating the MERS database and publicly recording a mortgage assignment are permissive choices for financial institutions. A key difference, however, is that strong legal incentives exist to encourage financiers to provide notice of assignments under the public system. In contrast, the MERS system-designed by and operated for the exclusive benefit of mortgage finance companies-deliberately undermines and altogether lacks that incentive. Under the still-current, but presently circumvented, law of many states, owners of an interest in land may intentionally conceal themselves, but they do so at the risk of losing that ownership interest. n98 In both notice and race-notice jurisdictions, if a mortgage assignee fails to record and the assignor either intentionally or unintentionally assigns the same mortgage to a subsequent assignee who does record, then the first assignee can lose priority. n99 [*131] Where both assignees are using the MERS system, the only officially recorded notice would be the original mortgage in the name of MERS. The MERS database may have no information on whether any assignments have taken place-leaving prospective owners and investors, and courts adjudicating the conflicts that will develop, to speculate on who actually owns rights in the property.

Currently, no legal disincentive exists for failing to update the MERS database on changes in loan ownership. Because many mortgage companies in the boom years planned to sell their loans to investors, they focused on the short-term commissions and profits from originating loans. n100 They did not implement a system that required public documentation that would preserve our national legacy of certainty in property rights. As compared to the public system, the MERS database does not provide reliable, authoritative information on legally cognizable beneficial ownership of loans registered in its system. n101 County real property records that hold only a reference to the MERS system now have a systemic break in chains of title. Perhaps this situation is what MERS means by its corporate slogan: "Process Loans, Not Paperwork." n102

The full risk of confusion and litigation from this system will not be known for years to come. But cases already are emerging that reveal serious clouds on title. For example, in late 2009, a Florida mortgage origination and servicing company called Diversified Mortgage Inc. (Diversified) sued MERS seeking a declaratory judgment to resolve uncertainty over ownership of Florida mortgages registered on the MERS system. n103 In its complaint, Diversified-a mortgage lender, rather than a borrower-alleged the following:

While the MERS system may benefit its members by enabling them to sell, transfer, and assign mortgages amongst themselves without the burden of documenting their transactions on paper or in the public records, this system has wreaked havoc on our nation's homeowners. In fact, the system implemented by MERS [*132] has essentially pri-

vatized mortgage records while undermining the value of county public records. No longer can a homeowner visit a government office, review the public records, and learn the identity of who actually owns his mortgage. Doing so today will only lead to the discovery that MERS is acting as nominee for whichever of its paying members currently owns the mortgage in question. While MERS may know which member owns a particular mortgage, the public cannot access the MERS system; it is a private virtual playground intended for members only. In essence, MERS' stance towards home-owners can be summarized as: "one of our members owns your mortgage and that is all you need to know." While some stories of the aftermath resulting from this secretive system have come to light, such as those of homeowners who want to work with their lenders to avoid foreclosure, but are unable to identify their lenders, the full extent of the damage has yet to unfold. n104

While hearing this argument from a mortgage origination and servicing company must be edifying for critics of MERS, the case is more interesting because of allegations about MERS's role in facilitating ownership disputes. In its complaint, Diversified alleged that MERS may have allowed trading partners of Diversified to list themselves as owners of Diversified's loans without permission from Diversified. n105 When the lender asked MERS to produce a list of all Diversified's trading partners that may have claimed to own some of Diversified's loans, MERS either could not or re-fused to do so. n106 After persistent requests for more information, Diversified alleged that MERS employees became "confusing and hostile," and "demanded that Diversified not attempt further contact with MERS." n107 Diversified also alleged it was "[d]umbfounded as to why MERS would cease communicating with a member mortgage company, and refuse it the basic information to which it was entitled." Diversified "attempted further contact with MERS," but to no avail. n108 Eventually, Diversified learned that other third-party  [*133]   financial institutions had initiated foreclosure proceedings on mortgages that Diversified believed it owned. n109

While this incident is only one example, some of the appellate courts that have criticized the MERS system foretell further long-term uncertainty surrounding property rights connected to MERS's claims of ownership. For example, rec-ognizing the implications of its own decision in Landmark National Bank v. Kesler, the Kansas Supreme Court pointed out that "[i]n attempting to circumvent the statutory registration requirement for notice, MERS creates a system in which the public has no notice of who holds the obligation on a mortgage." n110 The Supreme Court of Arkansas went even further, stating that "[p]ermitting an agent, such as MERS purports to be to step in and act without a recorded lender directing its action would wreak havoc on notice in this state." n111 And yet, the MERS system is designed to do precisely that. Prototypical MERS-as-original-mortgagee transactions have no recorded lenders. n112 MERS is de-signed to be the cradle-to-grave notice proxy for all the half-dozen or so financial institutions and shell companies that hold title to the loan at different times, yet remain undocumented both in the public record and often on MERS's own database.

III. MERS and the Problem of Conveyance

If the growing line of cases asserting that MERS is neither a mortgagee nor a deed of trust beneficiary is correct, then courts soon must confront profound questions about the very enforceability of MERS's security agreements. Not merely an ancillary issue, MERS registered loans have fundamental problems related to the very nature of what a mort-gage is. A compelling legal argument exists that loans originated through MERS fail to create enforceable liens.

[*134]

MERS's security agreements name MERS as the mortgagee or deed of trust beneficiary. n113 Loans originated with MERS as the original mortgagee purport to separate the borrower's promissory note, which is made payable to the originating lender, from the borrower's conveyance of a mortgage, which purportedly is granted to MERS. If this sepa-ration is legally incorrect-as every state supreme court looking at the issue has agreed n114 -then the security agree-ments do not name an actual mortgagee or beneficiary. The mortgage industry, however, has premised its proxy record-ing strategy on this separation, despite the U.S. Supreme Court's holding that "the note and mortgage are inseparable." n115 If today's courts take the Carpenter decision at its word, then what do we make of a document purporting to create a mortgage entirely independent of an obligation to pay? If the Supreme Court is right that a "mortgage can have no separate existence" from a promissory note, n116 then a security agreement that purports to grant a mortgage inde-pendent of the promissory note attempts to convey something that cannot exist. n117

While this argument surely will strike a discordant note with the mortgage bankers who invested billions of dollars in loans originated with this simple flaw, the position is consistent with a long and hitherto uncontroversial line of cases. Many courts have held that a document attempting to convey an interest in realty fails to convey that interest if the document does not name an eligible grantee. n118 Courts around the country have long held that "there  [*135]   must be, in every grant, a grantor, a grantee and a thing granted, and a deed wanting in either essential is absolutely void."

n119 Indeed, this common sense rule dates back to Blackstone's Commentaries, which stated: "[What are] the requisites of a deed[?] ... [T]here [must] be persons able to contract and be contracted with for the purposes intended by the deed: and also a thing, or subject- matter to be contracted for; all which must be expressed by sufficient names." n120 More recently, Patton and Palomar's treatise agreed: "It is axiomatic that a deed will be inoperative as a conveyance unless it designates someone to whom the title passes. A grantee is as necessary to the validity of a grant as that there should be a grantor or a property granted." n121

An 1862 New York Court of Appeals case illustrates this point. In Chauncey v. Arnold, a debtor attempted to create an "in blank" mortgage comparable to a negotiable instrument payable to bearer. n122 Rather than specifying the name of the actual mortgagee, the debtor left the name of the mortgagee blank, presumably with the intention of facilitating a subsequent transfer of the mortgage to any interested party willing to invest in it. n123 This temporary exclusion might make some sense in that writing a security agreement with no stated mortgagee might have the potential to facilitate easy transfer of the mortgage, just like banks quickly transfer personal checks that payors have endorsed in blank. Leaving the name of the mortgagee silent was likely an effort to eliminate the need to draw up, and perhaps pay record- ing fees on, a subsequent assignment of the mortgage.

[*136]

Unlike mortgages, promissory notes and drafts may be made "payable to bearer." n124 This legal language in an instrument allows any person in physical possession of the bearer paper-including even a thief-to demand payment from the maker in the case of a note, or the drawee in the case of a draft. n125 Negotiable instruments have this feature be- cause the architects of Article 3 of the Uniform Commercial Code, following the English common law set out by Lord Mansfield that preceded it, believed that transfer of the right to receive payment by mere possession of the instrument was useful in enhancing the liquidity of the payment right. n126 Nonetheless, in Chauncey, the trial court, intermediate appellate court, and New York's highest court all agreed that the attempt to convey an in blank mortgage failed. n127 As the Court of Appeals explained, "[n]o mortgagee or obligee was named in [the security agreement], and no right to maintain an action thereon, or to enforce the same, was given therein to the plaintiff or any other person. It was, per se, of no more legal force than a simple piece of blank paper." n128

The Supreme Court of California reached a similar result in a deed of trust case. In Trout v. Taylor, a shady finance company induced "an elderly woman, without business experience, and of very limited schooling and education" to sign a blank deed conveying her land. n129 After execution and delivery of the deed, the finance company filled in the name of company insiders, took out a few loans against the land, and sold them to investors. n130 In analyzing whether the deed was enforceable, the court pointed to the absence of a named grantee, and held that "the deed in question was not voidable, but was void in toto; a nullity." n131

An Illinois Supreme Court case provides an interesting contrast. In Richey v. Sinclair, a debtor simultaneously signed a promissory   [*137]   note and a mortgage. n132 The note specified the name of the creditor, but due to a drafting error, the mortgage did not specify the creditor's name, leaving the identity of the mortgagee unintentionally ambiguous. n133 While the Illinois Court of Appeals held the mortgage was unenforceable, the Illinois Supreme Court reversed. n134 The court agreed in principle that mortgages that do not specify a mortgagee are unenforceable. n135 But it pointed out that particular circumstances of the case-including the simultaneously executed promissory note iden- tifying a payee, and boilerplate language within the mortgage document indicating that the mortgagee was the same person as the note payee-made the identity of the mortgagee sufficiently clear to remain enforceable. n136 In compari- son, the case for enforcement of MERS loans is arguably worse because MERS never appears on the promissory note and is a different party than the actual economically interested business.

There are the occasional cases in which some form of agency relationship or nominal mortgagee is held not to in- validate a mortgage. For instance, Louisiana's pre-UCC civil code mortgage law seems more tolerant of nominal mort- gagees. For example, in the 1919 case of Commercial Germania Trust & Savings Bank v. White, the Louisiana Su- preme Court allowed a prospective borrower to list what it called a "nominal mortgagee" when the borrower made a bearer paper promissory note with no payee listed at the outset of the transaction. n137 When the bearer paper note was later negotiated for value to a third party by the mortgagor, the Louisiana Supreme Court labeled the original mortgagee a "nominal mortgagee" and held that the lien was still valid. n138 However, this case is distinguishable from MERS cases because the origination documents did not separate the note from the mortgage by naming a different payee in the note than the mortgagee listed in the security agreement. n139 Since the note was payable to the bearer, it left open the [*138]   possibility that the mortgagee could be the bearer of the note, and thus did not run afoul of the much more es- tablished line of cases holding that mortgages are inseparable from notes. n140 But even more fundamentally, any sup-

portive case MERS and its members find will still have the potential to be distinguished by a state supreme court, including Louisiana, that believes its legislature did not authorize this type of change to the system. And those courts will be on solid ground because, realistically, state legislatures and the common law simply have not willfully granted permission for one shell company, owned by banks and operated from Washington, D.C., to act as the entire nation's pretend owner of mortgages. Land title statutes and the common law of property conveyance contemplate recording and transfer by many different actual mortgagees and deed of trust beneficiaries, n141 not by one single shell company that stands in the place of the entire industry. The mortgage industry will not find a case that binds a state supreme court to hold otherwise because no fact pattern has emerged in American history that would have given a state supreme court the opportunity to ratify this radical change to the land title statutes and our common law heritage of mortgage origination.

The Chauncey decision from New York and cases like it have long lain dormant as settled and uncontroversial law. n142 Indeed, since the mid-nineteenth century, the often harshly introspective New York appellate courts have never limited or distinguished Chauncey. The reason must lie in a simple, common sense recognition that we ought not allow parties to transfer interests in land if the true identity of the party that receives the granted land is not plain, clear, and presently revealed at the time of the attempted conveyance. Unlike simple monetary payment rights that habitually are created and extinguished every day of a consumer's life, the conveyance of land has a special place in American law. n143 The lives  [*139]  and fortunes of generation after generation of America's middle class turn more on their ownership of land than on any other asset. n144 Just like the Chauncey court, American jurists traditionally have recognized that the conveyance documents of land rights must memorialize ownership carefully and clearly. n145 If a grantor-be it a prospective mortgage debtor or even one who wishes to convey fee simple title to land as a gift-wants to transfer an ownership interest in that land, surely the grantor easily can specify who will receive it in the document that purports to make the conveyance.

Reminiscent of the Chauncey facts, MERS mortgages and deeds of trust attempt to create the equivalent of bearer paper mortgages. Just as the debtor in Chauncey left the name of the mortgagee blank, debtors in MERS-as-original-mortgagee loans do nearly the same thing by attempting to convey the property interest to a nationally ubiquitous proxy that has no meaningful financial intention of taking that interest. The line of cases that hold MERS is not a mortgagee suggests that MERS security agreements are essentially silent on the identity of the mortgagee. By inducing debtors to specify a hollow placeholder as the grantee of their property interests, mortgage bankers have attempted to create a completely fungible mortgage in which the true owner of the lien, or the land itself in title theory states, becomes whomever the error-prone, virus-infected computer records of mortgage loan servicers say it is. n146

Even under the jurisprudence most favorable to MERS with respect to the severability of notes and mortgages, whether MERS-as-original-mortgagee security agreements can effectively convey a mortgage remains unclear. Some courts have held that under very limited circumstances, mortgages are severable from notes, but that prior to foreclosure, the ownership of the note and the mortgage must be unified in one party that both suffers a default and asks the [*140]  court for a remedy. n147 Under this view, some courts might be willing to reunite the mortgage with the note, possibly satisfying some concerns over standing to foreclose. n148 But even this controversial line of cases, which is not supported by the U.S. Supreme Court's decision in Carpenter, does not clearly stand for the proposition that a contract can create a mortgage severed at the outset from an obligation. Such a view would require the reversal of cases like Chauncey and would risk great mischief in property conveyance law, which has always had high standards for clarity of language in deeding and bequeathing property. n149 This rule therefore is tantamount to allowing the conveyance of a property interest that is unenforceable because the mortgage grantee would not have a foreclosure right. To convey a mortgage that does not include a foreclosure right is to convey nothing at all. Moreover, allowing the creation of a mortgage separate from the note will expose mortgagors to a constant threat of double liability because the holder of the promissory note and a different owner of the mortgage may both show up at different times demanding payment. n150 Over the long term, the more simple, sustainable, and conflict-deflating rule will be to follow the U.S. Supreme Court's position in Carpenter that mortgages and deeds of trust remain inseparable from the obligation that triggers foreclosure rights.

[*141]

In a stunning betrayal of the policies that ground the ancient statute of frauds principle, which commands that we commit transfers of land interests to writing, n151 mortgage bankers using MERS wrote millions of mortgage loans that did not specify the actual mortgagee. For over one hundred years, U.S. courts have held that "legal title to real property cannot be established by parol." n152 Had the parties to these transactions simply specified in the documents who owns what, they could have avoided a vast amount of confusing litigation and commercial uncertainty. These anchorless liens

now flail in the wind of our commercial tempest. Courts that come to understand this situation will be in a bitter predicament. On the one hand, if they employ a tough-love policy-invalidating liens because the liens do not specify a mortgagee-courts will throw the mortgage market into further turmoil. On the other hand, if the courts write opinions allowing MERS to act as a ubiquitous national proxy mortgagee, courts will write into the American common law fundamental legal mischief that will plague generations to come.

In the short term, granting the true loan owner, if one can be identified, an equitable mortgage could temper the harsh consequences of opinions that insist on security agreements that name an actual mortgagee. Traditionally, courts of equity were sometimes willing to imply an equitable mortgage in cases in which the parties to the transaction intended to have security for the loan, but failed to comply with formal conveyance requirements. n153 Generally speaking, the elements of an equitable mortgage include the following:

(1) the mortgagor has a mortgageable interest in the property sought to be charged as security;

(2) clear proof of the sum which it was to secure;

(3) a definite debt ... to be secured, due from the mortgagor to the mortgagee; and

[*142]

(4) the intent of the parties to create a mortgage, lien or charge on the property sufficiently described or identified to secure the obligation. n154

The sensible policy behind the rule is to give effect to the substance of the transaction rather than its form. n155 This equitable doctrine seems to fit the circumstances of MERS-as-mortgagee loans because borrowers clearly intended to grant security interests. Generally, reasonable borrowers should not expect to receive a home for free. Awarding equitable mortgages to securitization trusts could strike a reasonable balance in the interests of borrowers and lenders without ignoring the fact that the standard security agreement does not name an actual mortgagee.

Even in the absence of an equitable mortgage, borrowers that did not succeed in conveying a lien still signed the promissory note and generally will owe an unsecured debt. Creditors can sue on unsecured debts and, within the limits of state-exempt property statutes, obtain judicial liens on family homes. n156 Of course, this process is more time consuming than foreclosure and is subject to intervening liens. Moreover, it will be more difficult given the state of the financial industry's records. Given this situation, some judges in the trenches of judicial foreclosure have already held that the mortgage industry's reckless underwriting of unsuitable loans and irresponsible documentation of ownership justifies extreme equitable remedies. n157

[*143]

While awarding equitable mortgages surely is a better approach for financiers and their investors than simply invalidating liens, this solution would not solve all of their problems. Replacing legal mortgages with equitable mortgages would give borrowers and subsequent lien holders significant leverage. Historically, state law has not uniformly treated equitable mortgages vis-a-vis other competing creditors. Although the holder of an equitable mortgage generally had priority against judgment creditors, n158 an equitable mortgage likely could be avoided in bankruptcy proceedings. n159 Moreover, financiers likely would have less luck seeking deficiency judgments when foreclosing on equitable mortgages. n160 Perhaps most importantly, as financiers bargain in the shadow of losing their legal mortgage, they might become more inclined to offer realistic modification agreements. The judicial threat of invalidating mortgages and replacing them with less tactically useful equitable mortgages could decrease courts' dockets by forcing securitization trustees and servicers to the negotiating table.

IV. What About the Money? The Right of Counties To Recover Unpaid Recording Fees

At the most simple level, mortgages and deeds of trust recorded at origination represent that MERS is the mortgagee or deed of trust beneficiary. n161 Taking the appellate decisions in Arkansas, Kansas, Maine, and Missouri at face value, n162 mortgages naming MERS as the mortgagee contain a false statement. Accordingly, MERS and its members use false information to avoid paying recording fees to county governments. While MERS-recorded mortgages and deeds of trust have qualifying language suggesting that MERS is also a nominee, n163 the representation that MERS is the owner of the lien is not some innocuous legalism. It causes county  [*144]  recorders that maintain grantor-grantee indexes to list MERS in the chain of title for the land. The false designation of MERS as a mortgagee or beneficiary creates a false lead in the true chain of title that defeats an essential purpose of recording mortgages and deeds of trust.

Perhaps even more troubling are the documents recorded in the name of MERS later in the life of mortgage loans. Recall that MERS's business model does not include MERS actually recording documents relating to its purported ownership. n164 Instead, it allows employees of mortgage servicing companies and law firms to do so on its behalf. n165 MERS has a web page in which mortgage servicers and law firms can enter names of their own employees to automatically produce a boilerplate corporate resolution that purports to designate the servicers' and law firms' employees as certifying officers of MERS with the job title of assistant secretary, vice president, or both. n166 These servicer and law firm employees then sign and record documents such as mortgage assignments, substitution of deed of trust trustees, substitutions of deed of trust beneficiaries, and mortgage releases-all including the representation that they are MERS vice presidents or assistant secretaries. Some states require that the individual signing a document conveying a corporation's interest in land have the job title of vice president or higher. n167 Surely, this policy is to better assure that the signatory has the requisite authority and can thereby better prevent mistakes, confusion, and disputes over land ownership. But many servicer and law firm employees unnecessarily use the vice president title- perhaps just because it just sounds better.

And yet, this representation is not true. The representation that employees of mortgage servicing companies and foreclosure law firms are vice presidents of MERS is, at best, disingenuous. In the English language, the term vice president primarily means "an officer next in rank below a president and acting as president in case of that officer's absence or disability." n168 Sometimes, vice [*145] president can mean "one of several officers serving as a president's deputies in charge of particular locations or functions." n169 The reality of what MERS vice presidents actually do, from whom they receive their paychecks, and their actual job titles is fundamentally inconsistent with a corporate officer that serves as president when the president is disabled or acts as the president's deputy.

A deposition transcript taken from a foreclosure case brought by a Florida debt collection law firm is illustrative. n170 The deponent was a nonattorney employee of the firm that was claiming MERS certifying officer status. n171 The employee was responsible for signing twenty to forty mortgage assignments per day that MERS would record with county officials. n172 The firm's rationale for allowing this action was one of the boilerplate corporate resolutions taken off of MERS's website that stated: "The attached list of candidates are employees of Florida Default Law Group and are hereby appointed as assistant secretaries and vice-presidents of MERS." n173 When this vice president of MERS was asked about her relationship with MERS she responded as follows:

Q Did you have to have any sort of training to become a Certified Officer?

A No.

Q Do you know where MERS is located?

A No.

Q Have you ever been there?

A No.

Q Have you ever spoken with anyone at MERS?

A No.

Q Have you ever had e-mail transmissions back and forth with anyone from MERS?

A No.

...

Q Do you file any reports with MERS relating to assignments?

A No.

 [*146]

Q Do you know who the president of MERS is?

A No.

Q And I guess at some point, somebody explained to you that you were a Certified Officer is that correct? ...

A Yes.

53 Wm. & Mary L. Rev. 111, *

Q And what do you remember as to their explanation as to what that meant?

A Why I was being chosen as a Certified Officer?

Q Yes.

A That it was actually a group of us, we had one meeting and they explained that people that had an understanding of what an assignment was were going to go ahead and become certified officers because we then had authorization to execute on behalf of MERS. n174

That MERS can consider an individual who is not an employee of the company, has never been to the company's location, does not know where the company is located, has never met the company's president, does not know who the president is, and has never communicated personally with the company in any way to be a vice president of that company is inconsistent with even the most expansive definition of the term vice president. A belief is not true simply because it is convenient.

Perhaps the designation of servicer and law firm employees as assistant secretaries of MERS is less absurd, but it is still misleading. While many of these servicer and law firm employees are secretarial workers in the businesses that actually employ them, they are not assistant secretaries of MERS in any meaningful economic sense. They have no more contact with MERS than MERS's so-called vice presidents do. Indeed, the fact that MERS's boilerplate resolutions allow the employees to pick which title they want to use is compelling evidence that the whole concept is twaddle. MERS does not pay assistant secretaries, and they receive no employee benefits. In another example of Orwellian doublespeak, the financial institutions and law firms pay MERS to allow them to pretend that they have MERS employees. n175 Who pays to be an  [*147]  assistant secretary? n176 While mortgage brokers and financiers may be keen on entrusting the nation's real property records to a company with these standard business practices, one can imagine that this situation might make the democratically-elected county recorders that have dedicated their professional careers to preservation of land ownership rights somewhat uncomfortable.

County recorders deserve payment of recording fees for assignments avoided through the use of documents containing false statements. Recording of these documents caused a reduction in the revenue that county governments would have collected from mortgage financiers. MERS used projections of this reduction in revenue in its sales pitches and marketing material. n177 Indeed, the studies done by accountants that justified the creation of MERS show how use of the MERS system, which entailed recording arguably false documents, would cause a reduction in fees paid to counties. n178

But perhaps most compelling, pooling and servicing agreements packaging mortgage loans into securities legally require finance companies to publicly record, and pay recording fees on, every assignment of a non-MERS mortgage loan from origination through deposit in a securitization trust. A 2005 Pooling and Servicing Agreement between J.P. Morgan Chase's subprime subsidiary as a depositor, J.P. Morgan Chase's actual bank as servicer, and Wachovia Bank as trustee provides a typical example. n179 The pool  [*148]  included both non-MERS and MERS loans but had different assignment recording warranties for each. n180 In the agreement, J.P. Morgan Chase's subprime subsidiary promised to turn over to the securitization trustee "[o]riginals of all recorded intervening Assignments of Mortgage, or copies thereof, certified by the public recording office in which such Assignments or Mortgage have been recorded showing a complete chain of title from the originator to the Depositor, with evidence of recording." n181 Conversely, in the case of MERS-recorded loans, the same agreement does not require recording of intermediate assignments. Instead, it only requires the depositor to take "such actions as are necessary to cause the Trustee to be clearly identified as the owner of each such Mortgage Loan on the records of MERS." n182 In this typical securitization deal, J.P. Morgan Chase used the MERS system to duck a contractual obligation it otherwise would have incurred to produce recorded assignments for every non-MERS loan included in the pool-even though counties depend on the revenue that those assignments produce.

To many outside the finance industry, using false documents to avoid paying fees to the government sounds a lot like tax fraud. If county governments sue to recover unpaid recording fees, MERS and its member financiers will probably argue that tax fraud is distinguishable from using false documents to avoid paying recording fees. In typical cases of unpaid taxes, some underlying obligation to pay exists by virtue of statutory tax law. But in recording fee cases, the underlying choice to record a mortgage or assignment and pay the required fee is permissive under state land title laws. n183 Thus, the following argument exists: while the use of allegedly false statements may have caused financiers to choose not to pay recording fees, financiers were free to assume the risk of this choice. Taxes, unlike recording fees, are not permissive.

However, courts offended by financiers using allegedly false documents to avoid paying fees do not need to play the financier's music as written. The common law of unjust enrichment suggests one possible route for recovery of county recording fees. The general  [*149]  principle of unjust enrichment is that a person ought to make restitution for the reasonable value of unfairly received property or services. n184 Although a complete discussion of this ancient and complex legal doctrine is beyond the scope of this Article, three elements are typical in most states:

(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. n185

County recorders provide a service of promulgating legally sufficient public notice of real property liens in exchange for a fee; this service is also known as "perfecting." n186 Members of the MERS system certainly appreciate and understand the importance of perfecting, and maintaining perfection of, their mortgages. The more difficult question is whether it is inequitable for financial institutions participating in private securitization conduits, where loans are transferred three, four, or even more times, to receive the benefit of a continuous and seamlessly perfected mortgage when they used false statements to pay only one recording fee.

Many cases allow restitution for the value of services provided in enhancing land ownership rights. A common narrative in these cases arises where laborers, contractors, and subcontractors make improvements to land where there is no contractual basis for recovery. In typical cases, a landowner retains a contractor to improve land, and then the contractor hires a subcontractor. The subcontractor makes improvements but is not paid by the contractor-often because of insolvency. Courts facing this situation have frequently forced the landowner to pay restitution to the subcontrac-  [*150]  tor when the landowner has not already paid the contractor for the services rendered by the subcontractor. n187 Such lawsuits may be particularly viable where there is "evidence that the owner misled the subcontractor to his or her detriment, or that the owner in some way induced a change of position in the subcontractor to his or her detriment, or some evidence of fraud by the owner against the subcontractor." n188 The pattern of facts facing county recorders is different in that the services county recorders provide increase the value of a mortgage, rather than fee simple land ownership interest, but it is hard to see why this is a difference that ought to matter. The MERS system is similar to these cases in that the investment banks that sold mortgage loans into securitization trusts attempted to avail themselves of the benefit of selling a properly recorded mortgage without paying the costs of proper recording. Also, these financial institutions obtained this service without paying its full cost through recording false statements with county officials.

Moreover, it makes no difference that the plaintiffs in these cases would be county governments rather than private litigants. Historically the law of unjust enrichment has more generously favored granting restitution to county governments for recovery of mistakenly bestowed benefits. n189 For instance, the American Law Institute's Restatement of Restitution states that:

A person who has conferred a benefit upon another because of an erroneous belief induced by a mistake of law that he is under a duty to so do, is entitled to restitution as though the  [*151]  mistake were one of fact if ... the benefit was conferred by a State or subdivision thereof. n190

This rule is even more protective of county governments than ordinary citizens in that many jurisdictions only grant restitution to private litigants for mistakes of law where they are accompanied by misrepresentation. n191 The public policy behind lowering the bar for county restitution suits comes from the special role of government and the need to protect public funds and publicly funded services. While these cases generally involve recovery of funds paid rather than the value of services provided, the combination of this line of cases with those awarding restitution for services rendered in improving the value of land ownership rights is a compelling foundation of precedent upon which county governments might proceed. n192 Moreover, lest one doubt the potential for significant liability to municipal and county governments based on restitution theories, one need only recall that some of the successful tobacco litigation cases were premised on restitution for medical expenses paid by governments in treating diseases of uninsured tobacco smokers. n193

Furthermore, a lawsuit to recover unpaid county recording fees could be buttressed by the argument that MERS and its members should be judicially estopped from denying liability for unpaid recording fees. Courts have held that "a party will not be permitted to maintain inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, or was chargeable with, full knowledge of the facts." n194 The policy behind judicial estoppel is "to preclude one who prevents a thing from being done from availing himself of the nonperformance which he has himself  [*152]  occasioned." n195 Courts are particularly likely to use estoppel where the party making inconsistent representations accepts some benefit from the misrep-

resentation. n196 At the time of origination, and in many foreclosure cases, members of the MERS system maintain that MERS owns the mortgage. But when the time comes to deposit the mortgage loan into a securitization trust, they maintain that the depositor owns the mortgage. n197

The J.P. Morgan Chase securitization pooling and servicing agreement is again illustrative. Through this agreement the depositor warrants that "the Mortgage Loan, including the Mortgage Note and the Mortgage, [are] not subject to an assignment or pledge, and the Depositor had good and marketable title to and [is] the sole owner thereof." n198 Trust depositors claim to own the mortgage they are selling to investors because they want to ensure that courts will recognize the trust's assets as purchased through a true sale. True sale opinions were a sine qua non of securitization deals because rating agencies would not give satisfactory credit ratings to securities drawn from pools of assets that the trust does not actually own. n199 And all rights to a mortgage loan must be deposited into the trust for it to achieve tax exempt status under federal REMIC law, which does not contemplate the use of a proxy mortgagee. n200 Yet despite claiming sole ownership of mortgages sold to investors, these same institutions maintain that MERS is the sole owner of the mortgage in documents regularly recorded with county officials.

The chain of financial institutions linking originators to securitization depositors collectively want to have their lien and sell it too. When financiers talk to investors, they claim to own mortgages to convey the sense that they own what they are selling. But when   [*153]   financiers talk to the government, they claim not to own what they are selling so as not to obligate themselves to pay fees associated with owning it. MERS and its members avoid the payment of recording fees on assignments-the whole point of MERS- but then attempt to avail themselves of the protection that such an action would have afforded. The law of judicial estoppel gives state courts the power to pull back MERS's two-faced mask by estopping financial institutions from denying liability for intermediate recording fees.

Of course the equitable remedy of judicial estoppel requires courts to consider whether justice is served by requiring financial institutions to pay fee assignments that were left unrecorded through use of MERS's subterfuge. Here, a stark and ironic contrast exists between some of the largest financial institutions that benefited from the recording subterfuge and the budget crises facing many county governments. While financial institutions are defending the practice of recording arguably false documents to avoid paying modest fees, county governments have been laying off teachers, n201 firefighters, n202 police officers, n203 and infectious disease clinic workers; n204 closing   [*154]   criminal detention centers for violent juveniles; n205 and shuttering courthouses. n206 Surely some courts will find it offensive for the mortgage industry to argue that it can use false documents to avoid paying recording fees at a time when counties are laying off elementary school street crossing guards. n207

   [*155]

V. Rebuilding a Trustworthy Real Property Recording System

Counsel for financial institutions, federal and state housing agencies, and title insurance companies need to take a candid, reflective look at the implications of mortgage bankers' efforts to usurp government control of real property records. Even those who prefer minimalist government must recognize that in a democratic republic, divestment of this responsibility from government to industry should occur only with the consent of elected representatives of the people. In this case, the early involvement of Fannie Mae and Freddie Mac-federally sponsored corporations that deserve respect for their efforts to facilitate American homeownership-did not dispense with the sovereign right of state governments to control their own real property recording law. Laws for the states are made by the states, not by government-sponsored enterprises (GSEs). Fannie Mae and Freddie Mac could take a step toward restoring national trust by stepping away from the MERS system and requiring traditional recording practices in qualified loans. With their many critics in Congress, the last thing the GSEs need is to take on the political and legal risks associated with MERS. n208

As financial services companies begin to rebuild their loan portfolios and take steps toward restarting the securitization of residential mortgages, they should insist that mortgage brokers and originators deliver only non-MERS loans. Underwriters, as well as credit rating agencies, should demand much more careful attention to indicia of credit quality, as well as legal formalities such as physical note delivery and mortgage recordation. The "Process Loans, Not Paperwork" mantra still espoused by MERS n209 is a symptom of the industry's cavalier and self-defeating attitude toward attention to detail. Legal compliance-apparently what MERS calls "paperwork"-may create short-term savings for brokers and servicers, but it does so at the expense of substantial long-term risks and headaches for consumers, subsequent investors,   [*156]   and title companies. Legal counsel for title insurance companies in particular should counsel their clients on the need to adjust insurance underwriting to reflect potential exposure to MERS liability. Refusing to insure MERS loans is perhaps too drastic a step and would clog up the liquidity of the housing market, but charging a steeper premium to reflect the real and growing risks associated with MERS's purported ownership makes sense.

Communities around the country have elected and hired county recorders to act as the custodians of their property rights. n210 Those recorders who agree that the MERS system poses a threat to real property records have an obligation arising from their office to reclaim and restore faith in land title records. While some individual county recorders may reasonably feel reluctant to take on a powerful national system backed by some of the nation's largest financial institutions, this is precisely what they were hired to do when necessitated by the course of events. If county recorders do not protect county real property records, who will? A pathway to reclaiming authority over real property records could involve joining with other recorders to raise a unified voice. State and national county recorder trade associations could have a significant impact on pending cases by submitting amicus curiae briefs. Courts are likely to respect county recorders' expertise in maintaining and preserving transparent records, both because of recorders' experience and because of their democratic mandate. Even more to the point, county recorders should consider appealing directly to the courts to stop financial institutions from recording these documents. In lawsuits to recover unpaid recording fees, counties could hire private counsel on contingent fee agreements that would place no financial burden on county taxpayers.

The more hesitant recorders will hold up the New York Court of Appeals decision in MERSCORP v. Romaine as an argument for inaction. n211 In that case, the clerk of Suffolk County, New York, obtained an opinion from the Attorney General of New York stating that the MERS system illegally circumvented New York's real   [*157]   property recording statute. n212 Based on this opinion, Suffolk County began refusing to accept MERS documents for recording. n213 MERS sued, and Romaine appealed the Appellate Division's ruling up to the highest court in New York on an expedited basis. n214 In a split decision, the New York Court of Appeals sided with MERS, holding that the Suffolk County clerk did not have the statutory authority to refuse to accept documents for recording. n215

Although MERS succeeded in forcing Suffolk County to accept MERS documents, the scope of the Romaine decision is actually quite narrow. The case merely holds that county recorders, as ministerial officers, cannot decide which documents to accept. n216 As a concurring opinion explicitly stated, the decision saved for another day all of the other pressing questions, including whether MERS-recorded documents actually provide valid notice under New York law and whether mortgages can be severed from notes. n217 The opinion also does not address-perhaps because the justices were unaware of it-MERS's highly questionable practice of having thousands of vice presidents all over the country. n218 Moreover, the final appeal was decided in 2006, at a time when the mortgage industry still appeared to be flying high. Whether the outcome of the case would have been the same had it been decided a year or two later is unclear. Other state supreme courts will address this issue de novo, and very well may view the New York decision with the critical eyes of hindsight. Ultimately, Chief Judge Kaye's prescient dissenting opinion may prove more persuasive:

The lack of disclosure may create substantial difficulty when a homeowner wishes to negotiate the terms of his or her mortgage or enforce a legal right against the mortgagee and is unable to learn the mortgagee's identity. Public records will no longer contain this information as, if it achieves the success it envi-   [*158]   sions, the MERS system will render the public record useless by masking beneficial ownership of mortgages and eliminating records of assignments altogether. Not only will this information deficit detract from the amount of public data accessible for research and monitoring of industry trends, but it may also function, perhaps unintentionally, to insulate a noteholder from liability, mask lender error and hide predatory lending practices. n219

Especially in states such as Arkansas, Florida, Kansas, Maine, and Missouri- where courts are already on record as taking a dim view of the MERS system n220 -a unified legal challenge by county recorders would be a formidable blow to the long-term prospects of the MERS system.

Even county recorders who are reluctant to enter into court battles still can exert a positive influence on the law by encouraging state legislators to explicitly reassert traditional principles of recording law. State legislators should, at a minimum, consider enacting explicit bans on the use of nominees to obscure actual economic ownership of interests in land from the land records. Legislatures also could explicitly require that county records include recorded assignments reflecting each transfer of beneficial ownership of the loan from the original lender to the current owner prior to allowing home foreclosure, especially in nonjudicial foreclosure states. n221 Moreover, state legislatures should consider legislation clarifying that a recording in the name of a nominee does not provide notice sufficient to perfect a mortgage or deed of trust within that state. This provision would empower a state's citizens with substantial negotiating leverage and- particularly in struggling states such as California, Florida, Nevada, and Ohio-would inject tremendous new energy into financial institutions' thus far lackluster efforts to modify ill-advised loans.

Also, the time may have come for learned legal associations, such as the American Law Institute and the National Conference of Commissioners on Uniform State Laws, to develop a model law   [*159]   assisting legislators in reasserting the need for, as well as the reforming of, public land title records. Looking toward the future, states need to cre-

ate modern, uniform standards to facilitate efficient electronic recording without jettisoning democratic government control of this vital infrastructure. In particular, the American Law Institute and the National Conference of Commissioners on Uniform State Laws should at least consider the possibility of a new article of the Uniform Commercial Code dedicated to mortgage loans. Such an article is long overdue, has prospects of successful passage in the wake of this crisis, and emphatically would reassert the influence of these organizations in the wake of the disappointing reception of the revised Article Two on sales law. n222

Finally, the nation's judges should recognize that, despite crushing caseloads, mortgage foreclosure cases are no longer routine matters. Putting aside the short- term consequences of enforcing the law, jurists surely should know that ratifying a security agreement that does not specify a true grantee-when never authorized by state legislatures or Congress to do so-is poor lawmaking. Perhaps we should not be too surprised that the mortgage finance industry's bacchanal of pump-and-dump mortgage origination happened to coincide with a bizarre and unsustainable theory of land title ownership. But ratifying a standard industry practice of conveying rights to realty without specifying a true grantee inevitably will cause hidden liens, cases of exposure to double liability, and fraud. It will introduce long-term systemic instability, raise the cost and uncertainty of title insurance, and result in future businesses and individuals investing in land, only later to discover that they received nothing. Just as the Federal Reserve Board of Governors treated our largest financial institutions as too big to fail, our courts might be tempted to capitulate to a silly, but nonetheless too-incredible-not-to-believe, interpretation of the law. Decisions that allow security agreements that do not specify the identity of the actual mortgagee would be, in a sense, only the latest judicial version of a mortgage banker bailout policy. Unlike the other two branches of government, however, the greatest asset of an independent judiciary is its willingness to uphold the rule of law rather than   [*160]   second guess the consequences of doing so. Substituting equitable mortgages in the place of facially defective security agreements is a responsible middle path out of the mess that MERS created.

Conclusion

This Article analyzes the still-unfolding implications of the dual role claimed by MERS in home mortgages and deeds of trust. On the one hand, MERS asserts that it is solely a nominee of the lender. But on the other hand, MERS claims that it is a mortgagee or deed of trust beneficiary. Taking the former view, a growing line of cases has asserted that MERS is not a mortgagee or deed of trust beneficiary, but rather has a limited form of agency. n223 This assertion is almost certainly the correct view, given that MERS lacks any economic interest in the mortgages and deeds of trust it claims to own. Yet the consequences of this view, and the two-faced security agreements that underlie it, are still unfolding.

MERS, a company that does not actually own any interests in land, increasingly inserts inert gaps in county recorder grantor-grantee indexes that disseminate the chain of title to millions of homes. This growing separation between actual ownership and legally-recognized public notice is likely to significantly undermine the usefulness of real property recording systems over the long term. Moreover, courts traditionally have held that a security agreement that fails to name a mortgagee is void. n224 Because MERS is not really a mortgagee, financial institutions are, in effect, asking that courts treat lenders and their assigns as mortgagees even though their own security agreements do not. Even if courts reform void security agreements into equitable mortgages, the resulting litigation is likely to pose significant challenges for financial institutions seeking to foreclose, obtain deficiency judgments, and petition for relief from bankruptcy law's automatic stay.

Furthermore, this inconsistent position taken by financial institutions to avoid paying modest fees to county recorders faces potential challenges. Many counties rely on fees from mortgage and deed of trust assignments to fund the vital services they provide to   [*161]   their communities. Courts that take offense to this avoidance, or to the use of tens of thousands of uncompensated vice presidents, could use their equitable powers under the doctrines of unjust enrichment and judicial estoppel to compel financial institutions to pay their unpaid recording fees. Looking toward the future of American mortgage finance, counsel for financial institutions should advise their clients on the real and growing risks associated with using the MERS system. County recorders, state legislatures, and the judiciary each need to do their part to restore confidence, stability, and transparency in public land title records.

While MERS may reflect Janus in its two-faced land title theory, a demystified narrative of the company is actually quite simple. Hubris was the essential theme in Greco-Roman mythic tragedies and was the vital sin of figures like Icarus, Narcissus, Niobe, Arachne, and Ulysses. Each found tragedy after their overweening pride showed disrespect to deities and the basic values those deities embodied. MERS and its members believed that they could rewrite property law without a democratic mandate. Although our myths have changed, many of our courthouses and capital buildings

continue to this day to bear resemblance to Greek and Roman temples as homage to the values of humility and respect for the rule of law. The unfolding drama of the MERS system will tell us much about whether those values still endure.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
GovernmentsLocal GovernmentsFinanceReal Property LawFinancingMortgages & Other Security InstrumentsMortgagee's InterestsReal Property LawPriorities & RecordingTitle Registration

**FOOTNOTES:**

n1 See Mike Dixon-Kennedy, Encyclopedia of Greco-Roman Mythology 179 (1998).

n2 Jo l Schmidt, Larousse Greek and Roman Mythology 150 (Seth Benardete ed., 1980).

n3 Arthur Cotterell, The Macmillan Illustrated Encyclopedia of the Myths & Legends 112 (1989).

n4 See Ovid, Fasti 19-21 (James George Frazer trans., Harvard Univ. Press reprt. ed. 1959) (ca. 8 C.E.).

n5 See Cotterell, supra note 3@, at 112.

n6 See Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System, *78 U. Cin. L. Rev. 1359 (2010).*

n7 See 1 Joyce Palomar, Patton and Palomar on Land Titles § 4 (3d ed. 2003).

n8 See 14 Richard R. Powell, *Powell on Real Property § 82.03*[2][b] (Michael Allan Wolf ed., 2011).

n9 See id.

n10 76 C.J.S. Registers of Deeds § 4 (2011).

n11 See Gary A. Jeffress & Lynn C. Holstein, An International Survey of Real Property Transaction Recording Costs and Some Characteristics: A Preliminary Evaluation, 5 URISA J. 53, 53 (1993) (suggesting recording systems are a "precondition ... of an efficient land market").

n12 See William Dollarhide, Foreword to E. Wade Hone, Land & Property Research in the United States, at xi (1997).

n13 See Jeffress & Holstein, supra note 11@, at 60.

n14 See Robert Irwin, Tips and Traps When Mortgage Hunting 62 (3d ed. 2005).

n15 See Jeffress & Holstein, supra note 11@, at 62.

n16 See infra notes 201@-06 and accompanying text.

53 Wm. & Mary L. Rev. 111, *

n17 See Powell, supra note 8@, § 82.01[3].

n18 See id. § 82.02[1][a].

n19 See, e.g., *Conn. Mut. Life Ins. Co. v. Talbot, 14 N.E. 586, 588 (Ind. 1887)* ("It is settled everywhere that unrecorded assignments of mortgages are void as against subsequent purchasers, whose interests may be affected thereby, and whose conveyances are duly recorded, provided such assignments are embraced by the recording acts."); *Bacon v. Van Schoonhoven, 87 N.Y. 446, 450 (1882)* ("The assignments of the ... mortgage are also conveyances within the act. This is well settled by authority, and such assignments, if not recorded, are void, not merely as against subsequent purchasers of the same mortgage, but also as against subsequent purchasers of the mortgaged premises, whose interests may be affected by such assignments, and whose conveyances are first recorded.").

n20 See Phyllis K. Slesinger & Daniel McLaughlin, Mortgage Electronic Registration System, *31 Idaho L. Rev. 805, 810-12 (1995)* (describing an Ernst & Young study that mortgage bankers commissioned to study how much money they could avoid paying to county governments through the MERS system).

n21 See *Peterson, supra* note 6@, at 1361-62.

n22 Christopher L. Peterson, Predatory Structured Finance, *28 Cardozo L. Rev. 2185, 2186-87 (2007).*

n23 R.K. Arnold, Viewpoint, Inside MERS, Jan./Feb. 2004, at 1 ("[O]ur mission is to capture every mortgage loan in the country.").

n24 See id.; see also Howard Schneider, MERS Aids Electronic Mortgage Market, Mortgage Banking, Jan. 1997, at 42.

n25 See Carson Mullen, MERS: Tracking Loans Electronically, Mortgage Banking, May 2000, at 62; Schneider, supra note 24@.

n26 See *Peterson, supra* note 6@, at 1398. At least one state, Minnesota, later explicitly authorized MERS recording by amending its recording act to expressly permit nominees to record "[an] assignment, satisfaction, release, or power of attorney to foreclose." Act of Apr. 6, 2004, ch. 153, § 2, 2004 Minn. Laws 76, 76-77 (codified at *Minn. Stat. § 507.413* (2008)). See generally *Jackson v. Mortg. Elec. Registration Sys., Inc., 770 N.W.2d 487 (Minn. 2009)* (interpreting this statute). However, Minnesota did not enact this legal change until long after financial institutions already had been using the MERS system in that state. Similar changes have not taken place nationwide.

n27 See Kate Berry, Foreclosures Turn Up Heat on MERS, Am. Banker, July 10, 2007, at 1.

n28 See Schneider, supra note 24@. Unlike mortgage loan servicers that receive compensation for foreclosure services, MERS does not receive any compensation for assisting in foreclosures. See Deposition of R.K. Arnold at 88, Henderson v. Merscorp, Inc., No. CV-08-900805.00 (Ala. Cir. Ct. Sept. 25, 2009) [hereinafter Arnold Deposition].

n29 Financial institutions have not reliably updated the MERS-maintained database when these institutions assign loans to businesses that are not members of the MERS system. See *In re Hawkins, No. BK-S-07-13593-LBR, 2009 WL 901766,* at *4 (Bankr. D. Nev. Mar. 31, 2009).

53 Wm. & Mary L. Rev. 111, *

n30 Plaintiff's Brief in Support of Its Response to Defendants' Preliminary Objections at Exhibit A, Mortg. Elec. Registration Sys., Inc. v. Blumling, No. GD-05-016795 (Pa. Ct. Com. Pl. May 31, 2006), available at https://dcr.alleghenycounty.us (follow "Case Search" hyperlink; then enter "GD-05-016795" in "Enter Standard Case ID" field; then follow "Document 20" hyperlink) [hereinafter Plaintiff's Response]. The mortgage instrument, however, names the original lender. See id.

n31 See Mortg. Elec. Registration Sys., Inc. v. Bellistri, No. 4:09- *CV-731, 2010 WL 2720802*, at *4 (E.D. Mo. July 1, 2010).

n32 See *Restatement (Third) of Agency §§ 1.01-*.02 (2006).

n33 See Ann M. Burkhart, Freeing Mortgages of Merger, *40 Vand. L. Rev. 283, 353-54 (1987)*.

n34 See *Kirby Lumber Corp. v. Williams, 230 F.2d 330, 333 (5th Cir. 1956)* ("The rule is fully recognized in this state that a mortgage to secure a negotiable promissory note is merely an incident to the debt, and passes by assignment or transfer of the note. The note and mortgage are inseparable." (quoting *Van Burkleo v. Sw. Mfg. Co., 39 S.W. 1085, 1087 (Tex. Civ. App. 1896)))*; *In re Leisure Time Sports, Inc., 194 B.R. 859, 861 (B.A.P. 9th Cir. 1996)* (stating that "[a] security interest cannot exist, much less be transferred, independent from the obligation which it secures" and that "[i]f the debt is not transferred, neither is the security interest"); In re Bird, No. 03- 52010- *JS, 2007 WL 2684265*, at *4 (Bankr. D. Md. Sept. 7, 2007) ("'The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity.' ... It is equally absurd to assume that such bifurcation was intended because such a bifurcation of the note from the deed of trust would render the debt unsecured." (citations omitted) (quoting *Waterbury Trust Co. v. Weisman, 108 A. 550, 553 (1919)))*; *In re BNT Terminals, Inc., 125 B.R. 963, 970 (Bankr. N.D. Ill. 1990)* ("[A]n assignment of a mortgage without a transfer of the underlying note is a nullity... It is axiomatic that any attempt to assign the mortgage without transfer of the debt will not pass the mortgagee's interest to the assignee." (citations omitted)); *In re AMSCO, Inc., 26 B.R. 358, 361 (Bankr. D. Conn. 1982)* (reaffirming that "[t]he note and mortgage are inseparable" (quoting *Waterbury Trust Co., 109 A. at 553)*); *Denniston v. Comm'r, 37 B.T.A. 834, 838 (1938)* ("All the authorities agree that the debt is the principal thing and the mortgage an accessory... The mortgage can have no separate existence." (quoting *Carpenter v. Longan, 83 U.S. (16 Wall.) 271, 274 (1872)))*; *Hill v. Favour, 84 P.2d 575, 578 (Ariz. 1938)* ("The note and mortgage are inseparable; the former as essential, the latter as an incident."); *Barton v. Perryman, 577 S.W.2d 596, 600 (Ark. 1979)* ("[A] note and mortgage are inseparable." (quoting *Carpenter, 83 U.S. (16 Wall.) at 274*)); *Kelley v. Upshaw, 246 P.2d 23, 30 (Cal. 1952)* ("In any event, Kelley's purported assignment of the mortgage without an assignment of the debt which is secured was a legal nullity."); *First Nat'l Bank of Saco v. Vagg, 212 P. 509, 511 (Mont. 1922)* ("A mortgage, as distinct from the debt it secures, is not a thing of value nor a fit subject of transfer; hence an assignment of the mortgage alone, without the debt, is nugatory, and confers no rights whatever upon the assignee. The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while the assignment of the latter alone is a nullity. The mortgage can have no separate existence." (citations omitted)); *Southerin v. Mendum, 5 N.H. 420, 430 (1831)* ("[T]he interest of the mortgagee is not in fact real estate, but a personal chattel, a mere security for the debt, an interest in the land inseparable from the debt, an incident to the debt, which cannot be detached from its principal."); *Yoi-Lee Realty Corp. v. 177th St. Realty Assocs., 626 N.Y.S.2d 61, 64 (App. Div. 1995)* ("The mortgage note is inseparable from the mortgage, to which the note expressly refers, and from which the note incorporates provisions for default."); *West v. First Baptist Church of Taft, 71 S.W.2d 1090, 1098 (Tex. 1934)* ("The trial court's finding and conclusion ignore the settled principle that a mortgage securing a negotiable note is but an incident to the note and partakes of its negotiable character... 'The note and mortgage are inseparable; the former as essential, the latter as an incident.'" (citation omitted) (quoting *Carpenter, 83 U.S. (16 Wall.) at 274*)); *Trane Co. v. Wortham, 428 S.W.2d 417, 419 (Tex. App. 1968)* ("The note and mortgage are inseparable." (quoting *Van Burkleo, 39 S.W. at 1087))*.

n35 *83 U.S. (16 Wall.) 271, 274 (1872)* (emphasis added).

53 Wm. & Mary L. Rev. 111, *

n36 See Arnold Deposition, supra note 28@, at 46.

n37 See id. at 195-200.

n38 See id. at 187-90.

n39 Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcomm. on Housing and Cmty. Opportunity of the H. Comm. on Fin. Servs., 111th Cong. 103-04 (2010) [hereinafter Mortgage Servicing Hearing] (prepared statement of R.K. Arnold, President and Chief Executive Officer, MERSCORP, Inc.).

n40 Id.

n41 See MERS Commercial Pricing, MERS, http://www.mersinc.org/mersproducts/pricing. aspx?mpid=4 (last visited Sept. 23, 2011).

n42 Mortgage Servicing Hearing, supra note 39@, at 42, 102, 170.

n43 Compare Sharon Horstkamp, MERS Vice President and Corporate Counsel, Posting to MERS Legal Forum: recording - New York, MERS (Apr. 8, 2004, 12:42 PM), http:// www.mersinc.org/forum/viewreplies.aspx?id=13&tid=73 ("Mortgage Electronic Registration Systems, Inc. (MERS) gets its authority to assign and/or discharge a mortgage because MERS is the mortgagee, and as such holds legal title to the mortgage... The nominee language does not take away from the fact that MERS is the mortgagee." (emphasis added)), with Defendants' Motion to Dismiss at 1, King v. Ocwen, 2008 WL 2063553 (E.D. Mich. Apr. 14, 2008) (No. 07-11359), 2007 WL 1985166 (arguing that MERS could not be liable for Fair Debt Collection Practices Act violations because "HSBC was the mortgagee for the Property. Ocwen is the servicer for the Property. [And] MERS acted solely as the nominee for the original mortgagee of the Property." (emphasis added)).

n44 2009 Ark. 152, at 2, 301 S.W.3d 1, 2 (2009).

n45 Id. at 2, 301 S.W.3d at 2.

n46 Id. at 2-3, 301 S.W.3d at 2.

n47 Id. at 1, 301 S.W.3d at 2 ("Because MERS was at most the mere agent of the lender ..., it held no property interest and was not a necessary party.").

n48 Id. at 5, 301 S.W.3d at 4.

n49 Id. at 6, 301 S.W.3d at 4.

n50 See Landmark Nat'l Bank v. Kesler, 216 P.3d 158, 169 (Kan. 2009).

n51 Id. at 165-66.

n52 Id. at 169.

53 Wm. & Mary L. Rev. 111, *

n53 *2010 ME 79, P 1, 2 A.3d. 289, 292.*

n54 See id. P 1, 2 A.3d at 292.

n55 See id. P 7, 2 A.3d at 293-94.

n56 *Id. P 15, 2 A.3d at 297.*

n57 *Id. P 21, 2 A.3d at 299.*

n58 *284 S.W.3d 619 (Mo. Ct. App. 2009).*

n59 *Id. at 621.*

n60 Id. Normally, lenders or their servicing companies pay property taxes out of escrow accounts drawn from borrowers' monthly payments. The appellate opinion is unclear on why the taxes were not paid in this case. See id.

n61 Id.

n62 Id.

n63 Id.

n64 *Id. at 621-22.*

n65 *Id. at 623-24.*

n66 *Id. at 623* (citations omitted) (citing *Restatement (Third) of Prop.: Mortgs. § 5.4* cmts. a, b, c (1997)).

n67 *Id. at 624.*

n68 MERS, http://www.mersinc.org (last visited Sept. 23, 2011).

n69 See, e.g., *Brief for Appellant at Arg. 3-4, Mortg. Elec. Registration Sys., Inc. v. Sw. Homes of Ark, Inc., 2009 Ark. 152, 301 S.W.3d 1* (No. 08-1299).

n70 See supra note 65 and accompanying text.

n71 See, e.g., Response to Request from John O'Brien (Essex, Mass. Co. Register of Deeds) to Mass. AG Martha Coakley to Investigate MERS, MERS (Nov. 23, 2010), http://www. mersinc.org/newsroom/press details.aspx?id=254 [hereinafter MERS Response].

53 Wm. & Mary L. Rev. 111, *

n72 See MERS for Homeowners: How Can I Find Out the Identity of My Servicer?, MERS, http://www.mersinc.org/homeowners/index.aspx#3 (last visited Sept. 25, 2011) (the current phone number is 888-679-6377).

n73 See Katherine Porter, Misbehavior and Mistake in Bankruptcy Mortgage Claims, *87 Tex. L. Rev. 121, 131-32 (2008).*

n74 See Worth Civils & Mark Gongloff, Subprime Shakeout: Lenders that Have Closed Shop, Been Acquired or Stopped Loans, Wall St. J. Online, http://online.wsj.com/public/ resources/documents/info-subprimeloans0706-sort.html (last visited Sept. 25, 2011).

n75 More than 300 banks have failed since 2008. Failed Bank List, FDIC, http://www.fdic. gov/bank/individual/failed/banklist.html (last visited Sept. 25, 2011).

n76 Transcript of Hearing on Order to Show Cause at 5, HSBC Bank USA v. Eslava, No. 1-2008-CA-055313 (Fla. Cir. Ct. May 6, 2010).

n77 Cf. Porter, supra note 73@, at 126-28.

n78 Cf. Arnold Deposition, supra note 28@, at 176.

n79 See id.

n80 Id. at 178-79.

n81 Id. at 178.

n82 Id. at 177-80.

n83 Id. at 178-80.

n84 Id. at 176.

n85 Id. at 178-80.

n86 Id. at 177-78.

n87 The deposition transcript on this point reads: [Nicholas Wooten, Plaintiff's Attorney] Q. Okay. So whenever a transfer occurs of any interest, be it beneficial interest in the promissory note or be it servicing interest, those you expect to be entered on the MERS system? [R.K. Arnold, MERS CEO] A. It's not so much that we expect it. We operate a system that offers that capability.Id. at 178.

n88 MERS Servicer ID Overview, MERS, http://www.mersinc.org/MersProducts/index. aspx?mpid=7 (last visited Sept. 24, 2011).

n89 Cf. *66 Am. Jur. 2d Records and Recording Laws § 50* (2011).

53 Wm. & Mary L. Rev. 111, *

n90 Rebecca Jackson, Clerk, Jefferson Cnty., Ky., Statement at National Association of Counties Legislative Conference: Mortgage Assignment Issue Meeting 25 (Mar. 4, 1994) (transcript on file with author).

n91 Id. at 22.

n92 See MERS Expands Website To Disclose Loan Investor Information, MERS (July 16, 2010), http://www.mersinc.org/newsroom/press details.aspx?id=241.

n93 See supra notes 78@-87@ and accompanying text.

n94 E-mail from Karmel Lejarde, Communications Manager, MERSCORP, Inc., to author (Sept. 3, 2010) (on file with author).

n95 See *Peterson, supra* note 22@, at 2227-30 (summarizing mortgage loan assignee liability law).

n96 See supra notes 78@-87@ and accompanying text.

n97 MERS Servicer Identification System, Search for Servicer Information-Search Results (Nov. 2, 2010) (on file with author).

n98 See 66 Am. Jur. 2d Records and Recording Laws § 162 (2011).

n99 See id.; see also, e.g., *Second Nat'l Bank of New Haven v. Dyer, 184 A. 386, 388-89 (Conn. 1936).* That an assignment of a mortgage falls within the purview of the recording statute follows from the nature of such an instrument... Indeed, to hold otherwise would make a serious inroad upon the policy of this state that purchasers of interests in real estate are entitled to rely upon the land records as disclosing the true title. *Id. at 388.* This also assumes, for most jurisdictions, that the subsequent assignee did not have actual notice of the first assignment.

n100 See John M. Quidley, Compensation and Incentives in the Mortgage Business, Economist's Voice, Oct. 2008, at 2, available at http://www.bepress.com/ev/vol5/iss6/art2.

n101 See supra notes 76@-87@ and accompanying text.

n102 MERS, http://www.mersinc.org (last visited Sept. 24, 2011).

n103 See Complaint for Declaratory Judgment and Other Relief at 1, Diversified Mortg., Inc. v. MERSCORP, Inc., No. 8:09-cv-02497-VMC-EAJ (Fla. Cir. Ct. Dec. 10, 2009).

n104 Id. at 3.

n105 See id. at 5.

n106 See id.

n107 Id.

53 Wm. & Mary L. Rev. 111, *

n108 Id. at 6.

n109 Id.

n110 *216 P.3d 158, 169 (Kan. 2009).*

n111 *Mortg. Elec. Registration Sys., Inc. v. Sw. Homes of Ark., Inc., 2009 Ark. 152, at 8, 301 S.W.3d 1, 5 (2009).*

n112 Some county recorders track the originating lender's name in addition to MERS's name when a mortgage is first recorded. As mentioned above, the original lender is named in the mortgage instrument. See supra note 30@ and accompanying text. Once the mortgage is assigned, however, the name of the original lender is no longer useful and leads to a dead end in searching for actual ownership interest in the land.

n113 See supra notes 30@-32@ and accompanying text.

n114 See supra notes 44@-67@ and accompanying text.

n115 *Carpenter v. Longan, 83 U.S. (16 Wall.) 271, 274 (1872);* see also *Nagle v. Macy, 9 Cal. 426, 428 (1858)* ("The debt and the mortgage are inseparable.").

n116 *Carpenter, 83 U.S. at 275.*

n117 Nothing indicates that deeds of trust would be any different in this respect. See *Domarad v. Fisher & Burke, Inc., 76 Cal. Rptr. 529, 535-36 (Ct. App. 1969)* ("[A] deed of trust is inseparable from the debt and always abides with the debt, and it has no market or ascertainable value, apart from the obligation it secures." (emphasis added)).

n118 See *Richey v. Sinclair, 47 N.E. 364, 365 (Ill. 1897)* ("The law is well settled that a deed without the name of a grantee is invalid. It is said there must be in every grant a grantor, a grantee, and a thing granted; and a deed wanting in either essential will be void."); *Disque v. Wright, 49 Iowa 538, 540 (1878)* ("It has been frequently held that slight omissions in the acknowledgment of a deed destroy the effect of the record as constructive notice. A fortiori, it seems to us, should so important and vital an omission as that of the name of the grantee have that effect."); *Allen v. Allen, 51 N.W. 473, 474 (Minn. 1892)* (stating that an omission of the name of the grantee invalidated conveyance because "[a] legal title to real property cannot be established by parol"); *Chauncey v. Arnold, 24 N.Y. 330, 335 (1862)* ("No mortgagee or obligee was named in [a mortgage], and no right to maintain an action thereon, or to enforce the same, was given therein to the plaintiff or any other person. It was, per se, of no more legal force than a simple piece of blank paper."); 59 C.J.S. Mortgages § 306 (2011) ("Notice may be deemed not present in cases of insufficient attestation or where the instrument itself is so defective as to be void as a matter of law, as where it wholly omits the name of the mortgagee." (citations omitted)).

n119 *Whitaker v. Miller, 83 Ill. 381, 385 (1876);* see also *Trout v. Taylor, 32 P.2d 968, 969 (Cal. 1934); Green v. MacAdam, 346 P.2d 474, 477 (Cal. Dist. Ct. App. 1959); Beard v. Griggs, 24 Ky. (1 J.J. Marsh.) 22, 25 (1829); Allen, 51 N.W. at 473; Morris v. Stephens, 46 Pa. 200, 201 (1863); Hulsether v. Peters, 167 N.W. 497, 498 (S.D. 1918).*

n120 2 William Blackstone, Commentaries *296.

n121 Palomar, supra note 7@, § 338.

n122 *24 N.Y. at 331.*

n123 See id.

n124 See U.C.C. §§ 3-104(a)(1), -109(a) (2010).

n125 See id. §§ 1-201(b)(21), 3-301 (2010).

n126 Edward L. Rubin, Learning from Lord Mansfield: Toward a Transferability Law for Modern Commercial Practice, *31 Idaho L. Rev. 775, 777-86 (1995).*

n127 See *Chauncey, 24 N.Y. at 332* ("[T]he cases arising upon bills and notes are plainly distinguishable.").

n128 *Id. at 335.*

n129 *32 P.2d 968, 968 (Cal. 1934).*

n130 *Id. at 969.*

n131 *Id. at 970.*

n132 *47 N.E. 364, 364 (Ill. 1897).*

n133 Id.

n134 Id.

n135 *Id. at 365.*

n136 Id.

n137 *81 So. 753, 754 (La. 1919).*

n138 Id.

n139 See id. The case's applicability to common law jurisdictions is also dubious insofar as it explicitly relies on the Napoleonic Code for support. See *id. at 755.*

n140 See supra note 34@.

n141 See supra notes 7@-19@ and accompanying text.

n142 See supra note 122@ and accompanying text.

n143 See, e.g., *In re Stubbs, 330 B.R. 717, 730 (Bankr. N.D. Ind. 2005),* superseded by statute, Ind. Code Ann. § 32-21-*4-1* (West 2010), as recognized in *In re Gysin, 409 B.R. 485 (Bankr. N.D. Ind. 2009).* There is no other "thing" more important historically in our culture that [sic] an interest in land, whether that interest be in a condominium, in a house, or in [sic] farm. Land. The transferring of interests in land has been entrusted to a system of records that allows people to be certain that this single most important asset in their lives is indeed going to be theirs, and that the encumbrances recorded with respect to this asset are in fact accurate and valid.Id. (citation omitted).

n144 See Dalton Conley, Being Black, Living in the Red: Race, Wealth, and Social Policy in America 16 (1999).

n145 See supra notes 118@-19.

n146 See Porter, supra note 73@, at132; Gretchen Morgenson, Dubious Fees HitBorrowers in Foreclosures, N.Y. Times, Nov. 6, 2007, at A1, A24.

n147 See, e.g., 5- *Star Mgmt. v. Rogers, 940 F. Supp. 512, 521 n.5 (E.D.N.Y. 1996).* The Court observes that a determination that the mortgage at issue, having been separated from the underlying promissory note, may be unenforceable would not leave the plaintiff in possession of a worthless instrument. This conclusion obtains because the plaintiff presumably can sell the mortgage to the holder of the underlying obligation. The plaintiff also can purchase the underlying obligation from the holder of the note. In that case, plaintiff, as holder of both the mortgage and the note, could foreclose on the mortgage on the New York Property.Id.

n148 The inherent problem in this position is determining how MERS would assign the mortgage to someone if it is not a mortgagee. Surely, MERS cannot assign something that it does not own. Even if MERS is attempting to assign the mortgage as an agent, to whom MERS is assigning the mortgage remains unclear. After all, the security agreement does not specify who, other than MERS, owns the mortgage in the first place.

n149 *23 Am. Jur. 2d Deeds § 38* (2011).

n150 See 5- *Star Mgmt., 940 F. Supp. at 520* ("To allow the assignee of a security interest to enforce the security agreement would expose the obligor to a double liability, since a holder in due course of the promissory note clearly is entitled to recover from the obligor." (quoting *In re Hurricane Resort Co., 30 B.R. 258, 261 (Bankr. S.D. Fla. 1983)))*.

n151 See *Restatement (Second) of Contracts §§ 110(1)(d),* 127 (2010).

n152 *Allen v. Allen, 51 N.W. 473, 474 (Minn. 1892).*

n153 See *54A Am. Jur. 2d Mortgages § 13* (2009).

n154 Id.

n155 See, e.g., *Burkhardt v. Bailey, 680 N.W.2d 453, 465 (Mich. Ct. App. 2004)* ("An equitable mortgage places the substance of the parties' intent over form.").

53 Wm. & Mary L. Rev. 111, *

n156 See, e.g., C. Robert Morris, Bankrupt Fantasy: The Site of Missing Words and the Order of Illusory Events, *45 Ark. L. Rev. 265 (1992).*

n157 See *HSBC Bank USA v. Yeasmin, 911 N.Y.S.2d 693,* slip op. at 5 (Sup. Ct. May 24, 2010) (cancelling foreclosure action on MERS recorded loan in an order that states: "[T]he instant motion, attempting to cure the four defects explained by the Court [in a previous order] are so incredible, outrageous, ludicrous and disingenuous that they should have been authored by the late Rod Serling, creator of the famous science- fiction television series, The Twilight Zone."); Order at 2-4, Deutsche Bank Nat'l Trust Co. v. Lippi, No. CA08-0127 (Fla. Cir. Ct. Feb. 11, 2010) (dismissing foreclosure complaint with prejudice on MERS-recorded loan for failure to show any evidence of standing, following two years of litigation and multiple dismissals with leave to amend); Transcript of Hearing on Order to Show Cause at 4-6, 10, 17-18, 20, HSBC Bank USA v. Eslava, No. 1-2008-CA-055313 (Fla. Cir. Ct. May 6, 2010) (dismissing foreclosure complaint with prejudice, cancelling promissory note, and conveying clear title to homeowner as a sanction for poor record keeping and failure to comply with a court order).

n158 See, e.g., *Pagenhardt v. Walsh, 243 A.2d 494, 498 (Md. 1968).*

n159 See *11 U.S.C. § 544(a)* (2006); *In re Paul J. Paradise & Assocs., Inc., 217 B.R. 452, 455 (Bankr. D. Del. 1997); Citizens Nat'l Bank v. Denison, 133 N.E.2d 329, 333 (Ohio 1956); Mortg. Lenders Network, USA v. Sensenich, 873 A.2d 892, 894 (Vt. 2004).*

n160 See, e.g., *Clayton Dev. Co. v. Falvey, 253 Cal. Rptr. 609, 613 (1988).*

n161 See *Peterson, supra* note 22@, at 2212.

n162 See supra notes 44@-67@ and accompanying text.

n163 See *Peterson, supra* note 22@, at 2212.

n164 See supra notes 20@-27@, 79@-87@ and accompanying text.

n165 See supra note 29@ and accompanying text.

n166 MERS System Lite Tool Kit, MERS, http://www.mersinc.org/files/filedownload.aspx?id =246&table=ProductFile (last visited Sept. 24, 2011).

n167 See, e.g., *Fla. Stat. § 692.02* (2010).

n168 Webster's Third New Int'l Dictionary 2549 (3d ed. 2002).

n169 Id.

n170 See Deposition of Kimberly Litchfield at 36, Wells Fargo Bank, N.A. v. Van Siegman, No. 16-2008-CA-009724 (Fla. Cir. Ct. July 28, 2008).

n171 Id.

n172 Id.

n173 MERS, http://www.mersinc.org (last visited Oct. 6, 2010) (on file with author).

n174 Deposition of Kimberly Litchfield, supra note 170@, at 39-41; see also *In re Haque, 395 B.R. 799, 805-06 (Bankr. S.D. Fla. 2008)* (imposing $ 95,130.45 in sanctions on Florida Default Law Group for filing affidavit claiming entitlement to unjustified interest charges).

n175 See MERS Commercial Pricing, MERS, www.mersinc.org/MersProducts/pricing. aspx?mpid=1 (last visited Sept. 24, 2011) (containing a complete schedule of membership and transactional fees members pay to MERS).

n176 Ironically, MERS sometimes charges a fee to members when it has to forward mail addressed to MERS to the member that actually has an interest in the loan. See MERSCORP, Inc., Rules of Membership R. 5, § 4, http://www.mersinc.org/files/filedownload.aspx?id= 172&table=ProductFile (last visited Sept. 23, 2011). If MERS determines that MERS receipt of mail involving a foreclosure proceeding, lawsuit or code violation resulted from a violation of any of the MERS Rules or Procedures, then MERS shall be entitled to charge the Member a fee of $ 12.00 for each filing or document in the proceeding or for each piece of mail received related to the code violation that MERS forwards to the Member beyond the initial service of process or notification that MERS received on behalf of that Member.Id.

n177 See, e.g., *MERS Response, supra* note 71@.

n178 See Slesinger & McLaughlin, supra note 20@, at 810-12.

n179 Chase Mortg. Fin. Corp., Current Report, Pooling and Servicing Agreement (Form 8-K) (Nov. 1, 2005) [hereinafter Chase Agreement].

n180 Id. at 34.

n181 Id. (emphasis added).

n182 Id. at 36.

n183 See *MERSCORP, Inc. v. Romaine, 861 N.E.2d 81, 83 (N.Y. 2006).*

n184 See Shyamkrishna Balganesh, "Hot News": The Enduring Myth of Property in News, *111 Colum. L. Rev. 419, 428 (2011).*

n185 *66 Am. Jur. 2d Restitution and Implied Contracts § 12* (2001). For an interesting discussion of comparative historical origins of unjust enrichment doctrine, see generally Unjustified Enrichment: Key Issues in Comparative Perspective (David Johnston & Reinhard Zimmermann eds., 2004).

n186 See, e.g., Keith D. Haroldson, Perfecting a Security Interest in Future Rents from Mortgaged Property, *40 Drake L. Rev. 287, 294 (1991).*

n187 See *Costanzo v. Stewart, 453 P.2d 526, 528-29 (Ariz. Ct. App. 1969); Idaho Lumber, Inc. v. Buck, 710 P.2d 647, 656 (Idaho Ct. App. 1985); Encore Constr. Corp. v. SC Bodner Constr., Inc., 765 N.E.2d 223, 226 (Ind. Ct. App. 2002); Sachs Elec. Co. v. HS Constr. Co., 86 S.W.3d 445, 454 (Mo. Ct. App. 2002); Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 154-55 (Tenn. 1966); Lasich v. Wimpenney, 278 P.2d 807, 815 (Wyo. 1955);* J.R. Kemper, Annotation, Building and Construction Contracts: Right of Subcontractor Who Has Dealt Only with Primary Contractor to Recover Against Property Owner in Quasi Contract, *62 A.L.R.3d 288, 295 (1975)* ("Perhaps the most commonly cited of such latter considerations has been the fact-in cases where it was such a fact-that the landowner had already paid to the general contractor all, or a very substantial part, of the amount due the latter under the terms of the primary agreement between them, and that to allow the subcontractor to recover from the landowner would therefore be to require him to pay twice.").

n188 *Haz-Mat Response, Inc. v. Certified Waste Servs., Ltd., 910 P.2d 839, 847 (Kan. 1996).*

n189 See *Indep. Sch. Dist. No. 6 of Caribou Cnty. v. Mittry, 226 P. 1076, 1076 (Idaho 1924)* ("The rule that voluntary payments made by reason of mistake of law cannot be recovered applies to individuals, but not to municipal subdivisions of the state.").

n190 *Restatement (First) of Restitution § 46* (1937).

n191 Id. § 55.

n192 See *Indep. Sch. Dist. No. 6, 226 P. at 1076* (overpayment by town to contractor); *Dunne v. City of Fall River, 104 N.E.2d 157, 160 (Mass. 1952)* (allowing city to recover money paid for services under either a mistake of law or fact); *Wayne Cnty. v. Reynolds, 85 N.W. 574, 574 (Mich. 1901)* (overpayment of services by county clerk).

n193 See, e.g., *City of St. Louis v. Am. Tobacco Co., 70 F. Supp. 2d 1008, 1014 (E.D. Mo. 1999).*

n194 *28 Am. Jur. 2d Estoppel and Waiver § 71* (2000) (citation omitted).

n195 Id.; see also *Pannunzio v. Monumental Life Ins. Co., 151 N.E.2d 545, 553 (Ohio 1958)* (Taft, J., concurring) ("[A] defendant cannot be permitted to rely upon his own intentional failure to perform a duty owed to an innocent party as the basis for a defense against that party.").

n196 *28 Am. Jur. 2d Estoppel and Waiver § 65* (2000).

n197 See *Mortg. Elec. Registration Sys. Inc. v. Saunders, 2010 ME 79, P 4, 2 A.3d 289, 292-93.*

n198 Chase Agreement, supra note 179@, § 3.01(l) (emphasis added).

n199 Michael S. Gambro & Scott Leichtner, Selected Legal Issues Affecting Securitization, *1 N.C. Banking Inst. 131, 162-63 (1997);* Claire A. Hill, Securitization: A Low-Cost Sweetener for Lemons, *74 Wash. U. L.Q. 1061, 1069 n.34 (1996).*

n200 Tax Reform Act of 1986, Pub. L. No. 99-514, sec. 671, §§ 860A-860G, *100 Stat. 2085, 2308-2318, at 860F9*(a)(2)(A)(I) (codified as amended at *26 U.S.C. §§ 860A-860G* (2010)).

53 Wm. & Mary L. Rev. 111, *

n201 See Nick Anderson, Clock Ticks for 100,000 Teachers, Wash. Post, May 27, 2010, at A1, A8 ("California is ground zero for the school budget crisis. The most populous state, with a budget deficit of $ 19 billion, is shedding summer school, music and art classes, bus routes, days from the school year, and yet-uncounted thousands of teachers.").

n202 See Josh Brogadir, Lawrence Fire Layoffs Create Burden for Surrounding Towns, New England Cable News (Aug. 11, 2010), http://www.necn.com/08/11/10/Lawrence-fire-layoffs-create-burden-for-/landing.html?blockID=288296; Matt Byrne, Layoff Cause [sic] Station to Close, Boston Globe, Aug. 9, 2010, http://www.boston.com/yourtown/news/malden/2010/08/ 10 firefighters laid off 1 sta.html; David Giambusso & James Queally, Newark Submits Plan to Eliminate Nearly 1,000 City Jobs, Star-Ledger (Newark, N.J.), Aug. 26, 2010, http:// www.nj.com/news/index.ssf/2010/08/preview of newarks layoff plan.html; Derek Spellman, Police, Firefighter Layoffs Take Effect in Neosho, The Joplin Globe (Joplin, Mo.), Aug. 10, 2010, http://www.joplinglobe.com/local/x1388785750/Police- firefight-er-layoffs-take-effect-in-Neosho.

n203 See Sandra Livingston, Ashtabula Judge Says People May Want to Arm Themselves Since Budget Cuts Have Slashed Law Enforcement, Cleveland.com (Apr. 19, 2010), http://blog.cleveland.com/metro/2010/04/ashtabula judge says people ma.html ("Budget cuts have whacked Ashtabula County so hard that just one sheriff's cruiser now patrols 720 square miles, raising a troubling question: Who will protect residents of this sprawling, rural Northeast Ohio county when sheriff's deputies are miles away? A county judge has a suggestion: Concerned people may want to arm themselves.").

n204 See Lisa Schnirring, State Cuts Accelerate Public Health Funding Shortfall, Center for Infectious Disease Research & Policy (Mar. 1, 2010), http://www.cidrap.umn.edu/ cidrap/content/influenza/panflu/news/mar0110funding.html ("The National Association of County and City Health Officials (NACCHO) said today in a statement that the departments cut 16,000 jobs last year.").

n205 See Mike Corn, Detention Center Closing, Hays Daily News (Hays, Kan.), June 1, 2010, http://www.hdnews.net/story/juvenile053010; Juvie Center Closing Could Give Teen Thugs Their Freedom, Trentonian, May 21, 2009, http://www.trentonian.com/articles/ 2009/05/21/news/doc4a14c34dc6d8b165050805.txt; Dan Linehan, Juvenile Detention Center to Close: Blue Earth County Drops Its Commitment, Free Press (Mankato, Minn.), July 2, 2010, http://mankatofreepress.com/local/x1703948488/Juvenile-detention-center-to- close; P.J. Reilly, Detention Centers Struggling; Loss is County's Gain, Intelligencer J. New Era (Lancaster, Pa.), July 29, 2010, at A1.; Tom Brennan, Budget Cuts Could Close County Juvenile Detention Center, Tampa Bay Online (Jan. 29, 2010), http://www2.tbo.com/ content/2010/jan/29/budget-cuts-could-close-county-juvenile- detention-1; Ann Kelley, Budget Cuts May Close Shawnee Juvenile Detention Center, O k l a h o m a n ( M a y 2 4 , 2 0 1 0 ) , a v a i l a b l e a t http://www.allbusiness.com/government/government-bodies-offices-regional- local/14507996-1.html; Monmouth County Could Close Juvenile Detention Center, Star- L e d g e r ( N e w a r k , N . J . ) ( J a n . 2 4 , 2 0 0 9 ) , http://www.nj.com/news/index.ssf/2009/01/monmonth county issues report.html; State May Close Maximum Security Juvenile Detention Center, 8 News Now (Feb. 16, 2010), http://www.8newsnow.com/story/11995433/state-may-close-maximum-security -juvenile- detention-center.

n206 See William M. Welch, Court Budget Cuts Swift Hand of Justice, USA Today, Apr. 1, 2010, http://www.usatoday.com/news/nation/2010-03-31-court-cuts N.htm ("At least 15 states have put court workers on furloughs, eight have cut pay, six have imposed layoffs, and six have closed courtrooms to save money in the face of state funding cuts, even as the number of legal cases is rising."); Christina Pazzanese, Boston's Trial Court to Make 'Devastating' Employment Cuts, Courthouse Closures, Mass. Law. Wkly. (July 19, 2010), available at http://www.allbusiness.com/labor- employ-ment/human-resources-personnel-management/14847036-1.html ("Trial Court officials have announced they are moving ahead with plans to lay off hundreds of workers and to relocate or shutter 14 courthouses statewide.").

n207 See Crossing Guards, Parents Worry About Kids' Safety, Chillicothe Gazette (Chillicothe, Ohio), Aug. 28, 2010, available at 2010 WLNR 17205710; Brock Parker, Being Laid Off by Schools, Arlington Crossing Guards Appeal to Selectmen, Boston G l o b e , A p r . 1 3 , 2 0 1 0 , http://www.boston.com/yourtown/news/arlington/2010/04/being laid off by schools arli.html; Christopher Ramirez, Northfield Crossing-Guard Cuts Upset Parents, Press o f A t l a n t i c C i t y , A p r . 1 3 , 2 0 1 0 , http://www.pressofatlanticcity.com/news/top three/article 0bdf5dee-46a6-11df-9498- 001cc4c03286.html; Peg-gy Cassidy, Be Kind to Your Soon-To-Be Laid Off Crossing Guard, NBC Chicago (June 9, 2009), http://www.nbcchicago.com/news/ local-beat/Crossing- Guards-Traffic-Aides-Face-Layoffs.html.

n208 See, e.g., Fed. Nat'l Mortg. Ass'n, Quarterly Report (Form 10-Q) 148-49, 151 (May 6, 2011) ("At this time, we cannot predict the ultimate outcome of these legal challenges to MERS or the impact on our business, results of operations and financial condition.").

n209 See MERS, supra note 102@.

n210 See, e.g., Powell on Real Property, supra note 8@, §§ 82.01-.02; Frank Mulholland, Judge Kiley Swears-in Newly Elected Office Holders, Shelbyville Daily U n i o n ( S h e l b y v i l l e , I l l . ) , D e c . 1 , 2 0 1 0 , http://Shelbyvilledailyunion.com/local/x622284575/Judge-Kiley-Swears-in-Newly- Elect-ed-Office-Holders.

n211 861 N.E.2d 81 (N.Y. 2006).

n212 See id. at 83.

n213 See id.

n214 See id. at 82-83.

n215 See id. at 84-85.

n216 See id.

n217 See id. at 85 (Ciparick, J., concurring) ("I wish to note ... that to the extent that the County and various amici argue that MERS has violated the clear prohibition against separating a lien from its debt and that MERS does not have standing to bring foreclosure actions, those issues remain for another day.").

n218 See supra note 42@ and accompanying text.

n219 Romaine, 861 N.E.2d at 88 (Kaye, C.J., dissenting in part).

n220 See supra Parts II, III.

n221 Cf. Jackson v. Mortg. Elec. Registration Sys., Inc., 770 N.W.2d 487, 491 (Minn. 2009) (discussing the passage of section 507.413(a) of the Minnesota Statutes).

n222 See, e.g., William H. Henning, Amended Article 2: What Went Wrong?, 11 Duq. Bus. L.J. 131, 131 (2009).

53 Wm. & Mary L. Rev. 111, *

n223 See supra notes 44@-67@ and accompanying text.

n224 See supra notes 118@-20 and accompanying text.

149TPX

********** Print Completed **********

Time of Request: Thursday, September 27, 2012   14:42:48 EST

Print Number:    2826:372334999
Number of Lines: 1292
Number of Pages:

Send To:  Krawczyk, Andrew
          STAFNE LAW FIRM
          239 N OLYMPIC AVE
          ARLINGTON, WA 98223-1336