Appendix 4



Copyright (c) 2011 Law Review Association of the Quinnipiac University School of Law
Quinnipiac Law Review

2011

Quinnipiac Law Review

*29 Quinnipiac L. Rev. 551*

**LENGTH:** 29314 words

ARTICLE: Standing in Our Own Sunshine: Reconsidering Standing, Transparency, and Accuracy in Foreclosures

**NAME:** Dustin A. Zacks*

**BIO:** * Dustin A. Zacks is an associate at Ice Legal, P.A. B.A., University of Michigan, 2004; J.D. University of Michigan Law School, 2007. I am immensely grateful to Enrique Nieves, III and Eric Zacks for their comments and suggestions on earlier drafts. The views expressed herein are solely those of the author and should not be attributed to the author's firm or its clients.

**LEXISNEXIS SUMMARY:**
   ... Loans originated in MERS's name list MERS as the mortgagee or beneficiary, and the public records list MERS in that capacity - despite the fact that MERS does not own the equitable interest in the loans, meaning that it is not entitled to the proceeds of a foreclosure action, whether in terms of property or in terms of proceeds from auction.   ... The varying choices of theories of MERS's interests in loans result in the majority of courts granting MERS standing to foreclose, lift a bankruptcy stay, or transfer rights to mortgages via assignment.   ... But a second concern regarding MERS's status as nominee should give courts pause to consider whether lenders truly know what they are supposedly assenting to by disbursing money in connection with MERS mortgages and deeds of trust.   ... In addition, as the Landmark case points out, MERS's ability or inability to demonstrate holder status may impede future litigants' abilities to foreclose based on the invalidation of MERS assignments that purport to transfer notes along with mortgages.   ... The mere fact that the foreclosing bank or servicer now has possession of an alleged original note is enough for many courts to ignore the finer distinctions of MERS assignments.   ... MERS could still retain some cost savings benefit to lenders, however: MERS still remains a useful database for lenders and servicers to track such changes, rendering full title searches unnecessary before sales of loans; MERS still retains the clearinghouse function it maintains now, enabling a single servicer's employees, appointed as officers, to track ownership changes; and MERS still does not have to record every transaction in the public records or pay the associated fees.   ... As a result, MERS presents a number of public-policy issues, notably including MERS's information-restricting effect on data previously available in public records and MERS's alteration of longstanding recording laws and practices without democratic input.

**HIGHLIGHT:** "Most of the shadows of this life are caused by our standing in one's own sunshine."

   - Ralph Waldo Emerson n1


**TEXT:**
   [*551]

      I. Introduction

29 Quinnipiac L. Rev. 551, *

Mortgage Electronic Registration Systems, Inc. (MERS) appears across the nation in thousands of court actions as the party seeking to foreclose a mortgage or lift an automatic stay in bankruptcy court. n2 MERS's name is also brought into such actions when an assignment of a mortgage is produced from MERS to the foreclosing or moving entity. n3 MERS is an entity that is listed on millions of loans as the mortgagee or   [*552]  beneficiary under a deed of trust, but explicitly only in its capacity as nominee for the original lender and the lender's assigns. n4 As the mortgagee or beneficiary on the mortgage or deed of trust, the company often appears as the foreclosing entity on delinquent loans or as the party seeking to lift an automatic bankruptcy stay when a homeowner has filed a personal bankruptcy. n5 When MERS does not foreclose or move for relief from an automatic stay, it assigns the mortgage to the entity taking such action. n6

The basis upon which MERS has the right to foreclose, lift a stay, or assign a mortgage is newly developing, and courts of all levels have wrestled with exactly why MERS possesses or lacks standing. n7 Even though in 2006, 99.7% of loans registered on the MERS system were not in foreclosure, MERS has recently gained some measure of notoriety over the skyrocketing number of foreclosures in which its name appears. n8 In light of this young company's recent explosion into the nation's legal system, courts have taken a variety of positions on MERS's standing, and indeed MERS's own positions in different courts are often directly contradictory on the issue. One of the core criticisms of this Article is that MERS's arguments to courts are so numerous and contradictory as to make pinning down one core theory of standing impossible. In this way, foreclosing or appearing in court in the name of MERS provides an immense amount of flexibility to argue for its standing, regardless of the underlying merit or veracity of those theories.

MERS has drawn fire not only for its varying theories of standing, but also for the implications of its widespread use in mortgages and deeds of trust. n9 Loans originated in MERS's name list MERS as the mortgagee or beneficiary, and the public records list MERS in that   [*553]  capacity - despite the fact that MERS does not own the equitable interest in the loans, meaning that it is not entitled to the proceeds of a foreclosure action, whether in terms of property or in terms of proceeds from auction. n10 In the public records, MERS remains the mortgagee or beneficiary for the life of the loan, regardless of how many times the original lender transfers the underlying interest. n11 Thus, some commentators have argued that MERS obfuscates the informational goals of public recording statutes. n12 This informational disparity created by MERS means that, for example, homeowners cannot look to the public records to determine who currently owns the beneficial interest in their loan, as they could before the ascendancy of MERS. Commentators have maligned MERS for this change in the information-bearing capacity of the public records on the additional grounds that the changes in recording practices have not been affirmed by democratic changes in recording laws. n13

Part II of this Article provides a brief overview of MERS's creation, development, and usage. Part III explains when MERS might appear in courts around the country. Part IV explores the different theories of MERS's standing, including: 1) actual ownership of a note, a mortgage, or both; 2) Uniform Commercial Code (UCC) statuses, e.g., being a holder of a negotiable mortgage note; 3) status as "nominee" of the entity with the beneficial ownership in the loan; 4) having a form of agency that is different from nominee status; and 4) legal title, equitable title, or both as mortgagee. Part V engages the nascent jurisprudence under which courts have examined different theories of MERS's standing to foreclose, lift a stay, and assign mortgages, deeds of trust, and notes. Part VI examines the most common public-policy criticisms of MERS, including the information disparities it created without democratic input, and the contradictory theories regarding its standing to foreclose that it has asserted to various courts. Part VII examines possible solutions to problems presented at MERS by altering disclosure at origination, by changing MERS's burden of proof in courts, or by MERS deciding unilaterally to cease foreclosing in its own name. Part VIII proceeds to examine possible legislative and unilateral responses to MERS emanating from state legislatures, Congress, lenders, and the Government Sponsored Entities. Part VIX proposes that MERS be   [*554]  strengthened and further regulated to create a nationwide alternative recording system.

Through an examination of the current state of the law, this Article argues that MERS's amorphous nature creates innumerable inconsistencies in MERS's arguments for standing from case to case. The varying choices of theories of MERS's interests in loans result in the majority of courts granting MERS standing to foreclose, lift a bankruptcy stay, or transfer rights to mortgages via assignment. The Article further explores the numerous problems inherent in both legislation supporting MERS's legality and in legislation outlawing MERS's current way of proceeding through courts. Although MERS announced that it will cease from foreclosing in its own name in the near future, n14 the issues surrounding MERS that confront courts, the public, and legislatures will remain prominent through the many cases already filed in MERS's name, through the voluminous MERS assignments still filed daily in courts, and through mortgages still being originated in MERS's name.

29 Quinnipiac L. Rev. 551, *

This Article proposes that the best solution to the problems raised by widespread use of MERS is to neither outlaw MERS nor to explicitly ratify its appearance in court actions and in mortgages, but rather to bolster its information-providing capacity by forcing it to store actual electronic documents that were previously recorded at the local recording level, such as mortgages and assignments. The Article further argues that providing more regulatory oversight of the accuracy of such a bolstered MERS system would eliminate many concerns regarding the accuracy of its records. In this way, we can preserve local jurisdictions' judicial autonomy to make their own decisions about the validity of MERS's standing in courts, while allowing MERS to grow into a modern alternative to outdated and inefficient recording practices that is MERS's very raison d'etre.

II. Who the Bleep Did I Marry?: Mortgage Electronic Registration Systems, Inc.'s Appearance on the National Scene

The Investigation Discovery channel currently airs Who the Bleep  [*555]  Did I Marry?, a program that recounts harrowing tales of people who are happily married, only to find out that their spouse is, for example, a spy or a bank-robber. n15 Attorneys defending against foreclosures or filing personal bankruptcies will no doubt encounter similarly bewildered expressions when an average homeowner asks them: "Who the bleep is MERS, and why are they appearing against me in court?"

The reason for the confusion is that MERS is a separate and distinct company from any original lender or servicer that is the party with whom a mortgagor is most likely to have had dealings. It is highly unlikely that mortgagors signing a MERS mortgage when buying a home understand exactly to whom they are granting a mortgage, or why. MERS, incorporated in 1995, was created to eliminate the need for written and recorded assignments every time the ownership rights in loans are transferred. n16 Recording a mortgage in the name of MERS as nominee for the lender and its assigns means that lenders do not have to deal with the lengthy, error-prone, and expensive process of drafting and recording assignments every time the underlying ownership of the mortgage changes. n17 Regardless of how many times the underlying ownership in the loan is transferred, MERS remains the mortgagee of record. n18 This reduction in the need for assignments led MERS to predict yearly savings of $ 200 million for lenders and servicers. n19 Since 1997, sixty-six million loans have been registered on the MERS system. n20 These loans, as long as they remain in the MERS system, will continue to have MERS listed as the mortgagee on the public records of the county in which the property is located.

MERS is a subsidiary of MERSCORP, Inc., which is "a privately held stock company. [MERSCORP Inc.'s] principal owners are the Mortgage Bankers Association, Fannie Mae, Freddie Mac, Bank of America, Chase, HSBC, CitiMortgage, GMAC, American Land Title  [*556]  Association, and Wells Fargo." n21 MERS's day-to-day functioning depends on its members. These members consist of about 3000 lenders, representing nearly all mortgage lenders. n22 These members may certify their employees to sign documents, such as assignments of mortgages, on behalf of MERS. n23 MERS itself has few employees but has over 20,000 "certifying officers." n24 It is from this unique structure that many criticisms of MERS arise.

III. Encounters with MERS

MERS's interests in notes and mortgages are examined in a number of different settings. First, state courts have reviewed extensive challenges to MERS's standing to foreclose under state law. n25 Next, state and U.S. federal district courts have considered challenges of non-judicial foreclosures n26 conducted by MERS. n27 Third, U.S. bankruptcy courts have examined MERS's status when the company moves to lift an automatic bankruptcy stay so that foreclosure proceedings at the state court level may proceed. n28 Finally, courts of all levels have encountered  [*557]  class action or wrongful foreclosure suits against MERS filed by homeowners who have lost their homes through foreclosure. n29

This Article focuses primarily on the first three scenarios described above. In all of those scenarios, the principal owner of the note and mortgage directs servicers to file the suit, foreclosure, or motion in the name of the owner, the servicer, or MERS itself. n30 If the action is to be undertaken in the name of the actual note holder or owner rather than MERS, MERS makes an assignment to the owner. n31 These assignments have become yet another focal point in MERS litigation, despite the fact that, in those cases, MERS will not be the named plaintiff or defendant. n32

IV. General Theories of MERS's Right to Foreclose or Lift a Stay

29 Quinnipiac L. Rev. 551, *

Assuming that MERS has filed an action or motion in its own name, under what theory does MERS have a right to foreclose a mortgage or lift a bankruptcy stay? n33 Substantially clouding the issue are MERS's own contradictory positions. MERS has acted under a number of different theories, using whatever theory its local counsel has deemed appropriate. n34 Usually, MERS will not plead that it owns the underlying beneficial interest. Its terms and conditions of membership  [*558]  instruct members not to allege that MERS owns the note and mortgage. n35 Similarly, MERS instructs its members not to list MERS as a co-plaintiff. n36

Nonetheless, a wide variety of law firms from state-to-state are suing in the name of MERS. It is only natural that sometimes attorneys appearing on behalf of MERS make a mistake and plead or argue at some stage of litigation that MERS owns the beneficial interest in the loan. n37 Despite these attorneys who ignore MERS's own rules and make such arguments, MERS admits that there is little oversight of what attorneys are saying, signing, and arguing on behalf of MERS. n38 Even if MERS did not have internal rules, however, the plain language of a typical MERS mortgage or deed of trust, as discussed below, should normally serve to dissuade even the bravest attorneys from arguing that MERS owns a beneficial underlying interest in a loan. Given the plain language of the security instruments and MERS's own rules, therefore, it is unlikely that a practitioner will commonly encounter full ownership arguments from MERS's attorneys. In general, MERS's theories of standing are based on its status as nominee, agent, holder, or legal or equitable titleholder. This Article will give a general description of what these terms denote in the MERS context and will describe some of the inherent pitfalls MERS faces when pleading such terms.

[*559]

A. Plain Language - Nominee, Agent, or Both?

Examining the plain language of a MERS Originated Mortgage can require mental acrobatics to determine which different theory of standing might apply. n39 MERS's form mortgages state, nearly always in bold print, that "MERS is the mortgagee under this security instrument." n40 The deeds of trust in non-judicial foreclosure states state that MERS is named as the beneficiary or grantee. These clear descriptions of MERS's rights, if examined out of context, give rise to questions about whether the MERS device separates the mortgage interest from the note, given that the lender is a wholly separate party from MERS.

Courts have ruled that a mortgage may not have a separate existence apart from the note. n41 The consequence of this rule is that a mortgage may be deemed unenforceable by MERS if MERS has impermissibly severed the note from the mortgage.

In Mortgage Electronic Registration Systems, Inc. v. Johnston, a Vermont court ruled that the MERS pathway was indeed an impermissible separation of the note and mortgage. n42 Johnston is atypical of recent MERS jurisprudence, not only because of its result, but also because the court actually attempted to wrestle with the theoretical underpinnings of a MERS mortgage's existence. Most MERS cases do not even consider whether the MERS device is a threat to the unity of the note and mortgage. n43 Nonetheless, as a threshold issue, MERS is clearly concerned about the possibility that remaining designated as the mortgagee while the note is in another company's hands constitutes such a severance. n44 In an effort to avoid similar judicial rulings such as those in Johnston, MERS often points to other language in its mortgages, which contains the following limitation: "MERS is a separate corporation that is acting solely as nominee for Lender and Lender's assigns." n45

At least one court has agreed with MERS's arguments on this point  [*560]  and has ruled that the language regarding a nominee relationship is proof that no disconnect between the note and mortgage exists. n46 Thus, cautious counsel for MERS may choose to file a lawsuit as "MERS, as nominee for [Lender or beneficial interest holder]," rather than as MERS alone. The nominee relationship as envisaged by courts is discussed at length below.

A similar grant of authority to MERS concerns the language that although MERS is the mortgagee, it:

"holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument." n47

This language presumably serves to clarify the nominee relationship often alleged by MERS between itself and the lender. Considering the various analyses and approaches courts have used to try to pin down exactly what constitutes the nominee relationship and to what MERS is entitled as a result of such relationship, it was wise for MERS to specify examples of the grants of power conceptualized by the nominee language. In fact, courts have relied upon the paragraph cited above, and its similar incarnations, extensively, as discussed below. Such definitional extrapolation, however, might not be necessary if MERS mortgages would simply include intended definitions of terms such as "nominee." On the other hand, defining MERS's interests too narrowly would restrict its valuable dexterity in arguing various theories of standing in litigation.

For all the plain language contained in mortgages and security instruments ripe for MERS to adapt as needed in court, the notes are correspondingly deficient. MERS is usually not referred to on promissory notes, other than perhaps the placement of the MERS Identification Number on the note. n48 Accordingly, although MERS might deftly argue that courts should rely on the explicit right to foreclose granted by the security instrument, the right to enforce a note [*561]   is a different matter. Despite the ambiguity of MERS's relationship to notes, courts usually describe MERS mortgages as establishing some form of a nominee or agent relationship between MERS and the owner of the underlying interest in notes and mortgages. The nature of this relationship, as examined by courts, is described more fully in Part V.A below.

B. Holder

When MERS does not plead that it is the owner, nominee, or agent of the owner, it can seek to enforce the note and mortgage using the UCC definition of a "person entitled to enforce an instrument." n49 MERS's status as a holder of notes is one of the more disputed theories of MERS's standing. UCC Article 3, governing negotiable instruments, provides the following:

"Person entitled to enforce" an instrument means (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 3-309 or 3-418(d). A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument. n50

Several reasons exist for MERS commonly asserting holder status. By claiming that it is merely a holder, rather than an owner of any beneficial interest, MERS can avoid sticky questions about whether it actually owns the underlying notes and mortgages and whether its possession of the note is wrongful. In practice, this means that MERS can often merely file an endorsed note with the court that it alleges is the original instrument. In the vast majority of cases discussed below, possession of an alleged original note with an endorsement in blank alone will suffice to show that MERS can foreclose on the mortgage and note as a holder.

Courts examining MERS's holder status rarely step beyond the question of possession of an original document. n51 MERS's status as a holder, however, implicitly references other definitional thresholds   [*562]   within the UCC that are too often ignored. For instance, MERS's status as a holder under section 3-301 must necessarily mean that MERS believes that the notes it is enforcing are negotiable. n52 In the MERS jurisprudence analyzed below, though, it is rare to see a comprehensive discussion of negotiability or non-negotiability of a note. Professor Dale A. Whitman, speaking about negotiability of mortgage notes generally, observes that "cases are quite rare in which courts analyze the negotiability of a mortgage note carefully, and even when they do, the quality of the analysis is often unsatisfying." n53 Negotiability, however, may simply be irrelevant to MERS cases.

Whitman "attempted to identify every reported case, state and federal, decided in the past twenty years, in which the negotiability of a mortgage note was in issue." n54 It appears that the most common instances in which negotiability of a mortgage note is found relevant were in cases discussing: 1) holder in due course status; 2) competing claims to the note; 3) claims under consumer protection statutes; or 4) "set-offs or counterclaims against the note-holder." n55

In the cases analyzed below, MERS rarely, if ever, plead holder in due course status. Apparently, MERS is unconcerned with counterclaims from mortgagors brought under, for example, the Truth in Lending Act n56 or the Act's state counterparts. Alternatively, MERS may be unimpressed that holder in due course status adds any extra protection against counterclaims, given that investors and servicers are supposed to conduct their due diligence to protect against

such claims. n57 Similarly, since some courts have found that MERS is not required to plead that it is the holder in due course, n58 negotiability issues have not arisen.

Nonetheless, the implications of non-negotiability have not been fully played out in the MERS litigation context. Whitman's critique of the very concept of negotiability suggests that, at the very least, anyone can make a cogent argument that a note is non-negotiable. n59 But to plead mere holder status, as MERS often does, one must assume that the [*563] mortgage note is negotiable, because Article 3 of the UCC only applies to negotiable instruments. n60 Since this argument has apparently not been made by mortgagors' attorneys, however, non-negotiability's effect on MERS foreclosures remains to be seen.

Even if a party could prove that a note MERS was seeking to enforce was non-negotiable, it is unclear what benefit a homeowner would gain. Whitman postulates that the right to enforce a non-negotiable note can be obtained by virtue of physical possession of the note, but that an assignment of a mortgage is also likely to enable such a right to enforce. n61 If an issue of non-negotiability arose, it is entirely foreseeable that MERS would simply produce such an assignment. Much of the jurisprudence discussed below concerns MERS's rights indirectly, through dissection of its assignments of mortgages. From courts' proscriptions on MERS's ability to transfer a mortgage, a note, or both, we can try to pin down exactly what rights MERS has in the first place.

The raging debate about whether MERS assignments of mortgages can also transfer notes is most curious, considering that MERS has taken the public position that it does not have authority to transfer notes in its assignments. In In re Cartier, MERS explained the nature of its business, stating that "although mortgage assignments sometimes include language purporting to assign the promissory note as well, such assignments of the note have no legal effect." n62 Despite the mortgage industry's agreement with this statement, n63 at least one court has found that MERS assignments do validly transfer notes. n64 Given that this issue is at least questionable, attorneys for homeowners would do well to contest the negotiation aspect of UCC section 3-301 so as to make the suspect assignments from MERS a key issue. Common sense dictates [*564] that some courts will find that MERS cannot assign away what it does not own.

One unmistakable implication of the UCC's holder requirements in MERS litigation, and indeed all foreclosure litigation concerning a holder, is the necessity of producing the original instrument. Homeowners around the country have become attuned to this requirement, and will often ask the court to force MERS to produce the original document. n65 Whitman notes that this is often difficult for many foreclosure plaintiffs to do. n66 This requirement may be especially burdensome on MERS.

First, MERS does not have a repository where it can search for original notes to be filed in court. n67 MERS has very few employees, as mentioned above, so it would be difficult for MERS to search for thousands of promissory notes in a repository even if it existed. Second, despite the fact that MERS has no such storage facility, MERS often claims to be in actual possession of a note. n68 This claim is, to be charitable, a legal fiction. MERS apparently does not have any qualms about claiming that it can possess notes, even noting that this is the "preferred practice." n69

The reality is that when MERS states that a note has been transferred to it, it is referring to a servicer or custodian ostensibly transferring the note within its company to a certifying officer of MERS. n70 In practical terms, this does not appear to mean that the note actually changes location. Again, MERS admits that it only has sixteen employees checking on certifying officers' transactions. n71 MERS does not even retain records of how many documents are being filed on its behalf by such certifying officers. n72 The alleged transfers that move notes from a servicer to certifying officers of MERS (who are also [*565] employees of the same servicer) are therefore uncertain propositions ripe for dispute.

Before MERS prohibited all members from foreclosing in MERS's name, MERS used to instruct its members not to foreclose in the name of MERS when a note could not be found. n73 This was presumably because, in that case, MERS could not execute a lost note affidavit pursuant to its internal rules. n74 But MERS's certifying officers execute all kinds of other affidavits on behalf of MERS. Further, MERS commonly alleges that it acquires possession of notes even when the physical locus of the note never changed upon MERS's supposed acquisition. It remains unclear why, if MERS's certifying officers can "hold" a note at the servicer's vault, the same certifying officer could not certify that he or she attempted to locate the note.

If MERS cannot, in fact, prove possession of the note to assert its status as holder, other possibilities arise. First, the servicer may request an assignment of mortgage from MERS, so that the servicer may foreclose in its own name or in the name of the beneficial owner. Secondly, in a non-judicial state, MERS might not worry about physical possession of the note if the beneficial owner is not seeking to get a judgment of deficiency. n75 Regardless of the above mentioned difficulties, MERS will often plead holder status. n76

C. Legal Versus Equitable Title

Determinations about MERS's standing often hinge upon courts deciphering what kind of title, aside from nominee, agent, or holder, MERS had in the mortgage in the first place. Standard MERS security instruments in judicial foreclosure jurisdictions state that MERS has legal title to the mortgage. n77 MERS, however, couches this interest in terms of "only" having legal title. n78 In MERS jurisprudence, as discussed below, courts must often examine the nature of this legal title, and contrast it with equitable title. More than one court has had to resort   [*566]   to Black's Law Dictionary to make sense of what MERS means by "only" having legal title. n79

The core distinction between legal and equitable title is that bare legal title is less than full ownership. This theory of legal title is another method used by MERS to indicate that it does not have a beneficial interest in the underlying loans it forecloses. Similar to the language regarding nominee status, MERS can massage the theory of bare legal title to provide yet another justification for courts to find a right to foreclose, lift a stay, or assign a mortgage.

Although the difference between legal title and equitable title may seem minute, the difference between being a legal titleholder and being an equitable titleholder may determine MERS's success or failure on the threshold issue of standing.

V. Courts Examine MERS's Theories of Standing

A. Nominee

In many instances, courts around the country have assumed that if MERS can prove its status as a nominee for the loan owner, then MERS will naturally have the right to foreclose in its own name. n80 Getting to the heart of nominee status, however, is more difficult than might be imagined.

To begin with, "nominee" can have different meanings in different lawsuits. n81 Adding to the confusion over nominee status is the lack of a definition of the term "nominee" in MERS mortgages. More than one court has noted the lack of such a definition. n82 As such, nominee is yet another term where some courts have had to resort to Black's Law Dictionary as a starting reference point. n83

The applicable Black's Law Dictionary definitions of "nominee" are: "(2) A person designated to act in place of another, usu. in a very limited way," and "(3) A party who holds bare legal title for the   [*567]   benefit of others or who receives and distributes funds for the benefit of others." n84

After starting from the Black's Law definition, courts diverge in their analysis of what exactly a nominee is in the sense of MERS foreclosures. For instance, the Johnston court reasoned that MERS's use of the term nominee, rather than referencing status as agent or any applicable power of attorney, suggested that MERS did not intend to encompass those additional meanings. n85

Other courts have stated their belief that the Black's Law definitions encompass some agency duties. n86 In Gomez v. Countrywide Bank, the plaintiffs sued for wrongful foreclosure, alleging that MERS had no right to take any actions as a mere nominee of the beneficiary under a deed of trust. n87 The court disagreed, asserting that the second definition of "nominee" in Black's "indicates that a nominee is a limited agent." n88 Thus, in Gomez, the court ruled that MERS could substitute in a different trustee on the deed of trust for the purpose of initiating the foreclosure action. n89 The Gomez court failed, however, to consider that in many states, nominee or agent status must be recorded in a document produced to the court, such as a corporate resolution or other document. n90

Aside from definitional questions of what a nominee is, courts sometimes ask whether MERS is, in fact, a nominee for the actual owner of loans. n91 Despite the plain language of most uniform mortgages and deeds of trust, MERS occasionally must prove it is the nominee not only of the mortgagee, but also of the owner of the note.

The reasons for not simply assuming that MERS is the nominee for the lender or current note owner as well as the mortgagee delve to the   [*568]   very core of MERS's theory of legal existence. First, litigants have argued that MERS cannot be a nominee for the lender because MERS is never mentioned in promissory notes. n92 Furthermore, although MERS is mentioned as nominee of the lender on mortgages, the lender might not have assented to such status because lenders typically do not sign mortgages to signal their assent to MERS's nominee status.

The court in Bucci v. Lehman Bros. Bank, discussed this very argument and agreed that MERS had the ability to be the nominee for the lender, despite the lender not signing the mortgage. n93 The Bucci court reasoned that Lehman, the

original lender, would not have disbursed the proceeds to the mortgagors had Lehman not assented to MERS's nominee status as enunciated on the subject mortgage. n94 It is reasonable, albeit unremarkable, to assume that a bank would be aware that a home loan it was approving would have the related mortgage granted to MERS. What is notable about the Bucci reasoning is that it assumes, without examination, that no other possibility could exist. MERS did not have to prove anything regarding its nominee status. But a second concern regarding MERS's status as nominee should give courts pause to consider whether lenders truly know what they are supposedly assenting to by disbursing money in connection with MERS mortgages and deeds of trust. n95

This second concern is whether MERS, as nominee, can ever fully represent a note owner or holder in court. Michigan's Court of Appeals, in an unpublished decision in Fair v. Moody, affirmed MERS's substitution out of a case in favor of the holder of the note, LaSalle Bank. n96 The court remarked that "LaSalle' [sic] interest would not have adequately been represented by MERS." n97 Thus, although the Fair and Bucci courts both ruled in favor of MERS's nominee status for the holder or lender by virtue of the terms of the mortgage, the courts raised issues that ought to, in fairness, have been considered more thoroughly.   [*569]   The mere fact that lenders commonly use MERS is no reason to assume that lenders or owners or holders of notes (or their assigns and successors) know, assent to, or fully understand the ramifications of MERS's purported nominee status.

When a court assumes that MERS is a lender's nominee or examines the concept of nominee status, courts next must deal with the ramifications of such a status. In Morgera v. Countrywide Home Loans, the court seemed to expand the concept of MERS's apparent nominee status, going so far as to say that language in the mortgage contract meant that "MERS is the owner and holder of the note as nominee for the lender, and thus MERS can enforce the note on the lender's behalf." n98

The Morgera court did not take care to examine, however, exactly how the limited basis of nominee status means that MERS can own anything in a foreclosure case. In practical terms, the only ownership it seems MERS possesses is ownership of a right to foreclose at the behest of someone else. Even then, someone else dictates MERS's decisions to foreclose. Such reckless throwing about of terms, as the court in Morgera did, does little to clarify MERS's true status.

Contrarily, some courts find inherent problems with the MERS model, even assuming that MERS has properly been designated as nominee. For example, in Johnston, the court held that the note and mortgage had been severed, resulting in the unenforceability of the note and mortgage by MERS. n99 The Johnston court noted that nominee status denotes very limited duties on behalf of another, i.e., holding only legal title, rather than full equitable title. n100 The court thus reasoned that MERS, holding only legal title when a separate lender held equitable title to the note, could not reconnect the severed note and mortgage by virtue of such limited nominee status. n101

A different approach was taken in In re Huggins, however. In Huggins, the court made the bold, unsupported statement that "MERS is acting as nominee for Spectrum, which holds the Note, and therefore there is no disconnection between note and mortgage." n102 The court did   [*570]   not elaborate or even provide any reasoning on why it felt this way. Rather, the court seemed to indicate that it held as it did merely because to not allow MERS to foreclose would lead to "anomalous and perhaps inequitable results" n103 whereby MERS would not have standing to foreclose even though named as nominee and mortgagee.

It is unfortunate that the court ignored a meaningful consideration of the possible severance of the note and mortgage. The court gave great deference to the inconvenience it would cause MERS and the lender if they could not foreclose although MERS was named as nominee in the mortgage. The court, however, did not consider the obvious counterargument, namely that MERS and the lender voluntarily chose to draft the note and mortgage as they did.

The court's reticence to hold the parties accountable for language of their own choosing is disappointing, and unfortunately, all too common. It is unlikely that courts in other arenas are so cavalier about ignoring potentially unenforceable language in contracts merely to avoid inconveniencing one side. In addition, as the Johnston court noted, the potential inconvenience to MERS and lenders is easily overcome: all MERS has to do is assign its rights in the mortgage. n104 Nonetheless, it seems that courts that rely on MERS's nominee status, on the whole, do so to support MERS's contentions that it is has standing to foreclose and lift bankruptcy stays.

The next issue confronting courts examining MERS's nominee status is the relationship between MERS and the beneficial or true owner of loans. In other words, should courts look beyond the plain language of mortgages or deeds of trust to determine if MERS remains nominee for the owner of a loan or its successors? With the exponential growth in the securitization of mortgages, it would seem that MERS's representations to a court that it remains the nominee of the true owner should be examined in greater depth.

One approach is to merely assume this issue away. In Athey v. Mortgage Electronic Registration Systems, the court held that the subject deed of trust gave MERS the right to foreclose. n105 In Athey, HomEq submitted an affidavit claiming that it was the "mortgage servicer for MERS." n106 Despite the fact that MERS never owns loans and there-fore   [*571]   does not employ servicers, the court did not examine the homeowners' claims that MERS could not own or hold the note. n107 The plain language of the deed of trust appointing MERS as nominee, giving it the power to ini-tiate foreclosure actions, was enough to override any concerns about ownership disputes. n108 In Athey, however, there was no claim that the original lender had sold the note.

Even in cases with transfers of the note, many courts will assuredly mimic the reasoning of the Bucci court. In Bucci, as mentioned, the court reasoned that the original lender would not have disbursed the loan funds if it had not assented to MERS being named as nominee on the related mortgage. n109 Similarly, many courts will correctly assume that a lender or successor owner would not buy a MERS loan if it did not assent to MERS remaining its nominee with the associated rights to foreclose. Uniform mortgages, after all, typically state that MERS will be nominee for lender and its assigns and successors in interest.

Other courts, however, have thoroughly examined the underlying ownership of the loans, regardless of nominee status, and have stated that mere allegations by MERS of who owns the note will not be sufficient to show MERS's standing. For example, in In re Sheridan, MERS asserted that it was the nominee of a securitized trust that was the true owner of the underlying note and deed of trust. n110 The court still demanded proof that the party for whom MERS was bringing its motion owned the note. n111 Thus, the court reasoned:

Even if a "nominee" such as MERS could properly bring a motion for stay relief in the name of and on behalf of the real party in interest - the entity that has rights in and pecuniary interest under the Note secured by the Deed of Trust - noth-ing of record adequately establishes who that entity actually is. n112

B. Holder

In contrast to parsing out ramifications of whether MERS is a nominee or agent of a beneficial owner, some cases pre-sent the argument that MERS is the holder of the promissory note under the UCC. As   [*572]   such, some courts have held that on this basis alone, MERS has standing to foreclose or to move to lift a bankruptcy stay.

Despite the fact that MERS has no central repository where it physically "holds" notes, courts may find that mere production of the original note in court is sufficient to establish MERS's holder status. In this way, MERS may establish its standing while avoiding the messy question of underlying beneficial ownership.

In establishing holder status under the UCC, MERS has taken a variety of positions. In at least one case, a court found that MERS never made any pretense at being a holder. n113 In others, MERS has stated that notes are frequently transferred to it. n114 If MERS adopts the tactic of claiming holdership, what hurdles might it face?

At least one court has held that the "key question" is "who was the holder of the Note at the time of the Motion [for relief from stay]?" n115 One can extrapolate the Sheridan court's logic to all instances where MERS appears as holder and assume that MERS must be able to show holdership at the time it is seeking relief.

Next, MERS will usually need to present evidence that the note has been endorsed. In most cases, it seems that a blank endorsement on the note will assuage courts' concerns. In Johnston, for instance, the court explicitly concluded that "the "holder' option is not available to MERS because the note is not payable to MERS, nor has it been indorsed, either specifically to MERS or in blank." n116

Although this second prong, endorsement, may seem easy to show in practice, Sheridan provides a cautionary tale for MERS. There, although MERS was eventually able to produce a copy of an endorsed note, it was not able to do so at the time it filed its original motion. The court in Sheridan found that MERS was bound by its earlier allegation that the copy of the note attached to its motion was "true and correct." As that earlier filed copy of the note was unendorsed, MERS was precluded from using a subsequently filed note, which was endorsed, as evidence of its standing. n117

[*573]   When MERS can produce a note endorsed in blank, this will usually suffice to establish its ability to demonstrate holder status. Similar to the establishment of nominee status, establishing holdership appears to lead courts towards the same disregard for who the underlying beneficial owners of the note and mortgage are. In Mortgage Elec-

tronic Registration Systems, Inc. v. Azize, for example, the court explicitly disagreed with the trial court's opinion that MERS could not bring a foreclosure action because it "was not the owner of the beneficial interest in the note." n118 There, the trial court had stated that, even if MERS could establish a case for being a holder (e.g., "based on a transfer by the lender or a servicing agent"), MERS could never establish standing. n119 The District Court of Appeals disagreed, in a case that has been widely cited for MERS's ability to maintain foreclosure actions as holder. n120

It must be noted, however, that even in the Azize case, which is one of the most explicitly pro-MERS-as-holder decisions, MERS's standing in the case should rightfully be questioned. In that case, the homeowner-defendant never once contested MERS's standing as holder, owner, or any other status. n121 Rather, the court conceded, "the issue of MERS's ownership and holding of the note and mortgage was not properly before the trial court for resolution at this stage of the proceedings." n122

Although it appears at this stage that a note endorsed in blank, taken in tandem with MERS's allegations that it is the holder, may be enough to make a prima facie showing of standing, MERS still has reason to worry in certain instances. First, the Sheridan court noted that some bankruptcy courts will not accept solely an endorsement, but may demand a demonstration of the entire chain of title of the subject note. n123 MERS might be warier, then, of claiming holder status in certain bankruptcy courts.

Moreover, in Landmark National Bank v. Kesler, the court stated that even if MERS could establish holder status, it could not foreclose without demonstrating a "tangible interest in the mortgage." n124 Thus, in  [*574]  some jurisdictions, MERS may be unable to foreclose solely with a note endorsed in blank. MERS may also be required to adduce evidence of something more than agent, nominee, or holder status.

In addition, as the Landmark case points out, MERS's ability or inability to demonstrate holder status may impede future litigants' abilities to foreclose based on the invalidation of MERS assignments that purport to transfer notes along with mortgages. n125 The reasoning goes that if MERS never proved its interest as holder of a note to begin with, then it cannot prove its right to further transfer the note. Thus, MERS assignments of mortgages, which often include language purporting to transfer the mortgage together with the note, may be held ineffective. As such, parties further down on the chain of title from MERS may have problems proving their own claims of holdership if they are based on MERS's questionable right to assign the note.

Lastly, the discussion in Part V.B must lead to questions about possession of notes. MERS, servicers, and their attorneys face a multitude of problems based on the sheer number of foreclosure and bankruptcy cases being filed in many states. MERS and its attorneys around the country can be well assured that even a basic amount of diligence would lead most homeowners' attorneys to argue that MERS never has possession of notes, and in this context, can, therefore, never be the holder of those notes under the UCC.

As a final note to the MERS-as-holder discussion, the discussion about possession in this Part may prove irrelevant in non-judicial foreclosure states. At least one court in a non-judicial foreclosure jurisdiction has held that possession of an endorsed note may not matter at all. In Champlaie v. BAC Home Loans Servicing, the court stated that, not only is possession of the note irrelevant, but even production of a copy of the note is unnecessary. n126 Although this discussion was made without reference to holder status under the UCC, it nonetheless appears that MERS will be able to avoid such thorny issues as actual possession of notes in non-judicial states. Furthermore, in Hilmon v. Mortgage Electronic Registration Systems, Inc., the court analyzed the plaintiff's claims that MERS could not foreclose because MERS was not the "holder in due course of the promissory note because it cannot produce the original note." n127 The court simply noted that the applicable  [*575]  Michigan statutes did not require a named mortgagee to be a holder in due course. n128 As such, the court closed off another avenue of contesting MERS's standing using UCC strictures, because the mortgage "specifically identified MERS as the mortgagee and specifically [set] forth that MERS [was] acting solely as nominee for the lender." n129

The UCC also provides that a party can be a nonholder in possession of the note who has the rights of a holder. n130 Jurisprudence on this particular theory as it pertains to MERS is sparse. One reason may be because MERS simply does not choose to utilize this theory. n131 Another rationale may be that MERS would face additional proof issues about how it came to acquire the rights of the holder. For example, in In re Wilhelm, the court noted that MERS would still need to prove possession of the note. n132 As noted above, actual possession presents thorny issues of fact for a body such as MERS, which "possesses" notes only through appointed officers at servicing companies. Furthermore, the Wilhelm court stated that aspiring nonholders with the rights of holders "must prove the transaction by which they acquired [possession of] the notes." n133 In Wilhelm, this requirement was fatal to the foreclosing entities' cases, as their MERS assignments did not transfer any rights in the note. n134

C. Legal Title Versus Equitable Title

In addition to arguing nominee, agent, and holder status, MERS has also argued that its legal title in mortgages gives it the right to appear in court as a foreclosing entity or as a party seeking to lift a bankruptcy stay. As discussed above, typical MERS mortgages or deeds of trust provide that MERS holds legal title to the mortgage or deed. Because of the varying interpretations of the concept of legal title, it is useful to begin with the Black's Law definition of legal title, as the court in  [*576]  Johnston did: "[a] title that evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest." n135

MERS meets the prong of apparent ownership clearly enough, as its mortgages are recorded on the public records of counties around the country. This can, however, lead to public-policy arguments, n136 that MERS improperly conceals the true owners of mortgages and notes.

In contrast, MERS's legal counsel inconsistently argues the prong of full and complete title or a beneficial interest. In Sheridan, MERS conceded that it had no economic benefit, or beneficial interest, under the deed of trust. n137 Likewise, in Landmark, MERS tried to persuade the court that its economic benefit under the mortgage, or lack thereof, was irrelevant because of its status as mortgagee. n138 In Revoredo, however, the court noted that although it was perhaps "disingenuous," MERS nonetheless had argued that it held the "status of a conventional "actual' mortgagee." n139 Such inconsistency undoubtedly results from the fact that it is servicers, and not MERS, who are in charge of day-to-day foreclosure and bankruptcy litigation. n140 Accordingly, different attorneys nationwide are receiving different instructions on how exactly to argue MERS's standing. Further such inconsistencies in MERS's positions will be examined in Part VI of this Article.

Some courts have held that examination as to whether legal title confers standing upon MERS is unnecessary. As discussed above, courts may ignore substantive examinations of MERS's actual title due to plain language regarding nominee status. n141 Furthermore, other courts will undoubtedly reason that regardless of whether MERS's interest is legal or equitable, any such interest would be subordinate to the interest in the note. This logic was spelled out explicitly by the U.S. Supreme Court in Carpenter v. Longan, when it found that "whether the title of the assignee is legal or equitable is immaterial ... All the  [*577]  authorities agree that the debt is the principal thing and the mortgage an accessory." n142

From the author's own experience, it is commonplace for banks' attorneys to downplay inconsistencies in MERS ownership interests by endlessly repeating the mantra that "the mortgage follows the note," and therefore that mere possession of an endorsed note may entitle a party to proceed in foreclosure. One can reasonably assume that MERS's attorneys are doing the same all around the country. Nonetheless, various courts have wrestled with the idea of MERS's titles in mortgages and deeds of trust and have come to differing conclusions about the resulting implications.

First, MERS has encountered arguments that holding legal title to the mortgage, while at the same time remaining unmentioned on the note, will result in the separation of the note and mortgage. n143 In Johnston, the court acknowledged that MERS only held legal title to the mortgage, and not the note. n144 Thus, the court held that the nominee language failed to "connect the severed note and mortgage." n145

Next, when MERS argues that it holds bare legal title, courts are faced with the incongruous result of awarding a foreclosure sale in favor of MERS, which would ostensibly deliver the proceeds to the beneficial interest in the mortgage. The Johnston court noticed this inconsistency, pointing out that awarding MERS full title to the property when it is only named as legal titleholder in the mortgage document itself would be an incongruous result. n146

The decision rendered in LaSalle Bank National Association v. Lamy echoes this viewpoint, opining that MERS has no beneficial ownership in notes or mortgages. n147 Accordingly, the Lamy court held that a MERS assignment was ineffective to transfer anything. n148 Lamy marks one instance where a court used MERS's own language against it: because MERS was only a nominee and was recorded in the public records as such, it could not hold any beneficial interest in the mortgage  [*578]  or note. n149 Accordingly, the court implicitly held that anything less than full ownership, e.g., legal title, would not be sufficient to have the right to transfer the underlying rights to the note and mortgage.

Similarly, in Landmark, the court held that because MERS could not show any economic interest (read: equitable title) in the loan, whether by lending money or bearing a loss upon default, it did not have standing as a necessary party to a foreclosure action. n150 Landmark, as with Lamy, implicitly rejected the theory that bare legal title confers standing, stating that MERS's inability to demonstrate a "tangible interest" in the mortgage precluded it from claiming any

independent right to appear in the underlying foreclosure proceedings. Cited in the Landmark decision is the Arkansas Supreme Court decision in Mortgage Electronic Registration Systems, Inc. v. Southwest Homes. n151 The court there held that MERS was not a necessary party to underlying foreclosure proceedings. n152 The court held that despite the language in the subject deed of trust, MERS "could not obtain legal title." n153 This was because a) even though the deed of trust named MERS as beneficiary, MERS received no payments on the debt, and b) MERS held "no property interest in the mortgaged land." n154 Southwest, then, goes even further than Landmark, by holding that MERS never had legal title. The court essentially ruled that the language in the deed of trust was a fiction.

Although they are, at first glance, groundbreaking, the Lamy, Landmark, and Southwest decisions may be limited in their scope. First, they are just three cases in which the distinguishing factor, legal versus equitable title, led to a decision contrary to MERS's interests. Lamy, Landmark, and Southwest are probably the exception rather than the rule. Second, MERS's other available theories of standing, such as nominee, agent, or holder, appear to be having great success at all levels of courts nationwide. It is doubtful that MERS will couch its standing arguments strictly in terms of its legal title except as an absolute last resort.

Finally, MERS will undoubtedly argue to those who cite the aforementioned three cases that they are limited in their scope and distinguishable from the typical scenario in which MERS appears in  [*579]  courts: Landmark and Southwest are cases where underlying litigation proceeded at some length without MERS's participation. Thus, the cases concerned only whether MERS was a necessary party. When another party has initiated and concluded an entire foreclosure action, courts will understandably look with skepticism towards MERS's rights. But the gulf between necessary party status and initiating a foreclosure action or moving for a relief from a bankruptcy stay is wide. If courts are confronted with MERS as the foreclosing entity from the start, it appears unlikely, judging from the other cases examined herein, that the average trial court will go as far as the Landmark and Southwest cases did in examining MERS's legal title claims.

The import of Lamy may be similarly limited based upon the fact that the court may have been induced to take a cynical view towards MERS's assignment in the case due to the plaintiff-bank's apparent missteps in the case. The plaintiff presented the court with an undated allonge to the note after the case was filed. n155 The allonge, however, was not permanently affixed to the note, as required by the UCC. n156 It is unclear whether the court would have even considered MERS's underlying interests in the note and mortgage if the court had not been forced to examine the MERS assignment due to the deficient nature of the allonge. If the court could simply have relied on the bank's holder status with a properly endorsed note, the unfavorable ruling as to MERS's interests may not have emerged at all.

D. MERS's Right to Assign Anything

Although much of the emerging MERS jurisprudence deals with MERS's standing, MERS's murky status can cause problems for all kinds of litigants down the stream of ownership. Most notably, this can emerge from MERS assignments of mortgages, which are being filed by the thousands. This Part will explore the various interpretations, both pro-and anti-MERS, that courts have given to MERS assignments of mortgages.

MERS assignments of mortgages emerge any time a servicer desires a foreclosure to proceed in its own name, rather than in MERS's. n157 MERS also produces assignments any time a loan is sold to  [*580]  a non-MERS member. n158 Because of the unique nature of MERS, these assignments of mortgage also have unique characteristics.

To begin, the same processes that produced documents purportedly signed by officers of MERS are in play when considering MERS assignments of mortgages. That is, it is employees of servicers, not employees of MERS itself, who are executing the assignments. n159 The same considerations therefore apply to MERS assignments as those in the most outrageous cases of "robo-signing." Escalating numbers of foreclosures resulted in shortcuts and outright fraud when servicers produced perjurious affidavits as evidence around the country. n160 Thus, it is paramount to remember that these same servicers (and admitted robo-signers) executed and supposedly verified MERS assignments for their truthfulness and accuracy. Although this does not appear to have gained nationwide traction as a defense against banks' use of MERS assignments, the author has found that, quite often, the MERS officers signing the assignments have no idea what did or did not happen on the dates of transfer alleged in the assignment itself. At least one court, however, has become suspicious of MERS assignments and the fact that servicers' employees sign on behalf of MERS and other companies on such assignments. n161

Second, MERS assignments are unique in that they do not purport to memorialize any physical transfer from MERS to anyone. In the pre-MERS era, an assignment of mortgage would typically signify a transfer of possession.

n162 MERS admits, however, that it does not physically transfer any documents to anyone. n163 MERS assignments are therefore a novel way of showing a supposed transfer in ownership interest.

[*581]   In addition, assignments from MERS are often drafted with superfluous language, such as the allegation that the mortgage was being transferred "together with the Note and indebtedness secured thereby." n164 Apparently, many foreclosure plaintiffs' lawyers did not recognize that MERS's ownership interest is unique. MERS itself admits that the language is superfluous, n165 yet lawyers continually draft assignments with such language on behalf of MERS.

MERS assignments of mortgages also do not always correspond with MERS's own internal records. In the pre-MERS era, assignments of mortgage, even when they memorialized some earlier transfer, ostensibly made some good-faith attempts at being accurate. MERS assignments, however, and the dates of transfer represented on them, often do not even match up with MERS's own internal records. n166 Thus, it is not at all uncommon for the author to find the date of alleged transfer on the assignment to be totally absent on MERS's internal records of the tracking of beneficial ownership. n167

Finally, MERS assignments are unique in that they usually do not reflect the intervening transfers that occurred when loans were pooled together as mortgage-backed securities. For that matter, the MERS assignments do not reflect any intervening transfers whether the loan was securitized or not. n168 Indeed, the time and money saved in reducing the need for recording such intervening assignments was one of the most elemental goals of establishing MERS. n169 Thus, a securitized loan may travel from the original lender to several parties before being placed in a trust. Yet the only assignment recorded in the county records or produced in foreclosure litigation might be from MERS to the eventual foreclosing entity. Therefore, MERS assignments of mortgages present novel characteristics that have been confronted in different ways by various courts.

Some of the harshest assessments made regarding MERS assignments stem from the third point discussed above - that MERS   [*582]   assignments often purport to transfer notes as well as mortgages. In Wilhelm, the movants were trying to establish that they possessed the applicable promissory notes. n170 They were relying on MERS assignments of mortgages to show a "transaction by which they acquired possession of the notes." n171 Yet the court did not merely assume that the assignments alone established the movants' ability to enforce the notes. Rather, the court noted the bank's argument with skepticism: "Movants seem to presume that the assignments, standing alone, entitle them to enforce the underlying notes. Such a presumption is unfounded, however, because Movants have not established MERS's authority to transfer the notes at issue." n172 The Wilhelm court drew the conclusion that MERS deeds of trust do not authorize MERS to transfer promissory notes, whether explicitly or implicitly. n173 Thus, in the context of bankruptcy, Wilhelm stood for the proposition that MERS assignments could not establish that an ownership interest in the note was transferred by MERS, despite the fact that the movants might have been able to establish possession of the physical notes themselves.

A United States district court agreed with the reasoning of Wilhelm in Saxon Mortgage Services, Inc. v. Hillery. n174 There, the court held that the MERS assignment of mortgage was not proof of a transfer of the note, because 1) no evidence established the MERS ever held the note, and 2) no proof of authority from the original lender was submitted to show that MERS had the authority to transfer the note. n175

The above decisions, however, are likely in the minority. By way of contrast, the court in Chase Home Finance, LLC v. Fequiere, n176 downplayed the very issue of the validity of MERS assignments. There the court held that even if the MERS assignment were invalid, the plaintiff had established physical possession of an endorsed note, and therefore that the MERS assignment was irrelevant. n177 From the author's experience, n178 this is the most common argument made by banks to get around attacks on MERS's ability to transfer notes. The   [*583]   mere fact that the foreclosing bank or servicer now has possession of an alleged original note is enough for many courts to ignore the finer distinctions of MERS assignments. Accordingly, it is most probable that nationwide, MERS assignments purporting to transfer notes along with mortgages may prove to be a stumbling block in some instances, but not an impossible hurdle to overcome for banks. Many judges will ignore the purported transfer by MERS of notes via assignment. n179

Even if courts do examine MERS's supposed transfer of notes, it is not at all certain that courts will rule that MERS cannot transfer notes, whether via assignment or via any other legal document. In Crum v. LaSalle Bank, for example, the Alabama Court of Civil Appeals found that because "MERS was authorized to perform any act on the lender's behalf as to the property, including selling the note and the mortgage to a third party," the MERS assignment was valid to transfer the legal and equitable title to the note and mortgage. n180 The Crum court did not ask the corollary question: Even if MERS were given explicit authority to transfer notes, did that actually occur? The court took the MERS as-

signment at face value, pointing to its "consideration that included a $ 10 payment to MERS." n181 The court did not, however, ask whether the events alleged on the face of the assignment and apparently allowed by the mortgage language actually occurred. As we have seen from MERS's own admissions, no physical transfer of the note occurs from MERS to any other company. n182

[*584]   Aside from the reasons above, MERS assignments have been challenged on other grounds. Prominent among these is the circumstance discussed in Carter v. Deutsche Bank National Trust Co., where a plaintiff-homeowner argued against the validity of a MERS assignment based upon the fact that, at the time of the assignment, MERS was a suspended corporation in California. n183 The Carter court held that MERS was not exempt from state registration requirements in order to transfer a deed of trust. n184 Accordingly, because MERS was not properly registered at the time of the assignment, the assignment was held invalid. n185

MERS's standing and right to assign mortgages and notes is therefore in flux. Although it appears from the wide survey of cases above that a majority of courts recognize the right of MERS to foreclose in its own name, to lift bankruptcy stays, and to assign mortgages, MERS remains threatened by daily attacks from homeowners regarding its standing. Given that MERS appears on over half of all residential mortgage loans in the United States, n186 it is imperative to examine the emerging public-policy ramifications of this company whose exact   [*585]   relationship to notes and mortgages is so difficult to define with complete accuracy.

VI. Public Policy Ramifications of MERS

Part VI of the Article will discuss the public-policy ramifications of the widespread use of MERS mortgages and deeds of trust and the consequences of the emerging jurisprudence. First, this Part will consider the informational deficit created by the use of the MERS device nationwide. One of the key MERS talking points about the positive benefits of MERS is that it creates transparency for homeowners and the public at large. n187 This is so, MERS claims, because MERS makes the name of the servicer available to all on its website. n188 In some instances, the name of the investor in a homeowner's loan is available as well. n189 In fact, MERS goes so far as to assert that "most contested foreclosure and bankruptcy cases boil down to a lack of understanding of MERS's role, and the more attorneys know about the relationship between MERS and its members, the fewer complications should be encountered." n190 After even a cursory glance at the emerging jurisprudence dealing with MERS issues, however, it immediately becomes apparent that MERS actually muddies the waters of home ownership and rights to foreclose, contributing to the very "lack of understanding" MERS laments.

In the aggregate, this is evidenced by the innumerable inconsistent statements MERS has made in courts. Professor Christopher Peterson notes that MERS's theory of existence is akin to the two-faced Roman Deity Janus. n191 Upon examination, however, MERS's directly contravening statements to courts evoke a creature more akin to a many-tentacled squid. The most basic issues confronting courts when dealing with MERS are simply not uniform across the nation.

[*586]   Possession of Promissory Notes

MERS's former President and CEO has admitted that MERS has no central repository where it can hold notes. n192 Yet in court, MERS has not been afraid to claim that, frequently, notes are transferred to it. n193 Likewise, in sworn deposition testimony, MERS's president stated that, indeed, MERS does sometimes have physical possession of notes. n194

Beneficial Ownership

MERS admits that MERS does not hold beneficial ownership in notes and mortgages. n195 Yet MERS has claimed in court that it does, in fact, hold full ownership. n196 Furthermore, William Hultman, the former Senior Vice President of MERSCORP, Inc., does not agree with the statement that MERS is never owed money by borrowers. n197

Pleading Individually or as Nominee

MERS has filed cases in its own name, and it has filed cases in its own name, as the nominee of other companies. Likewise, servicers have filed lawsuits in their own name when no assignment from MERS was in existence. The apparently random choice of whether a servicer sues in its own name or in MERS's name, as nominee, led to a situation in one of the author's cases where a forty-four year veteran of litigation representing the foreclosing entity admitted to a judge that he had no idea whether he represented MERS or the servicer. n198

[*587]   What Does MERS Assign?

MERS assignments are routinely drafted to contain language that purports to transfer the mortgage, "together with the Note and indebtedness secured thereby." n199 Yet MERS itself admits that that language has no legal effect. n200

Who Assigns Mortgages?

Very rarely do courts tackle the fact that MERS assignments are actually prepared, requested by, and signed by people who do not work for MERS, and who often have no knowledge of even the most rudimentary facts about MERS. Yet despite foreclosing entities presenting assignments as supposedly "from MERS," the truth is that the servicers, not MERS, assign mortgages out of the MERS system. n201

For whom is MERS Serving as Nominee?

MERS has claimed in court that, on the basis of language in MERS mortgages and deeds of trust, it is the mortgagee or the beneficiary, respectively, on behalf of the lender. n202 Yet courts have recognized that MERS might not ever know who has the beneficial interest in notes. n203

MERS's Allegations of Default

MERS, as a foreclosure or bankruptcy party, will naturally claim in   [*588]   court that a homeowner is in default and has missed certain payments. Yet MERS's President and CEO admits that the MERS system has no information on the status of the loan or what payments were or were not missed. n204

MERS Assignments and Consideration in Connection Thereto

MERS assignments, as with all assignments, make some statement about valuable consideration being paid in exchange for the assignment. Yet R.K. Arnold admits that MERS does not receive any consideration from the new holder of the note when the new holder gets possession of the note. n205

MERS Officers - By whom Are They Authorized to Act?

The MERS officers who sign assignments of mortgages are supposed to be an officer of the MERS member who has the authority to bind that member. n206 Yet there is no policeman or regulator that verifies that the officer signing on behalf of MERS is, in fact, an officer of a servicer or bank. n207

MERS Officers - Do They Have Any Knowledge of MERS at All?

MERS officers sign as Vice President, Assistant Vice President, or Assistant Secretary of MERS. Yet such officers routinely admit that they do not have basic knowledge about what MERS is, and that they do not owe any duties to MERS. n208 Under congressional scrutiny, R.K. Arnold claimed that such officers have to pass a test. n209 But upon deposition, MERS officers have admitted that this is, or at least was not previously, the case. n210

[*589]   Accuracy of MERS Transactions

MERS has stated that the purpose of its system is to "track both beneficial ownership interests in, and servicing rights to, mortgage loans as they change hands throughout the life of the loan." n211 MERS cites its system as a benefit in terms of accurately recording such transfers, noting that "error rates as high as 33% were common" in the pre-MERS era. n212 Yet MERS admits that its attitudes about accuracy in ownership transfer records are blase: when asked how MERS verifies that certifying officers were signing accurate documentation, MERS's President and CEO remarked, "Well, if nobody challenges it, then it's probably true." n213 When that attitude is combined with the facts that MERS 1) is not aware every time a certifying officer executes documents on behalf of MERS, n214 2) has no idea how many affidavits, assignments, deeds, endorsements, or proofs of claim are done in its name, n215 3) has no employees to verify such documents, n216 and 4) indemnifies MERS members for the faulty acts of its members, n217 it is doubtful that MERS has any factual basis upon which to allege that its system of tracking ownership is any more accurate than the previous way of tracking note and mortgage transfers.

Accordingly, MERS is not merely a two-faced organization. Rather, it is an almost incomprehensibly amorphous company that changes its legal positions as necessity and jurisdictional requirements dictate. The only logical conclusion to draw, therefore, is that MERS's claims of making ownership of loans more transparent and accurate ring incredibly hollow. More than one court has agreed with this conclusion. n218

[*590]

VII. Possible Changes at the Stages of Origination, Litigation, or Recording to Solve the Informational Deficit Created by MERS

Now that MERS is the mortgagee of record on over sixty-six million loans, n219 it is not easy to prescribe solutions for the informational problems inherent in the MERS model. This Part describes and analyzes specific remedies for the information disparities presented by MERS.

A. More Disclosure to Borrowers at Origination

As mentioned above, one of the most troubling facets of the MERS model is that it can conceal the true owners of loans as well as eliminate from the public record the tracking of changes in ownership. The resulting confusion to distressed homeowners upon receiving a summons from MERS may be eliminated or reduced by more disclosure at the origination stage. Lenders could be required to provide a page or two, separate and distinct from the note, mortgage, or deed of trust, with explanations of what the MERS system is, what it means that a borrower is granting a mortgage to MERS, how it may affect future transfers in ownership and servicing rights to their loan, and how it could affect foreclosure procedures. It is not likely, however, that a more explicit statement of what MERS is and does would provide additional benefits to homeowners.

First, considering the enormous stack of documentation with which homeowners are presented at a closing, it is unclear that an additional page or two of disclosures about MERS would be read at all. n220 In the  [*591]  author's experience, it is far more likely than not that a homeowner will freely admit to not reading all the documentation presented to him or her at a closing.

Given the complex legal structure of MERS, it also is doubtful that a layperson would understand the ramifications that a MERS loan could have in the future. Many borrowers do not understand even the most basic terms of their loan, such as payment terms or interest rates. n221 If the average borrower cannot understand the difference between a fixed or variable interest rate, it is unlikely they will grasp the concept of MERS, which all at once in a mortgage claims to be 1) mortgagee, 2) of record, 3) with bare legal title, 4) but solely as nominee for the lender and its assigns, 5) with the power to foreclose, or 6) to execute documents as dictated by law or custom. n222

In addition, even if the potential frustrations of a MERS loan were made known to perspective borrowers, it is unlikely that borrowers would appropriately evaluate the potential costs that the MERS system could cause them to incur. Consumers incurring debt typically are overoptimistic about their ability to pay back loans, which can lead to underestimating the risks of default and the associated events. n223 If consumers are unable to accurately project the possibility of a default, they will likely downplay the possibility that MERS's masking of transfers of interest will somehow harm them.

Moreover, the practical problems of designing a satisfactory disclosure would be immense. To make a MERS disclosure statement acceptable to both MERS and consumer advocates would be a Herculean task. MERS's own statements in courts across the country, as we have seen, often directly conflict with each other. It would therefore be immensely difficult to pinpoint which core facets of MERS's existence are fact and which are not. Likewise, when spelling out what the day-to-day effect of a loan given to MERS as mortgagee might be for a borrower, MERS and consumer advocates are likely to disagree. Furthermore, it would be impossible to state with any certainty how being a MERS Originated Mortgage loan (MOM loan) could play out in court, because MERS jurisprudence is only now emerging, and, as we  [*592]  have seen, the resulting decisions are, in large part, an incoherent jumble. Therefore, additional disclosure regarding a loan's MERS status at origination is unlikely to significantly change borrowers' decisions.

B. Opt-in/Opt-out Provision

As a corollary to any disclosure-at-origination scheme, legislation or regulation could mandate an opt-in or opt-out provision. Currently, mortgage origination documents are essentially contracts of adhesion. n224 Borrowers could be presented with the choice to accept the loan as a MOM loan (a mortgage originated listing MERS as mortgagee) or not. Such a requirement, however, would evince many practical problems. First, it is unlikely that mere disclosure that a loan is a MOM loan, along with a right to opt out, would signify the actual, informed consent of borrowers. n225 After traversing the time-consuming path of obtaining financing, a disclosure that is unlikely to be understood, as discussed above, is unlikely to stop a borrower from going through with a final closing. Secondly, MERS claims that because its system saves lenders money, those savings are passed on to consumers in terms of more loans being made and better terms being given. n226 There may be some truth to the idea that savings to lenders are passed on to consumers. It can

be hypothesized, for example, that non-judicial foreclosure states, which presumably present less cumbersome procedures for lenders to foreclose, may have more money per average loan and better terms in the average loan when compared to those loans underwritten in judicial foreclosure states. n227

Even assuming that this proposition would hold true for MOM versus non-MOM loans, it would be hard to quantify on a per-loan basis how much the lender would stand to save if the loan were maintained on the MERS system, contrasted with having to record any assignment should the loan eventually be sold. Even if that amount of savings could be quantified, it is unlikely that an individual borrower would choose to [*593] opt-out of the MERS system if they were presented with an additional up front charge, given that the optimism bias cited above would likely lead borrowers to the conclusion that they do not stand to lose very much from their loan being a MOM loan.

We could also consider a more consumer-protective standpoint, and propose an opt-in requirement, as opposed to an opt-out clause. In this way, a MERS disclosure could protect against the passive consent that does not always signify informed, considered consent. n228 But one can easily imagine the following scenario: A borrower is presented with 100 pages of documents, and is told that if he checks the opt-in box, his closing costs will be $ 50 or $ 100 less expensive than they would be if he should choose not check the box. Furthermore, the borrower is told that the note and mortgage themselves are already drafted as if he has opted in to a MOM loan. Thus, should he elect not to check the box, the closing will have to be postponed for another day while the documents are re-drafted. It is unlikely that such an opt-in proposal would have any teeth or provide any more meaningful choice for borrowers. Indeed, MERS itself has argued that "it is not plausible to suggest that Plaintiffs [homeowners] would not have entered into the loans had they known MERS (as compared to some other entity) was not serving as the beneficiary on the deed of trust." n229 Therefore, the informational disparities created by MERS are unlikely to be solved by additional disclosures to borrowers or by requiring an opt-in or opt-out provision at origination.

C. Disclosure of Transfers in Ownership to Homeowners

Given that the standing of MERS is constantly in flux, one solution for MERS's masking of beneficial owners of loans could be to inform homeowners every time the beneficial ownership of their loans changes, despite MERS remaining the mortgagee of record on the public records. This approach has been firmed up by the federal regulations implementing section 131(g) of the Truth in Lending Act (TILA), to which Congress made changes as part of the Helping Families Save Their Homes Act. n230 As part of TILA and the corresponding regulation, any change in beneficial ownership of loans must be disclosed to [*594] borrowers. n231 Unfortunately, this does not solve all of the informational disparities created by MERS and creates some additional difficulties. First, requiring lenders to disclose the loan every time it was sold is unwieldy. Loans that are securitized often go through several changes in ownership. Requiring lenders to disclose each and every such transaction eliminates some of the cost savings of not having to record the assignments in the public records. Subsequently, as discussed, lenders may pass those increased costs onto homeowners. MERS could still retain some cost savings benefit to lenders, however: MERS still remains a useful database for lenders and servicers to track such changes, rendering full title searches unnecessary before sales of loans; MERS still retains the clearinghouse function it maintains now, enabling a single servicer's employees, appointed as officers, to track ownership changes; and MERS still does not have to record every transaction in the public records or pay the associated fees.

Notifying homeowners of beneficial ownership transfers only eliminates the information deficit as to those individual homeowners. The public, in many cases, remains unaware of any transfers in ownership, as MERS usually remains the mortgagee on the public records during securitization. n232 Any requirement that MERS record all transfers of underlying ownership would negate the very reason for its existence. A letter to a homeowner does nothing to inform the public at large about who actually owns some form of lien on a property. Indeed, MERS continues to list many investors on its public loan lookup website as "private." n233

Finally, and perhaps most significantly, enforcement and regulation is difficult. The only time a homeowner with a MERS loan would have occasion to wonder if the underlying ownership of their note had changed were if someone sued them in the name of some underlying party the homeowner has never heard of. Ownership of their loan could change twenty times without the average homeowner having any notice. n234 Reliance is thus upon MERS and its members to accurately [*595] disclose when a loan is sold. Given MERS's utter lack of diligence in ensuring accuracy in documentation filed in its name, it is difficult to see how the regulation implemented is going to be enforced except post facto.

D. Disclosure of Transfers in Ownership to Courts

Another possibility for narrowing the information gap created by the use of the MERS system could be remedied by an across-the-board requirement in foreclosure and bankruptcy proceedings that MERS be able to document each and every previous transfer in ownership. In theory, MERS already tracks every such transfer on its system, but because of the questionable accuracy of such records, judicial oversight could help eliminate any doubts homeowners have about who owns their loans.

This approach, however, does not seem reasonably practicable nor worth its costs. First, such an approach would only solve the informational problems created by MERS at the time of default and related proceedings. The lack of information about who presently owns loans would not be solved by court mandated disclosure once foreclosure has started, presumably years after a loan has been originated. Second, creating such a requirement would contradict the UCC and states' statutes regarding holder status. The vast majority of court rulings that this Article examined above found that, for someone to prove holder status, all that is needed is physical possession of an endorsed note, or at least a copy thereof. n235 Requiring a full and complete tracking of the chain of ownership is simply not part of the statutory requirements. Thus, such an across-the-board mandate would eviscerate much of the current law on negotiable instruments. Furthermore, the mandated disclosure, if enacted federally, would eliminate the freedom of individual jurisdictions to dictate what documentation is needed and what is not.

Finally, much has been written about the fact that foreclosure can be a long, expensive process for banks and servicers. n236 Producing  [*596]  proper documentation has been a major challenge for banks. n237 Initiating a new requirement that the foreclosing entity produce the entire chain of ownership in cases where it was previously not required could create more delay, which some observers believe will ultimately forestall a resolution to the housing crisis. n238

E. Changing Recording Systems

Many commentators have remarked about how MERS itself is not the problem and how antiquated recording systems are, in fact, adversely affecting modern processes. n239 One solution, these voices claim, is to reform the land registry title systems themselves. n240 It can be argued that if the recording requirements would go paperless, the need for a system such as MERS could be eliminated. One major problem with this idea is that it does not account for the severe lack of funding to which many states have fallen victim. n241 Courts and clerks alike have had to deal with reductions in funding. The lack of funding renders the ability to improve searching and readability capabilities for earlier records a difficult task unlikely to be resolved quickly.

In addition, reforming land recording processes does not completely meet the goals behind the MERS system. Even if records were user-friendly to file, were easily searchable, and were inexpensive to file and retrieve, fees and costs would still inevitably be borne by the recording party. Assuming that MERS assignments were prohibited under such a proposal, n242 (using the reasoning that the update in technology would render MERS obsolete and unnecessary, and that land registry reform would not accept the lack of transparency inherent in  [*597]  MERS), all assignments would once again find their way to the public records. The time and expense of recording such assignments, even if done through a hassle-free electronic system, would be borne by lenders and banks. Those costs, inevitably, would be passed on to consumers. Because it is difficult at this juncture to quantify the impact of requiring such costs to be borne by lenders, one cannot say whether consumers would rather live with some lack of transparency in public records or with the prospect of facing higher costs associated with obtaining a home loan. Nonetheless, on an individual basis, prospective homeowners are unlikely to opt for more transparency if it means higher costs to them at origination. n243 It is unlikely that the public at large necessarily would feel any differently.

Finally, even if consumers were willing to pay more for home loans in exchange for more transparency in the public records, that does nothing to address the status of current MERS loans. If MERS loans were prohibited, as proposed by Marsh, n244 someone would have to foot the bill for assigning all the loans out of the MERS system. This rush to produce assignments would undoubtedly result in more hastily prepared and error-prone documents being filed in our public records, whether electronic or not. n245

F. MERS Itself Reforms

On February 16, 2011, MERS announced that it proposed to cease from foreclosing in its own name. n246 MERS stated that it would require assignments out of the MERS system for all future foreclosures. n247 MERS adopted this policy in July 2011. n248 Although this represents a significant change in MERS's practices, it is not altogether unprecedented. In response to adverse decisions in Florida, MERS prohibited members from foreclosing in its name in

Florida in 2006. n249 Although in practical terms this has meant that practitioners are not able to raise directly the standing of MERS to foreclose at the trial level in   [*598]   Florida, challenges about the accuracy and validity of MERS assignments are still routinely made.

As noted above, courts have yet to resolve fully whether a MERS assignment can transfer a note as well as a mortgage, and courts have yet to resolve whether the certifying officer regime is valid under state laws. Nonetheless, it has been noted that if MERS does indeed stop foreclosing in its own name, such a change would represent a "significant concession." n250

Even though MERS eventually stopped filing foreclosures in its own name, ending the practice will do little to eliminate the problems this Article has sought to elucidate. First, the thousands of cases already filed in the name of MERS around the country will continue, along with the disputes regarding MERS's standing. Given the length of the foreclosure process, especially in judicial foreclosure states, appellate decisions regarding MERS's standing are sure to continue being rendered for years to come.

Next, the MERS assignments of mortgages will continue to be disputed as they are produced in even greater quantities to transfer mortgages to the foreclosing entity. Finally, whether MERS forecloses or not does not resolve the lack of transparency its widespread use has created in the nation's public records. MERS's refusal to foreclose in its own name will not clear up the dearth of information regarding previous mortgage transfers.

VIII. Possible Democratic or Unilateral Responses to MERS

The other public-policy issue commonly raised in protest to the use of MERS is the fact that its elimination of the previous system of recording assignments for every ownership transfer deprives counties of direly needed funds generated by recording fees. n251 Furthermore, this change in the process by which ownership is tracked has been called antidemocratic, given that the creation of MERS effectively rewrote the rules of public recording. n252 Barring consistent nationwide judicial decisions rendering MERS impotent, few alternatives to this problem exist: 1) legislators may enact legislation expressly permitting or   [*599]   denying MERS the right to practice recording as it has been doing, or, 2) lenders and the quasi-governmental agencies, concerned at public outrage and potential documentation problems, could stop using the MERS system. This Part will consider each of these options in turn.

A. Legislation

Legislative responses would presumably eliminate the argument of many commentators that MERS antidemocratically altered public recording laws. Citizens would have a say in how the recording statutes of their state are to be written and enforced. Nonetheless, legislative action on recording statutes is unlikely to generate public fervor. Public awareness of MERS has only been recently evoked. n253 It would not be an entirely true statement to say that a bill passed in a state house would accurately reflect public opinion, given that much of the public is still uninformed.

A case in point is the Minnesota "MERS statute." n254 The bill proposing the statute was passed unanimously by both houses of the Minnesota legislature. n255 Yet one would be skeptical of any claim that Minnesota voters are unanimous in their indulgence of MERS.

The Minnesota MERS statute explicitly entitles assignments, satisfactions, releases, or power of attorneys to be recorded, and allows foreclosures if the mortgagee is nominee or agent for a party identified in the mortgage and its assigns, if the document recorded is executed by the mortgagee, and if the document recorded is in recordable form. n256

The statute explicitly instructs county recorders to rely on any document so filed. n257 The bill was aptly dubbed the MERS statute, as it appears to be tailored exactly to the activities that MERS undertakes in connection with delinquent loan litigation. The same critics of MERS on the basis of its antidemocratic changes to recording law will probably not be satisfied with the bill. One can presume that such critics did not envision democratic action that would explicitly give approval to the MERS foreclosure pathway.

[*600]   Even if the statute did satisfy concerns about the clandestine metamorphosis of recording laws, the statute does not solve many of the other fundamental public policy issues regarding MERS raised in this Article. First, the Minnesota statute does not make any headway into clarifying what it means for a document such as an assignment to be "executed by the mortgagee." n258 As discussed above, when a document is executed by MERS as a mortgagee, the officer of MERS is actually an employee of the MERS member, which in most instances is the servicer. n259

The Minnesota statute also does not clarify if the process of appointing MERS officers - printing out a corporate resolution from its website - is valid under other Minnesota laws regarding corporate appointments. Rather, the statute simply assumes away the problem, requiring any document recorded by the mortgagee to be accepted by the county recorder and registrar of titles. One can only assume that attorneys for homeowners will continue to dispute this process to say that the recorded documents are fraudulent or invalid.

The Minnesota statute also does not solve the information gap so widely lamented. By giving approval to the MERS modus operandi of nominee foreclosures and assignments, the legislature did not address, and even eliminated the old ways of disclosure in the public records when a loan was sold. MERS does not have to address the chain of title; instead, it can remain the mortgagee on the public records for the life of the loan, despite any underlying transfers.

The Minnesota Supreme Court relied upon the statute in Jackson v. MERS, wherein the court recognized that "by passing the MERS statute, the legislature appears to have given approval to MERS' operating system for purposes of recording." n260 The court went further, saying that assignments of notes do not have to be recorded, so long as the security instrument was not transferred. n261 Recognizing that legal and equitable title can be separated, the court held that MERS could foreclose in its own name without recording any transfer of the underlying note. n262 Although the court indicated that a better public   [*601]   policy would be to require such transfers of the underlying debt to be recorded, it recognized that a ruling on that issue would be outside the scope of its authority. n263

The great irony, of course, is that those arguing for democratic input into changes in recording practices by MERS would likely be in favor of the exact opposite of the result found in Jackson. Yet, in a case of "be careful what you wish for," the Minnesota statute has solidified MERS's standing arguments in that state. Democratic action has failed to resolve the public policy problems created by MERS.

On the opposite end of the spectrum, lawmakers in Virginia are currently debating a bill that would severely restrict MERS's abilities to foreclose. n264 House Bill 1506 sets forth numerous requirements that would hamper the typical MERS foreclosure tactics. First, the bill provides that any party asserting holder status must be able to "trace his interest through the duly recorded assignments to the original grantee or mortgagee." n265 This requirement, along with its corollary requiring all assignments to be recorded, might not be as big a leap as it seems at first glance. MOM loans state that MERS is the mortgagee, although as nominee only. Thus, a single assignment from MERS to the party asserting holdership would arguably be sufficient to meet the requirements of the bill - a situation not unlike the present.

Secondly, and more significantly, the bill provides that "[a] nominee of a grantee, mortgagee, or beneficiary for a deed of trust or mortgage has no authority to request that the trustee, or any substitute trustee, proceed with any sale of the property." n266 The proposed statute would define a nominee as "a person who is designated in the deed of trust or mortgage, or who is subsequently designated to act on behalf of the grantee, mortgagee, or beneficiary. The term ""nominee' does not include an agent or other fiduciary." n267 We must first examine whether the statute would apply to MERS.

As discussed above, MERS has often described itself or has been described by courts essentially as an agent. n268 One can presume that MERS might simply amend its pleadings to state that it is an agent in fact for the lender, holder, or owner, instead of a nominee. In that case, it is not immediately clear whether Virginia courts would preclude   [*602]   MERS from foreclosing in its own name, because the proposed statute does not parse out the difference between an "agent" and a person "designated to act on behalf of the grantee, mortgagee, or beneficiary." n269 If MERS could not prove its status as agent, though, it appears that the statute would preclude MERS from filing a foreclosure action in its own name. The loophole for MERS to plead agency status is yet another example of how MERS being defined in so many different ways in courts around the nation makes democratic action to limit its abilities unwieldy. Just as in court MERS often argues that it is an agent, nominee, or owner, so too could it argue in response to this bill. The inability of the public and lawmakers to pin down an exact definition of MERS renders drafting statutory language sufficient to encapsulate all of MERS's activities very difficult.

Finally, Virginia House Bill 1506 provides for increased penalties for fraudulent statements and documentation filed in foreclosure actions. n270 The bill, therefore, speaks directly to the problems of which MERS has often been accused. Servicers' employees, including those signing as officers of MERS, would face penalties of up to $ 5000 for each instance of filing false documentation. n271

On the federal level, lawmakers have proposed additional action directed towards MERS. The Transparency and Security in Mortgage Registration Act of 2010 seeks "to prohibit Fannie Mae, Freddie Mac, and Ginnie Mae from owning or guaranteeing any mortgage that is assigned to [MERS] or for which MERS is the mortgagee of record." n272

The bill would prohibit any of these government-sponsored enterprises (GSEs) from purchasing, acquiring, making new loans on the security of, making new investments in securities consisting of, or otherwise entering new deals with MERS mortgages. n273 Furthermore, the bill prescribes that within six months of passage, all MOM loans "owned, guaranteed, or securitized" by the GSEs must "be assigned to the servicer, holder, or creditor." n274

First, the proposed changes, if enacted, will have an enormous effect on lending practices in the future. In 2009, the GSEs "financed three-quarters of new mortgages originated." n275 If MOM loans were  [*603]  prohibited from being owned or guaranteed by the GSEs in the future, one can presume that lenders would no longer offer such loans if they were seeking GSE backing. Given the huge chunk of lending that this represents, the enactment of the bill would drastically, if not totally, reduce the industry practice of originating mortgages and deeds of trust in the name of MERS. The bill would also reduce the marketability of MOM loans on the secondary market. The GSEs, not permitted to invest in new MOM loans, would be precluded from obtaining securities that contained any such loans.

Furthermore, as to existing loans owned or guaranteed by the GSEs, the proposed requirement that currently owned GSE mortgages be transferred out of the MERS system would represent a gargantuan task for the banking industry. In 2009, Fannie Mae and Freddie Mac "owned or guaranteed roughly half of all outstanding mortgages." n276 For each and every one of these loans granted in favor of MERS, the mortgages would have to be assigned to the "servicer, holder, or creditor." n277 The paperwork required to accomplish this would be almost unfathomable. This Article has already discussed some of the problems foreclosing entities have in producing such paperwork in relation to delinquent loans. Given that delinquent loans are a small percentage of all loans, a six-month window in which to accomplish assignments or transfers in half of all loans in the country seems impossible.

Additionally, the pressure to accomplish the task within six months might ruin the desire for transparency that critics of MERS so ardently wish for. Fraudulent documentation in mortgage foreclosures is already rampant. n278 The radical escalation in the scale of documentation needed, combined with a tight time frame in which to produce it would only increase pressure to push out assignments with no consideration for accuracy. On a more practical note, the bill provides that the GSEs will not be responsible for the costs of assigning mortgages out of the MERS system. n279 The cost of the bill's passage, then, would be enormous. Requiring the lender or servicer to foot the bill would eliminate some of the cost saving benefits behind writing those mortgages in the name of MERS initially.

 [*604]  The withdrawal of the GSEs from the MERS way of conducting business would thus be a stepping stone toward the death knell for MERS. The GSEs were a major part of sponsoring MERS's birth. n280 Their explicit disapproval and withdrawal would perhaps play a leading role in pushing the lending industry toward another form of electronically tracking mortgages and trying to evade county recording fees.

As we have seen, legislation can take many forms. The fact that some form of democratic action through legislation takes place, though, is not necessarily a panacea for the problems created by MERS.

B. Lender or GSE Responses

JPMorgan Chase & Company (Chase) received some of the most negative publicity regarding fraudulently filed foreclosure documentation. n281 In response, it instituted a temporary halt on foreclosures while it reviewed processes for verifying such documentation. n282 While news of Chase's malfeasance was emerging, its CEO announced that the company had not originated MERS loans since 2008. n283 Chase's CEO noted that "some courts won't accept MERS for foreclosures." n284 No other major lender has since come forward to state that it has ceased using MERS. n285 This does not, however, preclude the possibility that other lenders are simply not publicly announcing their decision.

What is notable about Chase's decision to stop using MERS is that it is the first major lender to publicly express doubts about the viability of MERS in courts. Clearly, although homeowners face an uphill battle  [*605]  in courts, their challenges to MERS have echoed throughout the lending industry. It remains to be seen, however, if other lenders take the challenges so seriously. Nonetheless, if the very same bankers behind the creation of MERS begin to doubt its viability, it may sound a death knell for MERS without the need for democratic action.

Similarly, the GSEs may take the initiative and begin to scale down their support for MERS mortgages without waiting for legislative direction such as H.R. 6460. In an ideal world, the GSEs would be as concerned about fraud in foreclosure litigation as Chase is. The GSEs, however, have shown a significant lag in recognizing and rectifying fraud. n286 It is unlikely, therefore, that the GSEs, part-founders of the MERS system, would take a proactive stance and eliminate their association with MERS without a clear legislative, judicial, or regulatory mandate.

29 Quinnipiac L. Rev. 551, *

One of the more prominent points this Article sought to develop is that MERS takes many positions in many different jurisdictions. It has many different theories of ownership interests, enforcement of those interests, and transfers of its rights in loans. This patchwork quilt of theories does not sit well with many commentators. n287 If we get beyond the fact that lawyers for MERS are saying different things to judges in different jurisdictions, a case can be made that MERS can actually be the groundwork for a new nationwide recording system.

[*606]

IX. MERS - A Useful Incremental Step Toward an Alternative Nationwide Recording System

A. Addressing Recording Practices

As seen above, MERS presents several difficult policy and regulatory issues that have yet to be addressed. This Article suggests, however, that MERS can be regulated to generate some positive outcomes by upgrading antiquated and outdated public recording practices. One possibility is to enhance MERS so that it forms or provides the basis of a standardized recording system.

The system would be similar to Professor Marsh's proposal noted above in many respects. Professor Marsh, however, proposes that we replace MERS and local land title systems with a federalized electronic system. n288 Arguing that we should "start from scratch," Marsh believes that lenders and banks should be able to opt out of local recording statutes to an alternative, electronic federal recording system. n289 Marsh's proposal, however, fails to consider one obvious solution: MERS already constitutes a type of nationwide alternative recording system. Furthermore, the costs of creating and adopting such a system would not be a minor undertaking. Local recording statutes have not changed since colonial times, n290 so it remains unlikely that any nationwide recording system created by the federal government would or could be formed quickly and without great expense.

As modified, a MERS-based system could actually help eliminate many of the problems critics of the current recording statutes lament. Professor Marsh, for example, notes that grantor/grantee indexes can be difficult to search. n291 Furthermore, local recording is also an error-prone process, and no standard nationwide system exists. n292 MERS, on the other hand, already has developed a standardized, easy-to-search identifier for all MERS mortgages: the MERS Identification Number, or "MIN." n293 This number, unique to every loan, facilitates searching for information regarding a loan. n294 MERS has also already   [*607]   developed its searchable website to search by homeowner's name or property address. n295

Although MERS currently only reveals the servicer and sometimes the investor in loans, it is not difficult to see that this easy-to-use lookup interface could become richer with data, such as the storing and indexing of actual documents. Given that over half of the nation's mortgages are MERS loans, lenders and servicers apparently approve of the MERS system's ease of use as well. n296 Thus, the ease of uploading information onto the MERS system has apparently already been demonstrated. To simply make the leap and envisage lenders and servicers using MERS as the new nationwide alternative recording system proposed by Marsh is not difficult. This is especially so given the fact that MERS already exists and is functioning, in contrast to some completely new recording system yet to be contemplated.

B. Transparency and Accuracy

To address transparency concerns, as outlined in this Article, a MERS recording database could be forced to reveal the identity of all investors. In light of the fact that federal legislators have already proposed that the GSEs eliminate dealing in MERS loans, significant pressure could be brought to bear on lenders and MERS in exchange for this small concession. n297 Similarly, if MERS were simply required to disclose to the public on its electronic registry or website each and every time beneficial ownership in loans was transferred, many other transparency concerns about MERS would vanish. Many people would not care if an assignment were recorded in local records as long as they felt that MERS was not trying to hide the transfer and as long as the information regarding the transfer were easily accessible.

Accuracy of the disclosures made on the MERS system would remain a paramount concern. A more robust system of oversight would be required to ensure that transactions reflected on the MERS system were accurate. Given that over 20,000 people around the country sign documents as "officers" of MERS, n298 the current employees of MERS simply do not have the capacity to ensure that information is being   [*608]   inputted accurately into the MERS system. Furthermore, it is clear that local recorders, courts of all levels, and GSEs have been slow to recognize frauds being perpetrated in foreclosures around the country. Accordingly, some agency must take responsibility for ensuring the reliability of the records on the new system.

29 Quinnipiac L. Rev. 551, *

Finally, allowing lenders to record on the MERS database would maintain some of the benefits sought by lenders and the GSEs when they created MERS. Although uploading information onto the MERS system is not free, it currently does not cost lenders or servicers anything to update a loan's information on the MERS system. If lenders or servicers choose to risk contravening state notice and foreclosure laws and not upload actual assignments, e.g., only submitting data reflecting a transfer rather than uploading the assignment itself, that would be up to them. They would still retain the cost savings from not having to pay a recording fee at local recording offices.

C. Benefits and Drawbacks

The benefits to this public/private hybrid model of the MERS system as the basis for a new alternative recording database are not difficult to imagine. Lenders would enjoy the same cost savings they do now from the MERS system, borrowers and the public would enjoy the newly updated and easy-to-search MERS-based interface, and regulators would be enabled to ensure the accuracy of records. States and their constituents also would retain their autonomy to determine, for example, whether lenders must to record all intervening assignments or whether MERS could foreclose in its own name. In this way, states can remain the incubator of new ideas in recording laws and can also retain autonomy to determine how they view the murky legal status of MOM loans. Forcing MERS to reveal investors' or true owners' names would address many of the transparency concerns raised in this Article. Furthermore, allowing states to remain the ultimate arbiter of MERS's standing in foreclosure actions would eliminate much of the anti-democratic criticism brought against MERS. Voters would remain free to enact anti-MERS legislation, such as that proposed in Virginia, or to enact legislation ratifying MERS's standing in courts, such as that in Minnesota.

Even for loans not originated in the name of MERS, lenders and servicers, if permitted to use the proposed MERS-based system, would still get the benefit of being able to complete previously burdensome tasks electronically and inexpensively. The public would gain an easy-  [*609]  to-use standardized interface rather than the patchwork system local recording offices currently offer.

One drawback to this proposal is that the current conflicting MERS jurisprudence would not be solved in one thrust. Litigants would remain subject to the many varying interpretations courts give MERS, as discussed in this Article. Although bolstering MERS's transparency and accuracy would help concerns raised earlier about public records, it would do little to provide certainty about how courts interpret MERS's standing. If those standing concerns were not resolved with uniformity, the continuing contradictory theories of MERS would continue to be asserted on its behalf around the nation.

X. Conclusion

This Article examined the various theories of MERS's standing to appear in foreclosures and bankruptcies. Through analyzing a number of illustrative judicial decisions, the Article suggested that most courts will allow MERS to appear in court as nominee or agent for the beneficial owner of loans, or as the legal titleholder or mortgagee. Similarly, on these bases, many courts will hold MERS assignments of mortgage valid, should they be filed as evidence of a transfer of the mortgage, the note, or both.

MERS's own theories of standing, however, widely vary from jurisdiction to jurisdiction and from case to case. This is, in part, because different lawyers represent MERS in different cases, because different servicers and lenders dictate how litigation in the name of MERS proceeds, and because MERS has so many different theories of standing from which to choose.

The Article argued that it is MERS's amorphous structure and the non-exact language in MERS-originated loans that allow it to propound so many different arguments in favor of its standing. Likewise, the Article suggested that courts' different choices for finding in favor of MERS result in a greater number of decisions in favor of MERS's standing. As a result, MERS presents a number of public-policy issues, notably including MERS's information-restricting effect on data previously available in public records and MERS's alteration of longstanding recording laws and practices without democratic input. The Article examined various solutions, including legislative resolutions for and against MERS, court procedural rules affecting MERS's burden of proof in courts, and unilateral solutions, such as lender, GSE, or MERS-initiated responses.

[*610]  In light of the many difficulties presented by the above-mentioned solutions, this Article proposed a possible solution for the problems MERS presents - MERS itself could be strengthened and regulated to form the foundation for a new, alternative national recording system. The MERS system already in place is user-friendly and easy to access. Adding requirements for disclosing transfers as they occur and for disclosing the true owners of loans would

eliminate some of the information-masking concerns MERS has evoked. Similarly, regulatory oversight of the MERS database would help reduce concerns about accuracy in the MERS records. Accordingly, the Article suggested that if the much-maligned MERS system were strengthened to actually store records and documents, and if those records were more firmly regulated, MERS would retain many of the cost-saving benefits for lenders while, at the same time, producing a valuable public good - a modern, updated, electronic registry of public land records.

The proposal would not, however, solve the problem of conflicting arguments being made before courts and the problem of conflicting judicial opinions being handed down from state to state. Given that federal legislation or a Supreme Court decision affirming or rejecting MERS's right to appear in foreclosures and bankruptcy cases seems exceedingly remote, however, strengthening the MERS system and mandating more oversight of its records would provide a step towards transparency and accuracy.

**FOOTNOTES:**

n1. Wisdom for the Soul 644 (Larry Chang ed., 2006).

n2. See, e.g., Mike McIntire, Tracking Loans Through a Firm That Holds Millions, N.Y. Times, Apr. 24, 2009, at B1 (noting that "in the last few years, banks have initiated tens of thousands of foreclosures in the name of MERS - about 13,000 in the New York region alone since 2005").

n3. Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcomm. on Hous. and Cmty. Opportunity H. Fin. Servs. Comm., 111th Cong. 105 (2010) (statement of R.K. Arnold, President and CEO of MERSCORP, Inc.) [hereinafter Mortgage Servicing Hearing], available at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=111_house_hearings&docid=f:63124.pdf.

n4. See McIntire, supra note 2; Freddie Mac, FLORIDA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS) Form 3010 (2011) available at http://www.freddiemac.com/uniform/mers/doc/MERS3010FL.doc. This language states that: ""MERS' is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns." Id. For a more thorough description of MERS, see discussion infra Part II.

n5. See discussion infra Part II.

n6. See discussion infra Part II.

n7. See, e.g., Mortg. Elec. Registration Sys., Inc. v. Sw. Homes, 301 S.W.3d 1 (Ark. 2009); Chase Home Fin., LLC v. Fequiere, 119 Conn. App. 570, 989 A.2d 606 (2010); Landmark Nat'l Bank v. Kesler, 216 P.3d 158 (Kan. 2009).

n8. David F. Borrino, MERS: Ten Years Old, USFN http://usfn.org/AM/Template.cfm?Section=Home&template=/CM/HTMLDisplay.cfm&ContentID=3888 (last visited Aug. 8, 2011).

n9. See, e.g., Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System, 78 U. Cin. L. Rev. 1359, 1374-97 (2010).

n10. Id. at 1361.

n11. Id. at 1361-62.

n12. See, e.g., *id. at 1400-04.*

n13. See, e.g., Peterson, supra note 9, at 1404-06.

n14. MERSCORP, Inc., Rules of Membership 8(d) (2011), available at http://www.mersinc.org/files/filedownload.aspx?id=172&table=ProductFile (prohibiting MERS members from foreclosing in MERS's name after July 22, 2011). See discussion infra Part VI.F.

n15. See Who the (BLEEP) Did I Marry?, Investigation Discovery, http://investigation.discovery.com/tv/whothebleep/ (last visited Aug. 8, 2011) (noting that "these compelling and sometimes startling characters will have viewers shaking their heads in disbelief and wondering how the truths behind these scandalous spouses were kept hidden for so long").

n16. R.K. Arnold, Yes, There is Life on MERS, Prob. & Prop., July/Aug. 1997, at 32, 33-34. In the interest of brevity, I have attempted to avoid an unnecessary duplication of the many articles which already explain the genesis of MERS. For a more detailed explanation of the development of MERS, see Peterson, supra note 9, at 1368-74.

n17. Arnold, supra note 16, at 33.

n18. Id.

n19. Id. at 35.

n20. *Mortgage Servicing Hearing, supra* note 3, at 102.

n21. Id. at 96 n.1.

n22. Id. at 92, 96.

n23. See id. at 103.

n24. *Mortgage Servicing Hearing, supra* note 3, at 170 ("As of November 15, 2010, MERS has 20,302 certifying officers who work with the more than 31 million active loans registered on the MERS system.").

n25. See, e.g., *Landmark Nat'l Bank v. Kesler, 216 P.3d 158, 164-69 (Kan. 2009);* Mortg. Elec. Registration Sys., Inc. v. Johnston, No. 420-6-09 Rdcv, 2009 Vt. Super. LEXIS 15, at 18-29 (Sup. Ct. Rutland County Oct. 28, 2009).

n26. For a succinct explanation of the distinction between judicial and non-judicial foreclosure, see Dan Immergluck, et al., Legislative Responses to the Foreclosure Crisis in Nonjudicial States, at 3-5 (Jan. 2011) (unpublished manuscript), available at http://ssrn.com/abstract=1749609. Non-judicial foreclosures are distinct from judicial foreclosures in that judicial foreclosures incorporate judicial supervision over all steps of the foreclosure process. Id. at 3. In most judicial states, the judicial foreclosure process proceeds much the same as any other traditional lawsuit. Id. Lenders or servicers appear as plaintiffs and sue defendant-homeowners. Id. In non-judicial foreclosure states, by contrast, lenders and servicers can proceed directly to a foreclosure sale

without judicial fiat after filing an initial notice, unless the homeowner files a lawsuit as a plaintiff alleging, for example, wrongful foreclosure based upon lack of standing or lack of proper notice. Immergluck, et al., supra at 3. For purposes of this Article, because MERS appears in judicial as well as non-judicial states, a discussion of both types of MERS litigation is necessary.

n27. See, e.g., *Champlaie v. BAC Home Loans Servicing, 706 F. Supp. 2d 1029, 1047-51 (E.D. Cal. 2009)*.

n28. See, e.g., *In re Huggins, 357 B.R. 180, 184 (Bankr. D. Mass. 2006)*.

n29. See, e.g., Cheryl Rosenblum & Matthew Cardinale, Fulton Class Action Challenges Foreclosures Involving MERS, Atlanta Progressive News (Dec. 2, 2010), http://www.atlantaprogressivenews.com/interspire/news/2010/12/02/fultonclassactionchallengesforeclosuresinvolvingmers.html.

n30. *Mortgage Servicing Hearing, supra* note 3, at 104.

n31. Id. at 105.

n32. See infra Part V.D.

n33. This Article will refer to MERS undertaking activities in court, making legal arguments, or drafting assignments. To be entirely clear, MERS only acts through its members: servicers and lenders. Thus, when the Article says that MERS files an action in court or makes a claim, the person actually filing the lawsuit or arguing a legal point is an attorney, on behalf of a servicer or lender, who told the attorney to file in the name of MERS. No single employee of MERS actually goes to court to argue in favor of a foreclosure. Nonetheless, in the interest of brevity, in the above mentioned situations, the Article will simply relay the message that "MERS argued" or "MERS filed." Even though MERS has ceased foreclosing in its own name, see *MERSCORP, Inc., supra* note 14, MERS foreclosures already initiated will continue to pose conceptual problems for courts across the country for the foreseeable future. Further, the necessity of MERS members to produce voluminous assignments means that many of the same accuracy concerns raised in Part VI, infra, remain apropos.

n34. See, e.g., *Mortg. Elec. Registration Sys., Inc. v. Sw. Homes, 301 S.W.3d 1, 4 (Ark. 2009);* Mortg. Elec. Registration Sys., Inc. v. Johnston, No. 420-6-09 Rdcv, 2009 Vt. Super. LEXIS 15, at 18-19 (Sup. Ct. Rutland County Oct. 28, 2009).

n35. *MERSCORP, Inc., supra* note 14 at 25-26 (2011), available at http://www.mersinc.org/files/filedownload.aspx?id=172&table=ProductFile.

n36. Id. at 26.

n37. See, e.g., *Mortg. Elec. Registration Sys., Inc. v. Revoredo, 955 So. 2d 33, 33 n.1 (Fla. Dist. Ct. App. 2007)* (noting, cynically, that MERS claimed at the lower circuit court level that MERS was the actual mortgagee, rather than an agent, nominee, or mere holder of the note).

n38. Transcript of Videotaped Deposition of William C. Hultman at 150, Henderson v. MERSCORP, Inc., No. CV 2008-900805 (Ala. Circ. Ct. Nov. 11, 2009) [hereinafter Hultman Deposition], available at http://www.scribd.com/doc/43093523/November-11-2009-Deposition-of-William-Hultman-MERSCORP. William Hultman, then a Senior Vice President of MERS, testified as follows:

29 Quinnipiac L. Rev. 551, *

Q: ... . And so again my question is there are 16 people designated to look at that issue, and you have thousands of certifying officers; correct?

A: Are you asking me if I have thousands of certifying officers?

Q: Yes.

A: Yes.

Q: You have 16 people who look at their compliance with this resolution?

A: Generally, yes.

Q: And do you have any idea daily how many transactions are taken in the name of MERS by these thousands of corporate certifying officers?

A: Generally, no.

n39. See Freddie Mac, supra note 4.

n40. See, e.g., id.

n41. Mortg. Elec. Registration Sys., Inc. v. Johnston, No. 420-6-09 Rdcv, 2009 Vt. Super. LEXIS 15, at 22 (Sup. Ct. Rutland County Oct. 28, 2009).

n42. Id.

n43. See, e.g., *Crum v. LaSalle Bank, No. 2080110, 2009 Ala. Civ. App. LEXIS 491* (Ala. Civ. App. Sept. 18, 2009).

n44. *Mortgage Servicing Hearing, supra* note 3, at 155. Even MERS concedes that "without the note, the mortgage has no effect." Id.

n45. See, e.g., Freddie Mac, supra note 4.

n46. *In re Huggins, 357 B.R. 180, 184 (Bankr. D. Mass. 2006).*

n47. See, e.g., Freddie Mac, supra note 4.

n48. See, e.g., *Bucci v. Lehman Bros. Bank, No. PC-2009-3888, 2009 R.I. Super. LEXIS 110, at 15* (Super. Ct. Aug. 25, 2009) (discussing the lack of any mention of MERS on the promissory note).

n49. See U.C.C. § 3-301 (2002).

n50. Id.

n51. Indeed, in some non-judicial jurisdictions, courts rule that possession of an original note is entirely unnecessary to initiate foreclosure proceedings. See, e.g., Morgera v. Countrywide Home Loans, No. 2:09-cv-01476-*MCE-GGH, 2010 U.S. Dist. LEXIS 2037, at 19-20* (E.D. Cal. Jan. 11, 2010).

n52. U.C.C. § 3-104(b) (2002) (""Instrument' means a negotiable instrument.").

n53. Dale A. Whitman, How Negotiability Has Fouled up the Secondary Mortgage Market, and What to Do About It, *37 Pepp. L. Rev. 737, 752 (2010)* (footnote omitted).

n54. *Id. at 754* (footnote omitted).

n55. *Id. at 755-56.*

n56. Truth in Lending Act, *15 U.S.C.§§1601-1667f (2010).*

n57. Whitman, supra note 53, at 746. Whitman notes that "the protection provided by the holder in due course status doctrine is, by itself, completely inadequate." Id.

n58. *Hilmon v. Mortg. Elec. Registration. Sys., Inc., No. 06-13055, 2007 U.S. Dist. LEXIS 29578, at 8-9* (E.D. Mich. Apr. 23, 2007).

n59. Whitman, supra note 53, at 747-51.

n60. Id. at 762-63.

n61. Id. at 758-59.

n62. Mortgage Electronic Registration Systems, Inc.'s Statement Explaining the Nature of Its Business and Providing a Status Report on Its Case Audits at 7 n.20, In re Cartier, Case No. 04-15754 (Bankr. N.D. Ohio 2008), ECF No. 105 [hereinafter MERS Statement], available at http://www.scribd.com/doc/49789469/7/VII-BANKRUPTCY.

n63. Patrick Crook, In Connecticut: Defending MERS as Plaintiff, USFN (Apr. 2006), http://www.usfn.org/AM/Template.cfm?Section=Home&template=/CM/HTMLDisplay.cfm&ContentID=2321

(stating that "separate assignments were necessary because MERS, of course, did not own the note and could not assign it").

n64. See, e.g., *Taylor v. Deutsche Bank Nat'l Trust Co., 44 So. 3d 618, 623 (Fla. Dist. Ct. App. 2010)* ("The written assignment filed as part of the summary judgment documents in the case before us specifically recites that MERS assigned to the appellee, Deutsche Bank, "the Mortgage and Note, and also the said property unto the said Assignee forever, subject to the terms contained in the Mortgage and Note.'").

n65. See Julie Schmit, Homeowners Use "Show Me the Note' to Fight Foreclosure, USA Today (Dec. 21, 2010 8:06 AM), http://www.usatoday.com/money/economy/housing/2010-12-21-mortgagenote21_CV_N.htm; Whitman, supra note 53, at 758-66.

n66. Whitman, supra note 53, at 758.

n67. Transcript of Hearing on Corrected Order to Show Cause at 39, Mortg. Elec. Registration Sys., Inc. v. Cabrera, No. 05-02425 CA 05 (Fla. Cir. Ct. 2005), available at http://mattweidnerlaw.com/blog/wp-content/uploads/2010/12/MERS11-Transcript.pdf (part I), http://mattweidnerlaw.com/blog/wp-content/uploads/2010/12/MERS21-Transcript.pdf (part II).

n68. Id. at 29, 49.

n69. Id. at 29.

n70. Hultman Deposition, supra note 38, at 215.

n71. Id. at 150.

n72. Id. at 153.

n73. *MERSCORP, Inc., supra* note 14, at 26.

n74. *Mortgage Servicing Hearing, supra* note 3, at 107.

n75. See *Champlaie v. BAC Home Loans Servicing, 706 F. Supp. 2d 1029, 1047-51 (E.D. Cal. 2009).*

n76. See, e.g. *Mortg. Elec. Registration Sys., Inc. v. Azize, 965 So. 2d 151, 154 (Fla. Dist. Ct. App. 2007)* (noting that MERS "alleged that it is the owner and holder of the note and mortgage" (emphasis added)).

n77. See, e.g., Freddie Mac, supra note 4.

n78. Id.

n79. See, e.g., Mortg. Elec. Registration Sys., Inc. v. Johnston, No. 420-6-09 Rdcv, 2009 Vt. Super. LEXIS 15, at 22 (Sup. Ct. Rutland County Oct. 28, 2009).

n80. See, e.g., *In re Huggins, 357 B.R. 180, 184 (Bankr. D. Mass. 2006).*

29 Quinnipiac L. Rev. 551, *

n81. See *Landmark Nat'l Bank v. Kesler, 216 P.3d 158, 166 (Kan. 2009)* ("In common parlance the word "nominee' has more than one meaning." (quoting *Thompson v. Meyers, 505 P.2d 680, 684 (Kan. 1973)))*.

n82. See *Johnston, 2009 Vt. Super. LEXIS 15, at 8; Landmark, 216 P.3d at 165*.

n83. See, e.g., *Landmark, 216 P.3d at 166*.

n84. Black's Law Dictionary 1149 (9th ed. 2009).

n85. *Johnston, 2009 Vt. Super. LEXIS 15, at 18-19*.

n86. See, e.g., Gomez v. Countrywide Bank, No. 2:09-cv-01489-*RCJ-LRL, 2009 U.S. Dist. LEXIS 108292, at 2-4* (D. Nev. Oct. 26, 2009).

n87. Id. at 2. Much of the emerging MERS jurisprudence is being developed similarly in non-judicial foreclosure states. In those jurisdictions, homeowners must assume the role of a plaintiff to ask the court for redress against foreclosure by parties, such as MERS, who are alleged to not be the rightful parties to foreclose. See, e.g., Immergluck et. al., supra note 26.

n88. Id. at 4.

n89. Id. at 4-5.

n90. See, e.g., *DGG Dev. Corp. v. Estate of Capponi, 983 So. 2d 1232, 1234 (Fla. Dist. Ct. App. 2008)* (noting that a deed of transfer executed by an officer other than a president, vice-president or CEO must be evidenced by a recorded corporate resolution).

n91. *In re Mitchell, 423 B.R. 914, 917 (D. Nev. 2009)* ("Here, MERS was unable to produce either the promissory note underlying the debtor's obligation or written authority from the holder of that note.").

n92. See, e.g., *Bucci v. Lehman Bros. Bank, No. PC-2009-3888, 2009 R.I. Super. LEXIS 110, at 15* (Super. Ct. Aug. 25, 2009).

n93. Id.

n94. Id.

n95. The obvious counterargument to any questioning of a lender or holder's knowledge or assent to MERS's nominee status is that to originate or hold MERS loans, lenders must be MERS members, implying informed consent to MERS's conduct in these lawsuits. But that counterargument must be tempered with the knowledge that servicers, and not always owners or holders, dictate the strategy of litigation.

n96. *Fair v. Moody, No. 278906, 2008 Mich. App. LEXIS 2542, at 40* (Mich. Ct. App. Dec. 23, 2008).

n97. Id. at 19 (citing Mich. Ct. R. 2.209(A)(3)).

29 Quinnipiac L. Rev. 551, *

n98. Morgera v. Countrywide Home Loans, No. 2:09-cv-01476-*MCE-GGH, 2010 U.S. Dist. LEXIS 2037, at 22 (E.D. Cal. 2010)* (citing *Mortg. Elec. Registration Sys., Inc. v. Azize, 965 So. 2d 151, 153-54 (Fla. Dist. Ct. App. 2007)).*

n99. Mortg. Elec. Registration Sys., Inc. v. Johnston, No. 420-6-09 Rdcv, 2009 Vt. Super. LEXIS 15, at 24 (Sup. Ct. Rutland County Oct. 28, 2009).

n100. Id. at 22.

n101. Id.

n102. *In re Huggins, 357 B.R. 180, 184 (Bankr. D. Mass. 2006).*

n103. Id.

n104. *Johnston, 2009 Vt. Super. LEXIS 15, at 25.*

n105. *Athey v. Mortg. Elec. Registration Sys., Inc., 314 S.W.3d 161, 166 (Tex. App. 2010).*

n106. *Id. at 165.*

n107. See id.

n108. *Id. at 166.*

n109. See *Bucci v. Lehman Bros. Bank, No. PC-2009-3888, 2009 R.I. Super. LEXIS 110, at 15* (Super. Ct. Aug. 25, 2009).

n110. In re Sheridan, No. 08-20381-*TLM, 2009 WL 631355, at 4 (Bankr. D. Idaho 2009).*

n111. See id. at 5.

n112. Id. at 6.

n113. *In re Vargas, 396 B.R. 511, 520 (Bankr. C.D. Cal. 2008).*

n114. *Mortg. Elec. Registration Sys., Inc. v. Azize, 965 So. 2d 151, 153-54 (Fla. Dist. Ct. App. 2007).*

n115. *Sheridan, 2009 WL 631355, at 5.*

n116. Mortg. Elec. Registration Sys., Inc. v. Johnston, No. 420-6-09 Rdcv, 2009 Vt. Super. LEXIS 15, at 11 (Super. Ct. Rutland County Oct. 28, 2009). It is notable, however, that in Johnston, MERS did not even claim to have holder status. Id. at 12. Nonetheless, the court considered and rejected that theory. Id.

n117. *Sheridan, 2009 WL 631355, at 5-6.*

n118. *Azize, 965 So. 2d at 153.*

n119. *Id. at 154.*

n120. See, e.g., *Trent v. Mortg. Elec. Registration Sys., Inc., 288 F. App'x 571, 572 (11th Cir. 2008).*

n121. *Azize, 965 So. 2d at 152.*

n122. *Id. at 154.*

n123. In re Sheridan, No. 08-20381-*TLM, 2009 WL 631355, at 5 n.15 (Bankr. D. Idaho 2009).*

n124. *Landmark Nat'l Bank v. Kesler, 216 P.3d 158, 167 (Kan. 2009).*

n125. Id.

n126. *Champlaie v. BAC Home Loans Servicing, 706 F. Supp. 2d 1029, 1047-51 (E.D. Cal. 2009).*

n127. *Hilmon v. Mortg. Elec. Registration Sys., Inc., No. 06-13055, 2007 U.S. Dist. LEXIS 29578, at 8 (E.D. Mich. 2007).*

n128. Id.

n129. Id. at 10.

n130. U.C.C. § 3-301 (2002).

n131. See, e.g., Mortg. Elec. Registration Sys., Inc. v. Johnston, No. 420-6-09 Rdcv, 2009 Vt. Super. LEXIS 15, at 12-13 (Super. Ct. Rutland County Oct. 28, 2009) (noting that MERS did not plead the theory of being a non-holder in possession with the rights of a holder).

n132. *In re Wilhelm, 407 B.R. 392, 401-03 (Bankr. D. Idaho 2009).*

n133. *Id. at 401* (emphasis omitted) (citing *Idaho Code Ann. § 28-3-203* cmt. 2 (West 2009)).

n134. *Id. at 403-05.*

n135. Black's Law Dictionary 1622 (9th ed. 2009); see also Mortg. Elec. Registration Sys., Inc. v. Johnston, No. 420-6-09 Rdcv, 2009 Vt. Super. LEXIS 15, at 9 (Sup. Ct. Rutland County Oct. 28, 2009).

n136. See discussion infra Part VI.

n137. In re Sheridan, No. 08-20381-*TLM, 2009 WL 631355, at 4 (Bankr. D. Idaho 2009).*

29 Quinnipiac L. Rev. 551, *

n138. *Landmark Nat'l Bank v. Kesler, 216 P.3d 158, 167-68 (Kan. 2009).*

n139. *Mortg. Elec. Registration Sys., Inc. v. Revoredo, 955 So. 2d 33, 34 n.1 (Fla. Dist. Ct. App. 2007).*

n140. *Mortgage Servicing Hearing, supra* note 3, at 105 ("The foreclosure is managed entirely by the member institution's MERS certifying officer.").

n141. See *Athey v. Mortg. Elec. Registration Sys., Inc., 314 S.W.3d 161 (Tex. App. 2010);* see also discussion supra Part IV.A.

n142. *Carpenter v. Longan, 83 U.S. 271, 275 (1872).*

n143. See, e.g., Peterson, supra note 9, at 1379.

n144. Mortg. Elec. Registration Sys., Inc. v. Johnston, No. 420-6-09 Rdcv, 2009 Vt. Super. LEXIS 15, at 23 (Super. Ct. Rutland County Oct. 28, 2009).

n145. Id. at 22.

n146. Id. at 28-29.

n147. *LaSalle Bank Nat'l Ass'n v. Lamy, No. 030049/2005, 2006 WL 2251721, at 2* (N.Y. Sup. Ct. Aug. 7, 2006).

n148. Id.

n149. Id.

n150. *Landmark Nat'l Bank v. Kesler, 216 P.3d 158, 167-68 (Kan. 2009).*

n151. *Mortg. Elec. Registration Sys., Inc. v. Sw. Homes, 301 S.W.3d 1 (Ark. 2009).*

n152. *Id. at 6.*

n153. Id.

n154. *Id. at 7.*

n155. *LaSalle Bank Nat'l Ass'n v. Lamy, No. 030049/2005, 2006 WL 2251721, at 1* (N.Y. Sup. Ct. Aug. 7, 2006).

n156. Id. at 2.

n157. *Mortgage Servicing Hearing, supra* note 3, at 105.

29 Quinnipiac L. Rev. 551, *

n158. See id. at 156.

n159. Id. at 103 ("It is important to note that the certifying officers [of MERS] are the same officers whom the lenders and servicers use to carry out these functions even when MERS is not the mortgagee.").

n160. See, e.g., Thomas E. Ice & Dustin A. Zacks, Slaying Goliath: Fighting Fraud and Contesting Standing in Residential Foreclosures in Judicial States, Practising L. Inst. (Jan. 26, 2011), http://www.pli.edu/Content.aspx?dsNav=Rpp:1,N:4294940396-167&ID=123003.

n161. Cf. *Deutsche Bank Nat'l Trust Co. v. Maraj, No. 25981/07, 2008 WL 253926, at 1* (N.Y. Sup. Ct. Jan. 31, 2008). In Maraj, an employee of IndyMac Bank signed an assignment as an officer of MERS on July 3, 2007, and an assignment as an officer of Deutsche Bank on July 31, 2007. Id. The court wondered, "Did Ms. Johnson-Seck change employers from July 3, 2007 to July 31, 2007, or does she engage in self-dealing by wearing two corporate hats?" Id.

n162. See, e.g., Phyllis K. Slesinger & Daniel Mclaughlin, Mortgage Electronic Registration System, *31 Idaho L. Rev. 805, 810 (1995).*

n163. *Mortgage Servicing Hearing, supra* note 3, at 99 ("MERS does not receive or maintain either the mortgage or the promissory note.").

n164. MERS Statement, supra note 62, at 7 n.20; Deposition of Erica A. Johnson-Seck at Ex. D, IndyMac Fed. Bank v. Debenedetti, No. 50 2008 CA 036505 XXXX MB (Fla. Cir. Ct. July 17, 2009) [hereinafter Johnson-Seck Deposition].

n165. MERS Statement, supra note 62, at 7 n.20.

n166. See, e.g., Johnson-Seck Deposition, supra note 164 at Ex. F (records produced by MERS did not reflect any transfer activity on the date of the assignment).

n167. See id.

n168. See id. at Ex. D (assignment of mortgage did not reflect any intervening transfers from the original lender and MERS to the eventual mortgage backed security trustee).

n169. See, e.g., Slesinger & Mclaughlin, supra note 162 at 811-12.

n170. See *In re Wilhelm, 407 B.R. 392, 401 (Bankr. D. Idaho 2009).*

n171. *Id. at 404.*

n172. Id.

n173. Id.

n174. *Saxon Mortg. Servs., Inc. v. Hillery, No. C-08-4357 EMC, 2008 U.S. Dist. LEXIS 100056* (N.D. Cal. Dec. 9, 2008).

n175. Id. at 16.

n176. *Chase Home Fin., LLC v. Fequiere, 119 Conn. App. 570, 989 A.2d 606 (2010).*

n177. *Id. at 576-77, 989 A.2d at 610-11.*

n178. Admittedly, this is from a foreclosure practice with many hundreds of clients, but in a relatively small geographic section of Florida, a judicial foreclosure state.

n179. For a slightly distinct viewpoint, consider CitiMortgage, Inc. v. Bischoff, No. 255-4-09 Rdcv, 2009 Vt. Super. LEXIS 2 (Sup. Ct. Rutland County Oct. 28, 2009). There, the court held that, although proof of possession alone would entitle the foreclosing bank to sue on the note as a holder under the UCC, the note and mortgage had been separated by the parties at origination: "Flagstar Bank retained the Note, which it later indorsed to CitiMortgage, while MERS held the mortgage deed, becoming the mortgagee of record." Id. at 4. Thus, because the note and mortgage were separated, the mortgage did not follow the note when the note was transferred to CitiMortgage - an assignment of mortgage was needed. This situation, factually distinct from Hillery, Wilhelm, and Fequiere, runs against banks' frequent argument that assignments of mortgage are not needed when the note is endorsed and the plaintiff is in possession of the note. But it will often be a hurdle simply to get a court to rule that an assignment is needed, much less to take the further step to see if the facts on the assignment, such as consideration and physical transfer, have occurred.

n180. *Crum v. LaSalle Bank, No. 2080110, 2009 Ala. Civ. App. LEXIS 491, at 7* (Ala. Civ. App. Sept. 18, 2009).

n181. Id.

n182. MERS Statement, supra note 62, at 7 n.20. The Crum court also refused to take a more in-depth look at MERS, which may have resulted in a sweeping ruling against it. One point of law that the court examined was the defendant-homeowner's argument that under Alabama law, "an agent of [a mortgage] holder to whom the mortgage is delivered merely for the purpose of foreclosure, having no ownership of the debt, is not authorized to foreclose in his own name, and execute a deed in his name to the purchaser." *Crum, 2009 Ala. Civ. App. LEXIS 491, at 6* (alteration in original) (quoting *Carpenter v. First Nat'l Bank of Birmingham, 181 So. 239, 240 (Ala. 1938)).* The Crum court neatly considered this argument with one sentence: "MERS and the assignee were not delivered a mortgage instrument by a mortgagee "merely for' the purpose of effecting a "foreclosure,' as was apparently the case in Carpenter." Id. at 6-7.

Just as many court decisions give MERS the benefit of the doubt as to its murky legal status, the court could have enumerated several arguments that would have tilted the benefit against it. The Crum court could have held that, in fact, the primary reason for MERS's existence was for expediency in foreclosure cases. Clearly some of the impetus behind establishing MERS in the first place was to assist lenders with ease of producing paperwork that would allow a successor mortgagee or holder to establish standing in foreclosure cases. Although this too would assume away some of the alleged benefits of MERS, the ruling would not have been outlandish. This is especially so when we consider that the Crum court assumed away some of the other facts about MERS, namely, that it never transfers mortgage notes, and that just because it is given the power "to take any action required of' the lender," that it actually does so. Id. at 7.

n183. *Carter v. Deutsche Bank Nat'l Trust Co., No. C09-3033 BZ, 2010 U.S. Dist. LEXIS 6473, at 3-4* (N.D. Cal. Jan. 27, 2010).

n184. See id. at 7.

n185. Id.; accord *Champlaie v. BAC Home Loan Servicing, 706 F. Supp. 2d 1029, 1046-47 (E.D. Cal. 2009).* Other grounds to invalidate MERS assignments include the lack of a recorded corporate resolution or power of attorney authorizing the signor to assign anything from MERS. See, e.g., *HSBC Bank USA v. Yeasmin, No. 34142/07, 2010 WL 2089273, at 6* (N.Y. Sup. Ct. May 24, 2010) (questioning the fact that the law firm filing for the foreclosure plaintiff represented both the assignor (MERS), and the assignee).

n186. *Mortgage Servicing Hearing, supra* note 3, at 101.

n187. Id. at 92 ("The MERS database is important to individual borrowers because it provides a free and accessible resource where borrowers can locate their servicers, and in many cases, learn who their note-owner is as they change over time."). R.K. Arnold also argued that the MERS database aids code enforcement officers by making identification of owners easier and aids law enforcement in detecting mortgage fraud. Id.

n188. Id. at 101.

n189. *Mortgage Servicing Hearing, supra* note 3, at 101 n.9.

n190. MERSCORP, Inc., MERS Core Legal Concepts 83 (2010), available at http://www.scribd.com/doc/49789469/7/VII-BANKRUPTCY.

n191. Christopher L. Peterson, Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory, 46 Real Prop. Trust & Est. L.J. (forthcoming 2011), available at http://ssrn.com/abstract=1684729.

n192. *Mortgage Servicing Hearing, supra* note 3, at 93.

n193. *Mortg. Elec. Registration Sys., Inc. v. Azize, 965 So. 2d 151, 153 (Fla. Dist. Ct. App. 2007).*

n194. Transcript of Hearing on Corrected Order to Show Cause, supra note 67, at 49; see also Hultman Deposition, supra note 38, at 215.

n195. *Mortgage Servicing Hearing, supra* note 3, at 166 ("A MERS mortgage makes clear that MERS is acting as the nominee (agent) of the lender - the original owner of the beneficial interest in the mortgage ... .").

n196. See, e.g., *Mortg. Elec. Registration Sys., Inc. v. Revoredo, 955 So. 2d 33, 34 (Fla. Dist. Ct. App. 2007).*

n197. See Hultman Deposition, supra note 38, at 54.

n198. Transcript of Hearing on Plaintiff's Motion for Extension of Time at 3-4, Mortg. Elec. Registration Sys., Inc. v. Persten, No. 50 2008 CA 034713 XXXX MB (Fla. Cir. Ct. Aug. 5, 2009) (on file with author).

n199. Johnson-Seck Deposition, supra note 164 at Ex. D.

n200. MERS Statement, supra note 62, at 7 n.20.

n201. Id. at 10 ("If the beneficial owner of the loan or its designated servicer decides to bring a foreclosure action or other action in the name of a party other than MERS, then the loan servicer is required to assign the mortgage from MERS to the appropriate party.").

n202. Reply Memorandum of Law in Support of Motion to Dismiss by Mortgage Electronic Registration Systems, Inc. & MERSCORP, Inc. at 6, Dalton v. CitiMortgage, Inc., No. 3:09-cv-00374 (D. Ariz. Dec. 23, 2009), ECF No. 10 [hereinafter MERS Reply Memorandum] ("MERS became the beneficiary, as nominee for the Lender, by operation of the Deeds of Trust agreed to and signed by the Plaintiffs, which are contracts whereby the Plaintiffs granted secured interests in the legal title of property to MERS, as the beneficiary, as nominee for the Lender.").

n203. In re Mortg. Elec. Registration Sys., Inc., No. 3:06-cv-00374-TJC-HTS (Fla. Cir. Ct. Aug. 18, 2005), ECF No. 21-3 ("Based upon information gained at the return hearing, it appears that the real party in interest in many of these cases is not known at the time Complaint for mortgage foreclosure is filed. The concept is foreign to this Court."). The order was overruled on appeal. *Mortg. Elec. Registration Sys., Inc. v. Azize, 965 So. 2d 151 (Fla. Dist. Ct. App. 2007).*

n204. Transcript of Videotaped Deposition of R.K. Arnold at 103-04, Henderson v. MERSCORP, Inc., No. CV-08-900805.00 (Ala. Cir. Ct. Sept. 25, 2009) [hereinafter Arnold Deposition], available at http://www.scribd.com/doc/43093118/September-25-2009-Deposition-of-R-K-Arnold-MERSCORP.

n205. *Id. at 171, 175.*

n206. Id. at 105.

n207. Id. at 188.

n208. See, e.g., Johnson-Seck Deposition, supra note 164, at 22. At this deposition, the author asked: "You would agree that you're not vice president of MERS in any sense of the word other than just being authorized to sign this one, correct?" to which the witness responded, "That's correct." Id.

n209. *Mortgage Servicing Hearing, supra* note 3, at 111.

n210. See Deposition of Patricia Arango at 76, Countrywide Home Loans Servicing LP v. Polanco, No. CACE 09 001184 (Fla. Cir. Ct. Jan. 7, 2011) (including a statement by deponent, who had signed on behalf of MERS in the past, that she had never heard of any examination or qualification process).

n211. MERS Statement, supra note 62, at 4.

n212. Id.

n213. Arnold Deposition, supra note 204, at 200-01.

n214. Id.

n215. Hultman Deposition, supra note 38, at 153-55.

n216. Id. at 79. Hultman later claimed that sixteen people track the transactions initiated by documentation signed by the thousands of MERS officers. Id. at 150.

n217. Arnold Deposition, supra note 204, at 197-98.

n218. See, e.g., *Landmark Nat'l Bank v. Kesler, 216 P.3d 158, 168 (Kan. 2009)* (acknowledging that with MERS, it is harder to tell who the note holder is); see also *MERSCORP, Inc. v. Romaine, 861 N.E.2d 81, 88 (N.Y. 2006)* (Kaye, J., dissenting in part) ("[MERS's] 800 number and Web site allow a borrower to access information regarding only his or her loan servicer, not the underlying lender. The lack of disclosure may create substantial difficulty when a homeowner wishes to negotiate the terms of his or her mortgage or enforce a legal right against the mortgagee and is unable to learn the mortgagee's identity. Public records will no longer contain this information as, if it achieves the success it envisions, the MERS system will render the public record useless by masking beneficial ownership of mortgages and eliminating records of assignments altogether. Not only will this information deficit detract from the amount of public data accessible for research and monitoring of industry trends, but it may also function, perhaps unintentionally, to insulate a noteholder from liability, mask lender error and hide predatory lending practices."); James Carlson, Note, To Assign, or Not to Assign: Rethinking Assignee Liability as a Solution to the Subprime Mortgage Crisis, *208 Colum. Bus. L. Rev. 1021, 1047 (2008)* (noting that determining who to sue in the context of assignee liability is rendered more difficult with MERS loans, which impedes victims from bringing claims).

n219. *Mortgage Servicing Hearing, supra* note 3, at 102.

n220. Michael I. Meyerson, The Reunification of Contract Law: The Objective Theory of Consumer Form Contracts, *47 U. Miami L. Rev. 1263, 1269 (1993)* ("It is no secret that consumers neither read nor understand standard form contracts.").

n221. Ellen Harnick, The Crisis in Housing and Housing Finance: What Caused It? What Didn't? What's Next?, *31 W. New Eng. L. Rev. 625, 630 (2009)* ("It is doubtful that most borrowers fully understood the actual cost of these loans - the rate increases were expressed as LIBOR ... plus a margin.").

n222. Freddie Mac, supra note 4.

n223. Eric A. Zacks, Unstacking the Deck? Contract Manipulation and Credit Card Accountability, *78 U. Cin. L. Rev. 1471, 1482 (2010).*

n224. See *Carter v. Deutsche Bank Nat'l Trust Co., No. C09-3033 BZ, 2010 U.S. Dist. LEXIS 6473, at 5* (N.D. Cal. Jan. 27, 2010) (noting that the contracts are contracts of adhesion).

n225. Zacks, supra note 223, at 1488 (noting that the CARD Act's disclosure provisions do not imply meaningful assent to altered credit card agreement terms).

n226. *Mortgage Servicing Hearing, supra* note 3, at 110.

n227. See, e.g., Karen M. Pence, Foreclosing on Opportunity: State Laws and Mortgage Credit (FEDS Working Paper No. 2003-16 May 13, 2003), available at http://papers.ssrn.com/abstract=410768.

n228. Zacks, supra note 223, at 1505-06.

n229. MERS Reply Memorandum, supra note 202, at 4.

n230. Helping Families Save Their Homes Act of 2009, Pub. L. No. 111-22, § 404, *123 Stat 1632, 1658 (2009)*.

n231. Id.; *15 U.S.C.A. § 1641* (2009).

n232. The author's experience is that, although pooling and servicing agreements may call for assignments to be delivered to the trustee or custodian of a trust upon the formation of the trust or within a certain time period, the assignments are usually not drafted and recorded until needed for foreclosure proceedings.

N233. R.K. Arnold claims in his testimony that "97% agreed to disclose the identity of the note-owner through the MERS system." *Mortgage Servicing Hearing, supra* note 3, at 101 n.9.

n234. See, e.g., Peterson, supra note 9, at 1401 ("For example, in loans where MERS is listed as the mortgagee, virtually any company can show up, claim to own the note, and proceed to foreclose on a family that is in arrears.").

n235. See, e.g., *Chase Home Fin., LLC v. Fequiere, 119 Conn. App. 570, 576-77, 989 A.2d 606, 610-11 (2010)*.

n236. See Yuki Noguchi, Foreclosures: A Busted System or Veiled Opportunity?, Nat'l Pub. Radio (Oct. 6, 2010), http://www.npr.org/templates/story/story.php?storyId=130376768 (noting the immense paperwork involved in a judicial foreclosure).

n237. Id.

n238. Id. (citing Rick Sharga, Vice President of RealtyTrac, for the proposition that paperwork problems in foreclosure cases, causing delays, "will simply prolong an already protracted housing crisis").

n239. See *Mortg. Elec. Registration Sys., Inc. v. Revoredo, 955 So. 2d 33, 34 (Fla. Dist. Ct. App. 2007)* ("The problem arises from the difficulty of attempting to shoehorn a modern innovative instrument of commerce into nomenclature and legal categories which stem essentially from the medieval English land law."); Tanya D. Marsh, Foreclosures and the Failure of the American Land Title Recording System, *111 Colum. L. Rev. Sidebar 19, 20 (2011)*, http://www.columbialawreview.org/assets/sidebar/volume/111/19_Marsh.pdf ("Little has changed since colonial days in the process by which title is recorded.").

n240. For a more detailed examination of this issue, see Marsh, supra note 239, at 24-26.

n241. See News Release, Court Leaders to Address ABA Task Force About Court Funding Crisis, Nat'l Ctr. for State Courts (Feb. 8, 2011), http://www.ncsc.org/newsroom/newsreleases/2011/abataskforce.aspx.

n242. Marsh, supra note 239, at 26.

n243. See discussion supra, Part VII.A-B.

n244. Marsh, supra note 239, at 26.

n245. See author's critique of H.R. 6460, infra Part VIII.A.

n246. Announcement, Foreclosure Processing and CRMS Scheduling, MERS, (Feb. 16, 2011), http://www.mersinc.org/files/filedownload.aspx?id=678&table=ProductFile.

n247. Id.

n248. *MERSCORP, Inc., supra* note 14 at Rule 8(d).

n249. Id., at 25.

n250. Thom Weidlich, Merscorp May Stop Members Foreclosing in Its Name, Bloomberg (Feb. 17, 2011), http://www.bloomberg.com/news/20110217/merscorpmaystopmembersforeclosinginitsnameupdate1.html.

n251. See *MERSCORP, Inc. v. Romaine, 861 N.E.2d 81, 88-89 (N.Y. 2006)* (Kaye, J., dissenting in part).

n252. Peterson, supra note 9, at 1404-06.

n253. See, e.g., McIntire, supra note 2.

n254. *Minn. Stat. Ann. § 507.413* (West 2010).

n255. SF1621 Status in Senate for Legislative Session 83, Minn. St. Legislature, https://www.revisor.mn.gov/revisor/pages/search_status/status_detail.php?b=Senate&f=SF1621&ssn=0&y=2004 (last updated May 5, 2011).

n256. *Minn. Stat. Ann. § 507.413(a)* (West 2010).

n257. Id., § 507.413(b).

n258. Id., § 507.413(a)(2).

n259. See, e.g., *Mortgage Servicing Hearing, supra* note 3, at 103-04.

n260. *Jackson v. Mortg. Elec. Registration Sys., Inc., 770 N.W.2d 487, 494 (Minn. 2009).* For a more detailed analysis of Jackson, see Robert E. Dordan, Comment, Mortgage Electronic Registration Systems (MERS), Its Recent Legal Battles, and the Chance for a Peaceful Existence, *12 Loy. J. Pub. Int. L. 177 (2010).*

n261. *Jackson, 770 N.W.2d at 500-01.*

n262. *Id. at 500, 503.*

29 Quinnipiac L. Rev. 551, *

n263. *Id. at 502.*

n264. H.R. 1506, Gen. Assemb., 2011 Reg. Sess. (Va. 2010).

n265. Id.

n266. Id.

n267. Id.

n268. See discussion supra Part V.A.

n269. H.R. 1506.

n270. Id.

n271. Id.

n272. H.R. 6460, 111th Cong. (2d Sess. 2010).

n273. Id.

n274. Id.

n275. Congressional Budget Office, Fannie Mae, Freddie Mac, and the Federal Role in the Secondary Mortgage Market, at VIII-IX (2010), available at http://www.cbo.gov/ftpdocs/120xx/doc12032/12-23-FannieFreddie.pdf.

n276. Id. at VIII.

n277. H.R. 6460.

n278. See, e.g., Ice & Zacks, supra note 160.

n279. H.R. 6460 ("The corporation shall not reimburse the servicer, holder, or creditor for any expense incurred in the carrying out or recording such an assignment.").

n280. See Peterson, supra note 9, at 1370.

n281. Alistair Barr, "Robo-Signer' Controversy Spreads, Market Watch (Sep. 29, 2010 6:39 PM), http://www.marketwatch.com/story/robo-signer-controversy-spreads-2010-09-29; Lorraine Woellert & Dakin Campbell, JPMorgan Based Foreclosures on Faulty Documents, Lawyers Claim, Bloomberg (Sep. 27, 2010 12:00 AM), http://www.bloomberg.com/news/20100927/jpmorganbasedhomeforeclosuresonfaultycourtdocumentslawyerscla im.html (noting that a Chase Home Finance operation supervisor admitted in a deposition that she did not look at any documentation prior to signing affidavits in support of foreclosure).

29 Quinnipiac L. Rev. 551, *

n282. Jim Zarroli, JPMorgan Suspends Some Foreclosures, Nat'l Pub. Radio (Sep. 30, 2010), http://www.npr.org/templates/story/story.php?storyId=130247584.

n283. Diana Olick, JP Morgan Chase Drops Electronic Mortgage Clearing House, CNBC (Oct. 13, 2010 2:37 PM), http://www.cnbc.com/id/39655299.

n284. Id. (quoting Tom Kelly, JP Morgan Chase spokesman).

n285. Wells Fargo apparently also only registers loans that it plans to sell. *Mortgage Servicing Hearing, supra* note 3, at 96 n.2.

n286. For example, the GSEs waited until news broke about fraudulent documents being filed in foreclosure courts before sending out letters to servicers regarding properly verifying such documents. Ariana Eunjung Cha, Bank of America Latest to Put Hold on Foreclosures Amid Paperwork Concerns, Wash. Post (Oct. 1, 2010 11:40 PM), http://www.washingtonpost.com/wp-dyn/content/article/2010/10/01/AR2010100106678.html. This was despite the fact that some of the depositions exposing faulty practices, such as the deposition by the author of a OneWest Bank official took place months, and in other cases, years before lenders enacted their temporary foreclosure moratorium in response to publicity. See id. Another example is Fannie Mae and Freddie Mac continuing to retain plaintiff's firms who are under investigation by the State Attorney General of Florida. See, e.g., Harriet Johnson Brackey, Congressional Leaders Question Fannie Mae over Law Firms Under Investigation, Sun Sentinel (Sept. 27, 2010), http://articles.sunsentinel.com/20100927/business/flforeclosurefanniemae092820100927 1 shapirofishmanforeclosureproceedingslawfirms.

n287. For perhaps the most virulently anti-MERS view, see Peterson, supra note 191.

n288. See Marsh, supra note 239, at 24.

n289. Id.

n290. Id. at 20.

n291. Id. at 21.

n292. Marsh, supra note 239, at 22.

n293. *Mortgage Servicing Hearing, supra* note 3, at 100.

n294. Id. at 159-60.

n295. See MERS Servicer Identification System, MERS, http://www.mers-servicerid.org/sis/ (last visited Aug. 11, 2011).

n296. See *Mortgage Servicing Hearing, supra* note 3, at 101.

29 Quinnipiac L. Rev. 551, *

n297. MERS stated that only a small percentage of investors chose not to reveal themselves on the MERS Servicer ID Website. Id. at 101 n.9.

n298. Id. at 170.

149TPX

********** Print Completed **********

Time of Request: Thursday, September 27, 2012  14:44:26 EST

Print Number:    2826:372336004
Number of Lines: 1645
Number of Pages:

Send To:  Krawczyk, Andrew
          STAFNE LAW FIRM
          239 N OLYMPIC AVE
          ARLINGTON, WA 98223-1336