FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE   FEB 2 8 2013

CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on Feb 28, 013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DIANNE KLEM, as Administrator of the Estate of Dorothy Halstien, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 87105-1 |
| WASHINGTON MUTUAL BANK, a Washington Corporation, | ) ) ) | En Banc |
| Defendant, | ) ) ) | |
| QUALITY LOAN SERVICE CORPORATION OF WASHINGTON, a Washington Corporation; and QUALITY LOAN SERVICE CORPORATION, a California Corporation, | ) ) ) ) ) ) | |
| Respondents. | ) ) ) | Filed   FEB 2 8 2013 |

CHAMBERS, J.* — Dorothy Halstien, an aging woman suffering from

dementia, owned a home worth somewhere between $235,000 and $320,000. At

about the time she developed dementia, she owed approximately $75,000 to

Washington Mutual Bank (WaMu), secured by a deed of trust on her home.

Because of the cost of her care, her guardian did not have the funds to pay her

mortgage, and Quality Loan Services (Quality), acting as the trustee of the deed of

*Justice Tom Chambers is serving as a justice pro tempore of the Supreme Court pursuant to
Washington Constitution article IV, section 2(a).

*Klem v. Washington Mutual Bank,* No. 87105-1

trust, foreclosed on her home.  On the first day it could, Quality sold her home for $83,087.67, one dollar more than she owed, including fees and costs.  A notary, employed by Quality, had falsely notarized the notice of sale by predating the notary acknowledgment.  This falsification permitted the sale to take place earlier than it could have had the notice of sale been dated when it was actually signed.

Before the foreclosure sale, Halstien's court appointed guardian secured a signed purchase and sale agreement from a buyer willing to pay $235,000 for the house.  Unfortunately, there was not enough time before the scheduled foreclosure sale to close the sale with that buyer.  In Washington, the trustee has the discretion to postpone foreclosure sales.  This trustee declined to consider exercising that discretion, and instead deferred the decision to the lender, WaMu.  Despite numerous requests by the guardian, WaMu did not postpone the sale.  A jury found that the trustee was negligent; that the trustee's acts or practices violated the Consumer Protection Act (CPA), chapter 19.86 RCW; and that the trustee breached its contractual obligations.  The Court of Appeals reversed all but the negligence claim.  We reverse the Court of Appeals in part and restore the award based upon the CPA.  We award the guardian reasonable attorney fees and remand to the trial court to order appropriate injunctive relief.

## FACTS

The issues presented require a detailed discussion of the facts.  In 1996, Halstien bought a house on Whidbey Island for $147,500.  In 2004, she borrowed $73,000 from WaMu, secured by a deed of trust on her home.  That loan was the

*Klem v. Washington Mutual Bank,* No. 87105-1

only debt secured by the property, which otherwise Halstien owned free and clear. Unfortunately, by 2006, when Halstien was 74 years old, she developed dementia. At the time, Halstien's daughter and her daughter's boyfriend were living at the home with her.

Washington State's Adult Protective Services became concerned that Halstien was a vulnerable adult being neglected at home. After an investigation, protective services petitioned the court for the appointment of a professional guardian to protect Halstien. The court granted the petition and Dianne Klem, executive director of Puget Sound Guardians, was appointed Halstien's guardian in January 2007. Klem soon placed Halstien in the dementia unit of a skilled nursing facility in Snohomish County.

Halstien's care cost between $3,000 and $6,000 a month. At the time, Halstien received about $1,444 a month in income from Social Security and a Teamsters' pension. The State of Washington paid the balance of her care and is a creditor of her estate.

Halstien's only significant asset was her Whidbey Island home, which at the time was assessed by the county at $257,804. WaMu also had an appraisal indicating the home was worth $320,000, nearly four times the value of the outstanding debt. Klem testified that if she had been able to sell the home, she could have improved Halstien's quality of life considerably by providing additional services the State did not pay for.

Selling the home was neither quick nor easy. Even after Halstien was placed

3

*Klem v. Washington Mutual Bank,* No. 87105-1

in a skilled care facility, her daughter still lived in the home (without paying rent) and both the daughter and her brother strongly opposed any sale. The record suggests Halstien's children expected to inherit the home and, Klem testified, getting the daughter and her family to leave "was quite a battle." Verbatim Report of Proceedings (VRP) (Jan. 13, 2010) at 94. Ultimately, Puget Sound Guardians prevailed, but before it could sell the home, it had to obtain court permission (complicated, apparently, by the considerable notice that had to be given to various state agencies and to family members, and because some of those entitled to notice were difficult to find), remove abandoned animals and vehicles, and clean up the property.[1]

During this process Halstien became delinquent on her mortgage. Quality, identifying itself as "the agent for Washington Mutual," posted a notice of default on Halstien's home on or around October 25, 2007. Ex. 3, at 3. The notice demanded $1,372.20 to bring the note current. The record establishes that the guardianship did not have available funds to satisfy the demand.

A notice of trustee sale was executed shortly afterward by Seth Ott for Quality. The notice was dated and, according to the notary jurat of "R. Tassle," notarized on November 26, 2007. VRP (Jan. 13, 2010) at 89-90. However, the notice of sale was not actually signed that day. The sale was set for February 29, 2008.

This notice of sale was one of apparently many foreclosure documents that

---

[1] Puget Sound Guardians advanced the costs and, as of trial, had not been reimbursed.

4

*Klem v. Washington Mutual Bank*, No. 87105-1

were falsely notarized by Quality and its employees around that time.  There was considerable evidence that falsifying notarizations was a common practice, and one that Quality employees had been trained to do.  While Quality employees steadfastly refused to speculate under oath how or why this practice existed, the evidence suggests that documents were falsely dated and notarized to expedite foreclosures and thereby keep their clients, the lenders, beneficiaries, and other participants in the secondary market for mortgage debt happy with their work.  Ott acknowledged on the stand that if the notice of sale had been correctly dated, the sale would not have taken place until at least one week later.

On January 10, 2008, Puget Sound Guardians asset manager David Greenfield called Ott in his capacity as trustee.  Greenfield explained that Halstien was in a guardianship and that the guardianship intended to sell the property. Greenfield initially understood, incorrectly, that the trustee would postpone the sale if Puget Sound Guardians presented WaMu with a signed purchase and sale agreement by February 19, 2008.  Puget Sound Guardians sought, and on January 31, 2008, received, court permission to hire a real estate agent to help sell the house.

Unknown to Greenfield, Quality, as trustee, had an agreement with WaMu that it would not delay a trustee's sale except upon WaMu's express direction. This agreement was articulated in a confidential "attorney expectation document" that was given to the jury.  This confidential document outlines how foreclosures were to be done and billed.  It specifically states, "Your office is not authorized to

*Klem v. Washington Mutual Bank,* No. 87105-1

postpone a sale without authorization from Fidelity[2] or Washington Mutual." Ex. 12, at 5. This agreement is, at least, in tension with Quality's fiduciary duty to both sides and its duty to act impartially. *Cox v. Helenius,* 103 Wn.2d 383, 389, 693 P.2d 683 (1985) (citing GEORGE E. OSBORNE, GRANT S. NELSON & DALE A. WHITMAN, REAL ESTATE FINANCE LAW § 7.21 (1979) ("[A] trustee of a deed of trust is a fiduciary for both the mortgagee and mortgagor and must act impartially between them.")).[3]

Regardless of what Washington law expected or required of trustees, David Owen, Quality's chief operations officer in San Diego, testified that Quality did what WaMu told it to do during foreclosures. Owen testified that there were two situations where Quality would postpone a sale without bank permission: if there was a bankruptcy or if the debt had been paid. Owen could not remember any time Quality had postponed a sale without the bank's permission.

By February 19, 2008, Puget Sound Guardians had a signed purchase and sale agreement, with the closing date set for on or about March 28, 2008. This was almost a month after the scheduled foreclosure sale, but well within the 120 day window a trustee has to hold the trustee's sale under RCW 61.24.040(6). Quality referred the guardians to the bank "to find out the process for making this happen."

---

[2] Fidelity National Foreclosure & Bankruptcy Solutions is not a party to this case. It appears it assisted WaMu in processing foreclosures and providing documentation, not unlike Lender Processing Service that we discussed in *Bain v. Metro. Mortg. Grp., Inc.,* 175 Wn.2d 83, 107 n.13, 285 P.3d 34 (2012). *See* Ex. 12.

[3] Since then, the legislature has amended the deed of trust act to provide that the trustee owes a duty of good faith to both sides. LAWS OF 2008, ch. 153, § 1; RCW 61.24.010(4) (effective June 12, 2008).

*Klem v. Washington Mutual Bank,* No. 87105-1

VRP (Jan. 14, 2010) at 127; Ex. 25. Klem testified Quality "told us on two occasions that they unequivocally could not assist us in that area, that only the bank could make the decision." VRP (Jan. 14, 2010) at 131.

Puget Sound Guardians contacted WaMu, which instructed them to send copies of the guardianship documents and a completed purchase and sale agreement. Over the next few days, WaMu instructed the guardians to send the same documents to WaMu offices in Seattle, Washington, southern California, and Miami, Florida. Klem testified that Puget Sound Guardians called WaMu on "[m]any occasions," and that if the bank ever made a decision, it did not share what it was. VRP (Jan. 14, 2010) at 130-31. The guardian also faxed a copy of the purchase and sale agreement to various WaMu offices on February 19, 21, 26, 27, and 28. In all, the guardian contacted Quality or WaMu over 20 times in the effort to get the sale postponed. Simply put, Quality deferred to WaMu and WaMu was unresponsive.

Accordingly, the trustee's sale was not delayed and took place on February 29, 2008. Quality, as trustee, sold the Halstien home to Randy and Gail Preston for $83,087.67, one dollar more than the amounts outstanding on the loan, plus fees and costs.[4] The Prestons resold the house for $235,000 shortly afterward.

Klem later testified it was "shocking when we found out that [the home] had actually been sold for $83,000 . . . . Because we trusted that they would sell it for the value of the home." VRP (Jan. 13, 2010) at 103. In previous cases where a

---

[4] As of trial, Quality had not delivered that one dollar to the Halstien estate.

7

*Klem v. Washington Mutual Bank*, No. 87105-1

ward's home had gone into foreclosure, Klem testified, either the trustee had
postponed the sale to allow Puget Sound Guardians to sell the property or had sold
the property for a reasonable price.  Klem testified that if they had just one more
week, it was "very possible" that they could have closed the sale earlier.  VRP
(Jan. 14, 2010) at 131.

    In April 2008, represented by the Northwest Justice Project, Puget Sound
Guardians sued Quality for damages on a variety of theories, including negligence,
breach of contract, and violation of the CPA.  Later, with permission of the court,
Quality's California sister corporation was added as a defendant.  Halstien died
that December.

    Quality defended itself vigorously on a variety of theories.  Initially
successfully, Quality argued that any cause of action based on the trustee's duties
was barred by the fact Klem had not sought an injunction to enjoin the sale.  The
record suggests that it would have been impossible for the guardianship to get a
presale injunction due to the time frame, the need for court approval, and the lack
of assets in the guardianship estate.  While Judge Monica Benton dismissed some
claims based on the failure of the estate to seek an injunction, she specifically
found that the negligence, breach of contract, and CPA claims could go forward.

    The case proceeded to a jury trial.  The heart of the plaintiff's case was the
theory that Quality's acts and practices of deferring to the lender and falsifying
dates on notarized documents were unfair and deceptive and that the trustee was
negligent in failing to delay the sale.  David Leen, an expert on Washington's deed

*Klem v. Washington Mutual Bank,* No. 87105-1

of trust act, chapter 61.24 RCW, testified that it was common for trustees to postpone the sale to allow the debtors to pay off the default. He testified that under the facts of this case, the trustee "would absolutely have to continue the sale." VRP (Jan. 14, 2010) at 245.

By contrast, Ott, representing Quality as trustee in this case, testified that he did not take into account whether the house was worth more than the debt when conducting foreclosures. When asked why, Ott responded, "My job was to process the foreclosure . . . according to the state statutes." VRP (Jan. 19, 2010) at 348. When pressed, Ott explained that he counted the days, prepared the forms, saw they were filed, and nothing more. He acknowledged that, prior to 2009, he would sometimes incorrectly date documents. He testified that he had been trained to do that. He also testified that Quality, as trustee, would not delay trustee sales without the lender's permission. And he testified that he had never actually read Washington's deed of trust statutes.[5]

The jury found for the plaintiff on three claims: negligence, CPA, and breach of contract.[6] On the negligence claim, it found that both sides were 50

---

[5]This inspired a juror's question, "If you never read the statute, how did you know you were following it, following Washington law?" VRP (Jan. 19, 2010) at 393. Ott responded that he relied on his training. Judge Barbara J. Mack also asked a question:

> THE COURT: And finally, did you have the authority to postpone the sale if requested to do so?
> THE WITNESS: Yes, if the lender had requested us to postpone the sale, the sale would be postponed.

*Id.*

[6]The jury found for the defendant on the claims of negligent misrepresentation and failure to make an accommodation.

*Klem v. Washington Mutual Bank,* No. 87105-1

percent at fault.  The jury determined that the damages on all three claims were the same: $151,912.33 (the difference between the foreclosure sale price and $235,000).

Judge Barbara J. Mack entered judgment for the full $151,912.33 awarded by the jury.  The judge concluded that the 50 percent reduction was only on the negligence claim. She also rejected Quality's challenges, concluding that the jury's verdicts on the CPA and breach of contact claims were "clearly supported by the evidence." VRP (Feb. 4, 2010) at 34, 37-38.  She awarded the plaintiff attorney fees on the CPA claim.  She declined to issue an injunction against Quality in part because she believed the threat of endless litigation was sufficient to prevent Quality from continuing its unfair or deceptive practices.

Quality brought a blunderbuss of challenges to the trial court's decisions. Klem cross-appealed Judge Mack's decision not to enter an injunction.  The Court of Appeals concluded Washington courts had jurisdiction, that the guardian's failure to enjoin the sale did not apply to the damages claims, that the negligence verdict was sustainable, but that the evidence was insufficient to uphold the breach of contract and CPA claims. *Klem v. Wash. Mut. Bank,* noted at 165 Wn. App. 1015 (2011).  It rejected the remaining arguments.  Puget Sound Guardians sought, and we granted, review. We received amicus briefing in support of the plaintiff from the Washington State attorney general, the Washington State Bar Association, and University Legal Assistance, a public interest legal clinic at Gonzaga University School of Law.

*Klem v. Washington Mutual Bank*, No. 87105-1

## ANALYSIS

Most of the questions before us are questions of law.  Our review of those is
de novo.  *Udall v. T.D. Escrow Servs., Inc.*, 159 Wn.2d 903, 908, 154 P.3d 882
(2007) (citing *Berrocal v. Fernandez,* 155 Wn.2d 585, 590, 121 P.3d 82 (2005)).
We review jury verdicts for substantial evidence, taking all inferences in favor of
the verdict. *See Indus. Indem. Co. of Nw., Inc. v. Kallevig*, 114 Wn.2d 907, 915-
16, 792 P.2d 520 (1990) (citing *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 67,
738 P.2d 665 (1987)).

### I. CPA CLAIMS

To prevail on a CPA action, the plaintiff must prove an "(1) unfair or
deceptive act or practice; (2) occurring in trade or commerce; (3) public interest
impact; (4) injury to plaintiff in his or her business or property; (5) causation."
*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778,
780, 719 P.2d 531 (1986). The plaintiff argues that both Quality's historical
practice of predating notarized foreclosure documents and Quality's practice of
deferring to the lender on whether to postpone most sales, satisfies the first element
of the CPA.  Deciding whether the first element is satisfied requires us to examine
the role of the trustee in nonjudicial foreclosure actions.  A deed of trust is a form
of a mortgage, an age-old mechanism for securing a loan.  18 WILLIAM B.
STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE:
TRANSACTIONS § 17.1, at 253, § 20.1, at 403 (2d ed. 2004).  In Washington, it is a
statutorily blessed "three-party transaction in which land is conveyed by a

11

*Klem v. Washington Mutual Bank*, No. 87105-1

borrower, the 'grantor,' to a 'trustee,' who holds title in trust for a lender, the 'beneficiary,' as security for credit or a loan the lender has given the borrower." *Id.* at 260.  If the deed of trust contains the power of sale, the trustee may usually foreclose the deed of trust and sell the property without judicial supervision. *Id.* at 260-61; RCW 61.24.020; RCW 61.12.090; RCW 7.28.230(1).

Quality successfully challenged the jury's CPA verdict before the Court of Appeals. Primarily, it argued that the plaintiff had waived its claims by not seeking a presale injunction.  The Court of Appeals, correctly, rejected that argument and it is not renewed here.[7]  Quality also argued that if the court reached the merits of the CPA claim, it failed for three reasons.  First, the falsely dated and notarized notice of sale caused Halstien no harm because she got her full (albeit minimum)

---

[7]Both at the trial court and before the Court of Appeals, Quality vigorously argued that the guardian had waived all claims by failing to seek an injunction to stop the sale. We have said the "[t]he failure to take advantage of the presale remedies under the deed of trust act *may* result in waiver of the right to object to the sale." *Plein v. Lackey*, 149 Wn.2d 214, 227, 67 P.3d 1061 (2003) (citing RCW 61.24.040(1)(f)(IX) (emphasis added)).  We found in *Plein* it did result in waiver.  We emphasized that "Plein received notice of his right to enjoin the sale, had knowledge of his asserted defense before the sale . . . and failed to obtain a preliminary injunction." *Id.* at 229.  Accordingly, "Plein waived any objections to the foreclosure proceedings." *Id.*  But we have rejected the argument that, under *Plein*, the failure to seek a presale injunction acts as a per se bar to any postsale challenge.  As we noted recently, waiver is an equitable doctrine, and "we apply waiver only where it is equitable under the circumstances and where it serves the goals of the act." *Albice v. Premier Mortg. Servs. of Wash., Inc.*, 174 Wn.2d 560, 570, 276 P.3d 1277 (2012).  We note with approval that the Court of Appeals rejected Quality's waiver argument.  We also note that Quality has not sought review of that issue.  Here, there are ample reasons why a presale injunction was not an available remedy and thus application of the equitable doctrine of waiver would be inappropriate.  Klem was unaware that the notice of sale was falsely notarized or that the trustee had agreed to defer to the lender on whether to postpone a foreclosure sale until after the sale had taken place.  The fact the guardian was required to give the Department of Social and Health Services 21 days notice to obtain authorization to seek an injunction may also have made a presale injunction impossible to acquire.

*Klem v. Washington Mutual Bank,* No. 87105-1

statutory period to avoid foreclosure.  Next, it argued that the predated notarized

documents had no potential to harm anyone, and thus, the public interest element

could not be met.  Finally, it argued that deferring to the lender was not an unfair

or deceptive practice as a matter of law.

A. *Unfair or Deceptive Acts or Practices*

The legislature has specifically stated that certain violations of the deed of

trust act are unfair or deceptive acts or practices for purposes of the CPA.  *See*

RCW 61.24.135.  At the time, the deed of trust act said:

**Consumer protection act — Unfair or deceptive acts or practices.**

It is an unfair or deceptive act or practice under the consumer
protection act, chapter 19.86 RCW, for any person, acting alone or in
concert with others, to offer, or offer to accept or accept from another,
any consideration of any type not to bid, or to reduce a bid, at a sale of
property conducted pursuant to a power of sale in a deed of trust.
However, it is not an unfair or deceptive act or practice for any
person, including a trustee, to state that a property subject to a
recorded notice of trustee's sale or subject to a sale conducted
pursuant to this chapter is being sold in an "as-is" condition, or for the
beneficiary to arrange to provide financing for a particular bidder or to
reach any good faith agreement with the borrower, grantor, any
guarantor, or any junior lienholder.

Former RCW 61.24.135 (1998).  There is no allegation in this case that Quality's

conduct violates the provisions of RCW 61.24.135.  Quality argues and the Court

of Appeals appears to have agreed that only an act or practice the legislature has

*Klem v. Washington Mutual Bank*, No. 87105-1

declared to be "unfair" is unfair for purposes of the CPA.[8]  That is an incorrect
reading of the act.

> In *Hangman Ridge,* we observed:

> The [first] two elements may be established by a showing that (1) an
> act or practice which has a capacity to deceive a substantial portion of
> the public (2) has occurred in the conduct of any trade or commerce.
> Alternatively, these two elements may be established by a showing
> that the alleged act constitutes a per se unfair trade practice. A per se
> unfair trade practice exists when a statute which has been declared by
> the Legislature to constitute an unfair or deceptive act in trade or
> commerce has been violated.

*Hangman Ridge,* 105 Wn.2d at 785-86.  Several courts, including the Court of
Appeals below, seem to have understood this language to establish the exclusive
ways the first two elements of a CPA claim can be established.  *Klem,* 2011 WL
6382147, at *8; *see also Henery v. Robinson*, 67 Wn. App. 277, 289-90, 834 P.2d
1091 (1992) (rejecting plaintiff's CPA action against the seller of a defective
mobile home because they could not show legislatively declared unfair or
deceptive practice); *Minnick v. Clearwire US, LLC,* 683 F. Supp. 2d 1179, 1186
(W.D. Wash. 2010) (rejecting plaintiff's CPA action against phone company for
imposing an early termination fee on the ground that the legislature had not
declared it "a per se unfair trade practice" (internal quotation marks omitted)
(quoting *Saunders v. Lloyd's of London,* 113 Wn.2d 330, 344, 779 P.2d 249
(1989))).

---

[8] We say "appears to have agreed" because it is not completely clear the Court of Appeals relied
upon the reasoning that only per se statutory violations could violate the CPA.  *Klem,* 2011 WL
6382147, at *8-9.

*Klem v. Washington Mutual Bank,* No. 87105-1

But, as we noted in *Saunders,* "[b]ecause the act does not define 'unfair' or 'deceptive,' this court has allowed the definitions to evolve through a 'gradual process of judicial inclusion and exclusion.'" *Saunders,* 113 Wn.2d at 344 (quoting *State v. Reader's Digest Ass'n,* 81 Wn.2d 259, 275, 501 P.2d 290 (1972), *modified in Hangman Ridge,* 105 Wn.2d at 786).   That "gradual process of judicial inclusion and exclusion" has continued to take place in cases that, properly, did not read *Hangman Ridge* as establishing the only ways the first two elements could be met.  *See, e.g., State v. Kaiser,* 161 Wn. App. 705, 708, 721, 254 P.3d 850 (2011) (finding a company that "preyed on property owners" by "falsely offering to help save the property from foreclosure" had committed an unfair and deceptive act under the CPA without reference to any specific statutory provision); *Magney v. Lincoln Mut. Sav. Bank,* 34 Wn. App. 45, 57, 659 P.2d 537 (1983) (holding that an act is unfair under the CPA if it offends public policy as established "'by statutes [or] the common law,'" or is "'unethical, oppressive, or unscrupulous,'" among other things (quoting *FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972))).

Any doubt should have been put to rest in *Panag v. Farmers Ins. Co.* of Wash., 166 Wn.2d 27, 48, 204 P.3d 885 (2009), where we discussed both per se and unregulated unfair or deceptive acts.  The primary issue in *Panag* was whether a collection agency that used deceptive mailers could be liable to debtors.  *Id.* at 34. We quoted with approval language from the congressional record on the federal consumer protection act:

*Klem v. Washington Mutual Bank*, No. 87105-1

> "'It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task. It is also practically impossible to define unfair practices so that the definition will fit business of every sort in every part of this country.'"

*Panag,* 166 Wn.2d at 48 (quoting *State v. Schwab*, 103 Wn.2d 542, 558, 693 P.2d 108 (1985) (Dore, J., dissenting) (quoting H.R. CONF. REP. No. 1142, 63d Cong., 2d Sess. 19 (1914))).[9]   Given that there is "no limit to human inventiveness," courts, as well as legislatures, must be able to determine whether an act or practice is unfair or deceptive to fulfill the protective purposes of the CPA.

To resolve any confusion, we hold that a claim under the Washington CPA may be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest.

We note in passing that an act or practice can be unfair without being deceptive, and Klem and the Washington State attorney general also argue it is sufficient that Quality's conduct was unfair. They point out that the CPA itself declares "unfair acts or deceptive acts or practices" are sufficient to satisfy the acts

---

[9]   We also clearly noted:

> A CPA claim may be predicated on either a per se violation of the statute or on deceptive practices unregulated by statute but involving the public interest. *Anhold v. Daniels*, 94 Wn.2d 40, 614 P.2d 184 (1980); *Lidstrand v. Silvercrest Indus.*, 28 Wn. App. 359, 623 P.2d 710 (1981). Here, the claims are predicated on deceptive practices.

*Panag*, 166 Wn.2d at 37 n.3.

*Klem v. Washington Mutual Bank*, No. 87105-1

or practices prong of a CPA action. The "or" between "unfair" and "deceptive" is disjunctive. Washington's CPA is modeled after federal consumer protection laws and incorporates many of provisions of the federal acts. *Panag*, 166 Wn.2d at 48; *Hangman Ridge*, 105 Wn.2d at 783. The legislature declared the CPA was intended "to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition." RCW 19.86.920. The Washington legislature instructed courts to be guided by federal law in the area. *Id.* Although we have been guided by federal interpretations, Washington has developed its own jurisprudence regarding application of Washington's CPA. Current federal law suggests a "practice is unfair [if it] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and is not outweighed by countervailing benefits." 15 U.S.C. § 45(n).

Our statute clearly establishes that unfair acts or practices can be the basis for a CPA action. *See* RCW 19.86.020 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."); RCW 19.86.090 ("Any person who is injured in his or her business or property by a violation of RCW 19.86.020 . . . may bring a civil action in superior court."). This case does not give us an opportunity to explore in detail how to define unfair acts for the purposes of our CPA. That must wait for another day.

B. *Failure To Exercise Independent Discretion To Postpone Sale*

Until the 1965 deed of trust act, there was no provision in Washington law

*Klem v. Washington Mutual Bank,* No. 87105-1

for a nonjudicial foreclosure. *See* LAWS OF 1965, ch. 74. In 1965, the legislature authorized nonjudicial foreclosure for the first time, subject to strict statutory requirements. LAWS OF 1965, ch. 74, *codified as* ch. 61.24 RCW. Because of the very nature of nonjudicial foreclosures, Washington courts have not shied away from protecting the rights of the parties. The paradigmatic case, of course, is *Cox,* 103 Wn.2d 383, where this court found multiple, independent reasons to void a foreclosure. In *Cox,* the trustee was well aware of a pending legal action on the alleged debt, meaning one of the statutory prerequisites had not been met. *Id.* at 388. As we noted, though, "[e]ven if the statutory requisites to foreclosure had been satisfied and the Coxes had failed to properly restrain the sale, this trustee's actions, along with the grossly inadequate purchase price, would result in a void sale." *Id.* (citing *Lovejoy v. Americus*, 111 Wash. 571, 574, 191 P. 790 (1920)). In *Cox,* the trustee consistently favored the beneficiary, who was also his client, over the homeowner, to whom of course he had a fiduciary duty. The trustee did not tell the Coxes that their initial attempt to restrain the sale had failed, and sold the property for a grossly inadequate price. *Id.* at 388-89. We had no difficulty voiding the sale and quieting title in the homeowner. *Id.; accord Walcker v Benson & McLaughlin PS,* 79 Wn. App. 739, 746, 904 P.2d 1176 (1995) (quieting title in homeowner after beneficiary sought to enforce a promissory note after the statute of limitations had run); *Albice v. Premier Mortg. Serv. of Wash., Inc.*, 174 Wn.2d 560, 568, 276 P.3d 1277 (2012) (quieting title in original owner after a foreclosure after trustee exceeded his powers).

18

*Klem v. Washington Mutual Bank,* No. 87105-1

The power to sell another person's property, often the family home itself, is a tremendous power to vest in anyone's hands.  Our legislature has allowed that power to be placed in the hands of a private trustee, rather than a state officer, but common law and equity requires that trustee to be evenhanded to both sides and to strictly follow the law.  *Albice,* 174 Wn.2d at 568 (citing *Udall,* 159 Wn.2d at 915-16); *Cox,* 103 Wn.2d at 389 (citing OSBORNE, *supra*).  This court has frequently emphasized that the deed of trust act "must be construed in favor of borrowers because of the relative ease with which lenders can forfeit borrowers' interests and the lack of judicial oversight in conducting nonjudicial foreclosure sales."  *Udall,* 159 Wn.2d at 915-16 (citing *Queen City Sav. & Loan Ass'n v. Mannhalt,* 111 Wn.2d 503, 514, 760 P.2d 350 (1988) (Dore, J., dissenting)).  We have invalidated trustee sales that do not comply with the act.  *See Albice,* 174 Wn.2d at 575.

As a pragmatic matter, it is the lenders, servicers, and their affiliates who appoint trustees.  Trustees have considerable financial incentive to keep those appointing them happy and very little financial incentive to show the homeowners the same solicitude.  *Bain v. Metro. Mortg. Grp., Inc.* 175 Wn.2d 83, 95-97, 285 P.3d 34 (2012).  However, despite these pragmatic considerations and incentives

under our statutory system, a trustee is not merely an agent for the lender or the lender's successors.  Trustees have obligations to all of the parties to the deed, including the homeowner.  RCW 61.24.010(4) ("The trustee or successor trustee has a duty of good faith to the borrower, beneficiary, and grantor."); *Cox v. Helenius,* 103 Wn.2d 383, 389, 693 P.2d 683 (1985) ("[A] trustee of a deed of trust is a fiduciary for both the mortgagee and mortgagor and must act impartially between them.") (citing GEORGE E. OSBORNE, GRANT S.

19

*Klem v. Washington Mutual Bank,* No. 87105-1

NELSON & DALE A. WHITMAN, REAL ESTATE FINANCE LAW § 7.21
(1979)).

*Id.* at 93.  In a judicial foreclosure action, an impartial judge of the superior court

acts as the trustee and the debtor has a one year redemption period.  RCW

61.12.040; RCW 4.12.010; RCW 6.23.020(1).  In a nonjudicial foreclosure, the

trustee undertakes the role of the judge as an impartial third party who owes a duty

to both parties to ensure that the rights of both the beneficiary and the debtor are

protected.  *Cox,* 103 Wn.2d at 389.  While the legislature has established a

mechanism for nonjudicial sales, neither due process nor equity will countenance a

system that permits the theft of a person's property by a lender or its beneficiary

under the guise of a statutory nonjudicial foreclosure.[10]  An independent trustee

who owes a duty to act in good faith to exercise a fiduciary duty to act impartially

to fairly respect the interests of both the lender and the debtor is a minimum to

satisfy the statute, the constitution, and equity, at the risk of having the sale voided,

title quieted in the original homeowner, and subjecting itself and the beneficiary to

a CPA claim.[11]

---

[10] Washington courts have a long tradition of guarding property from being wrongfully
appropriated through judicial process.  When "a jury . . . returned a verdict which displeased
[Territorial Judge J. E. Wyche] in a suit over 160 acres of land" he threatened to set aside their
verdict and remarked, "'While I am judge it takes thirteen men to steal a ranch.'"  W. AIREY, A
HISTORY OF THE CONSTITUTION AND GOVERNMENT OF WASHINGTON TERRITORY, at 312 (1945)
(unpublished Ph.D. thesis available in the Washington State Library, Olympia, Washington &
cited with approval in *Cox,* 103 Wn.2d at 385).
[11] We have not had occasion to fully analyze whether the nonjudicial foreclosure act, on its face
or as applied, violates article I, section 3 of our state constitution's command that "[n]o person
shall be deprived of life, liberty, or property, without due process of law."  While article I,
section 3 was mentioned in passing in *Kennebec, Inc. v. Bank of the West,* 88 Wn.2d 718, 565
P.2d 812 (1977), where we joined other courts in concluding that the Fourteenth Amendment
does not bar nonjudicial foreclosures, no independent state constitutional analysis was, or has

*Klem v. Washington Mutual Bank,* No. 87105-1

      The trustee argues that we "should not hold that it is unfair and deceptive either to honor a beneficiary's instructions not to postpone a sale without seeking its authorization, or to advise a grantor to contact her lender." [12]  Suppl. Br. at 6. We note that Quality contends that it did not have a practice of deferring to the lender but merely followed its "legally-mandated respect for its Beneficiary's instructions" and asserts that "[s]imply put, no competent Trustee would fail to respect its Beneficiary's instructions not to postpone a sale without first seeking the Beneficiary's permission."  Resp. to Amicus Att'y General at 2.  We disagree. The record supports the conclusion that Quality abdicated its duty to act impartially toward both sides.

      Again, the trustee in a nonjudicial foreclosure action has been vested with incredible power.  Concomitant with that power is an obligation to both sides to do

---

since been done.  *Cf. State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986).  Certainly, there are other similar "self help" statutes for creditors that are subject to constitutional limitations despite the State's limited involvement.  *See, e.g., Culbertson v. Leland,* 528 F.2d 426 (9th Cir. 1975) (innkeeper's use of Arizona's innkeeper's lien statute to seize guest's property was under color of law and subject to a civil rights claim).  "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."  *Id.* at 428 (quoting *United States v. Classic,* 313 U.S. 299, 325-26, 61 S. Ct. 1031, 85 L. Ed. 1368 (1941)); *accord Smith v. Brookshire Bros., Inc.,* 519 F.2d 93, 95 (5th Cir. 1975) (exercise of statute that allowed merchant to detain suspected shoplifters subject to civil rights claim); *Adams v. Joseph F. Sanson Inv. Co.,* 376 F. Supp. 61, 69 (D.C. Nev. 1974) (finding Nevada's landlord lien act violated due process because it allowed landlord to seize tenant property without notice); *Collins v. Viceroy Hotel Corp.,* 338 F. Supp. 390, 398 (N.D. Ill. 1972) (finding Illinois innkeepers' lien laws, which allowed an innkeeper to seize guest's property without notice, violated due process); *Hall v. Garson,* 430 F.2d 430, 440 (5th Cir. 1970) (exercise of a statute giving a landlord a lien over the tenant's property gave rise to a civil rights claim against private party).
[12] Where the beneficiary so controls the trustee so as to make the trustee a mere agent of the beneficiary, then as principle, the beneficiary may be liable for the acts of its agent.  However, WaMu is in receivership and is not a party to this lawsuit.

*Klem v. Washington Mutual Bank*, No. 87105-1

more than merely follow an unread statute and the beneficiary's directions. *See* VRP (Jan. 19, 2010) at 393 (Ott admitting he had not read the statute he purported to follow); *Albice*, 174 Wn.2d at 568 (citing *Udall*, 159 Wn.2d at 915-16); *Cox*, 103 Wn.2d at 389. If the trustee acts only at the direction of the beneficiary, then the trustee is a mere agent of the beneficiary and a deed of trust no longer embodies a three party transaction.[13] If the trustee were truly a mere agent of the beneficiary there would be, in effect, only two parties with the beneficiary having tremendous power and no incentive to protect the statutory and constitutional property rights of the borrower.

We hold that the practice of a trustee in a nonjudicial foreclosure deferring to the lender on whether to postpone a foreclosure sale and thereby failing to exercise its independent discretion as an impartial third party with duties to both parties is an unfair or deceptive act or practice and satisfies the first element of the CPA. Quality failed to act in good faith to exercise its fiduciary duty to both sides and merely honored an agency relationship with one.

C. *Predating notarizations*

Klem submitted evidence that Quality had a practice of having a notary predate notices of sale. This is often a part of the practice known as "robo-

---

[13] Prior to 1975, the deed of trust act strictly forbade agents, employees, or subsidiaries of a beneficiary to act as a trustee. Former RCW 61.24.020 (1965). The 1975 legislature saw fit to remove that limitation, but neither did it expressly authorize agents of beneficiaries to act as trustees. LAWS OF 1975, 1st Ex. Sess., ch. 129, § 2; *Cox*, 103 Wn.2d at 389 (citing OSBORNE, *supra*). As we have said, without an independent trustee, the nonjudicial foreclosure process is subject to challenges based upon constitutional and equitable grounds.

*Klem v. Washington Mutual Bank,* No. 87105-1

signing."[14] Specifically, in this case, it appears that at least from 2004-2007,
Quality notaries regularly falsified the date on which documents were signed.

Quality suggests these falsely notarized documents are immaterial because
the owner received the minimum notice required by law. This no-harm, no-foul
argument again reveals a misunderstanding of Washington law and the purpose
and importance of the notary's acknowledgment under the law. A signed
notarization is the ultimate assurance upon which the whole world is entitled to
rely that the proper person signed a document on the stated day and place. Local,
interstate, and international transactions involving individuals, banks, and
corporations proceed smoothly because all may rely upon the sanctity of the
notary's seal. This court does not take lightly the importance of a notary's
obligation to verify the signor's identity and the date of signing by having the
signature performed in the notary's presence. *Werner v. Werner,* 84 Wn.2d 360,
526 P.2d 370 (1974). As amicus Washington State Bar Association notes, "The
proper functioning of the legal system depends on the honesty of notaries who are
entrusted to verify the signing of legally significant documents." Amicus  Br. of
WSBA at 1. While the legislature has not yet declared that it is a per se unfair or
deceptive act for the purposes of the CPA, it is a crime in both Washington and
California for a notary to falsely notarize a document. In Washington:

---

[14] Generally, robo-signing refers to "assembly-line signing and notarizing of affidavits for
foreclosure cases, mortgage assignments, note allonges and related documents, all filed in courts
and deed recorders in counties across the United States." Alan M. White, *Losing The Paper —
Mortgage Assignments, Note Transfers and Consumer Protection,* 24 LOY. CONSUMER L. REV.
468, 470 (2012).

*Klem v. Washington Mutual Bank,* No. 87105-1

**Official misconduct--Penalty**

(1) A notary public commits official misconduct when he or she signs
a certificate evidencing a notarial act, knowing that the contents of the
certificate are false. Official misconduct also constitutes
unprofessional conduct for which disciplinary action may be taken.

(2) A notary public who commits an act of official misconduct shall
be guilty of a gross misdemeanor.

RCW 42.44.160; *see also* CAL. GOV'T CODE § 6203 (criminal) ("Every officer

authorized by law to make or give any certificate or other writing is guilty of a

misdemeanor if he or she makes and delivers as true any certificate or writing

containing statements which he or she knows to be false."). A notary jurat is a

public trust and allowing them to be deployed to validate false information strikes

at the bedrock of our system.  We note that Washington state asserts criminal

jurisdiction over any person "who commits in the state any crime, in whole or in

part" or "commits an act without the state which affects persons or property within

the state, which, if committed within the state, would be a crime," among many

other things. RCW 9A.04.030(1), (5).  Gross misdemeanors are crimes under our

criminal code as long as "a sentence of imprisonment is authorized."  RCW

9A.04.040(1) ("Crimes are classified as felonies, gross misdemeanors, or

misdemeanors.").  RCW 9.92.020 assigns a penalty of up to 364 days for gross

misdemeanors not otherwise classified, like this one.

This court has previously considered a case with striking similarities.

*Meyers v. Meyers*, 81 Wn.2d 533, 534, 503 P.2d 59 (1972) (notary who notarized

24

*Klem v. Washington Mutual Bank*, No. 87105-1

forged signatures on a forged deed answerable in negligence to subsequent

purchasers).  In *Werner*, California notaries affixed their jurats to forged

documents conveying real property situated in Washington.  An issue before us in

*Werner* was whether Washington had jurisdiction over the California notaries in a

civil suit to hold them accountable for their actions.  We held Washington did have

jurisdiction and that a notary may be personally liable to those injured by the

notary's failure to determine the identity of those whose signatures they notarize.

We observed:

> The whole of our system of title registration hinges upon the integrity
> of the documents which comprise it. As in the instant case, the
> corruption of that system may cause substantial economic loss to the
> parties involved. The notary, as a public officer, has a duty to take
> reasonable precautions to assure that his seal will not be the vehicle by
> which a fraudulent transaction is consummated. In our opinion,
> therefore, the State of Washington has the power to extend its
> jurisdiction to reach the nonresident notaries in this action. We hold
> that, consistent with due process, RCW 42.28.185(1)(b) encompasses
> the tortious actions of nonresident notaries when a notarized forgery is
> affixed to a document affecting interests in immovables. *Cf. Golden
> Gate Hop Ranch, Inc. v. Velsicol Chem. Corp.*, 66 Wn.2d 469, 403
> P.2d 351 (1965).

*Werner*, 84 Wn.2d at 367.  We noted that without the notary's acknowledgement,

the documents would not have been valid.[15]  *Id.* at 366.

We hold that the act of false dating by a notary employee of the trustee in a

nonjudicial foreclosure is an unfair or deceptive act or practice and satisfies the

first three elements under the Washington CPA.

---

[15] The question of whether or not a falsely notarized notice of sale is valid is not before us.

*Klem v. Washington Mutual Bank,* No. 87105-1

The trustee argues as a matter of law that the falsely notarized documents did not cause harm. The trustee is wrong; a false notarization is a crime and undermines the integrity of our institutions upon which all must rely upon the faithful fulfillment of the notary's oath. There remains, however, the factual issue of whether the false notorization was a cause of plaintiff's damages. That is, of course, a question for the jury. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.,* 122 Wn.2d 299, 314, 858 P.2d 1054 (1993) (citing *Ayers v. Johnson & Johnson Baby Prods. Co.,* 117 Wn.2d 747, 753-56, 818 P.2d 1337 (1991)). We note that the plaintiff submitted evidence that the purpose of predated notarizations was to expedite the date of sale to please the beneficiary. Given the evidence that if the documents had been properly dated, the earliest the sale could have taken place was one week later. The plaintiff also submitted evidence that with one more week, it was "very possible" Puget Sound Guardians could have closed the sale. This additional time would also have provided the guardian more time to persuade WaMu to postpone the sale. But given that the trustee's failure to fulfill its fiduciary duty to postpone the sale, there is sufficient evidence to support the juries CPA violation verdict, and we need not reach whether this deceptive act was a cause of plaintiff's damages.[16]

---

[16]The Court of Appeals also reversed the jury's verdict on breach of contract on the ground that the defendant breached the law, not the contract. The deed of trust provided that:

   **16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by

*Klem v. Washington Mutual Bank*, No. 87105-1

## II. INJUNCTION

Puget Sound Guardians unsuccessfully moved for an injunction below requiring Quality to follow Washington law relating to foreclosures and notarizing documents. Judge Mack declined to enter the injunction, in part, because she found the plaintiff's request was "overly broad and unenforceable" relating to the deed of trust act, because she accepted Quality's assurances that it no longer falsely notarized documents, and because the deed of trust act had been significantly amended since the Halstien foreclosure. CP at 1586-88. We disagree. Quality is a company that does business in California and Washington and has demonstrated little understanding or regard for Washington law. Quality continues to function as a trustee and to conduct sales in Washington. Injunctive relief is appropriate and we remand to the trial court to fashion an appropriate injunctive order.

## III. ATTORNEY FEES

The trial judge granted the plaintiff's attorney fees under the CPA for the work done forwarding that claim. We affirm and hold that the plaintiff is also entitled to attorney fees on appeal relating to that CPA claim. RCW 19.86.090.

## CONCLUSION

---

contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.

Ex. 9, at 17. Inasmuch as the parties devote little time on the issue and its resolution will not provide additional damages to the plaintiff, we decline to reach the issue.

*Klem v. Washington Mutual Bank,* No. 87105-1

We hold that the right to enjoin a foreclosure sale is an equitable remedy and the failure to enjoin a sale does not operate to waive claims based on the foreclosure process where it would be inequitable to do so. Where applicable, waiver only applies to actions to vacate the sale and not to damages actions. We hold that it is an unfair or deceptive act or practice under the CPA for a trustee of a nonjudicial foreclosure to fail to exercise its authority to decide whether to delay a sale. We hold the practice of falsely notarizing a notice of sale is an unfair or deceptive practice under the CPA. We affirm the Court of Appeals in part and reverse in part.  We remand to the trial court for further proceedings consistent with this opinion.

*Klem v. Washington Mutual Bank,* No. 87105-1

Chambers, C.P.T.

WE CONCUR:

_____

_____

_____                Stephens, J.

_____                Bridgewater, J.P.T.

Owens, J.

_____                González, J.

29

*Klem v. Wash. Mut. Bank*

No. 87105-1

MADSEN, C.J. (concurring)—I concur in the majority's determination that the jury's award under the Consumer Protection Act (CPA), chapter 19.86 RCW, should be upheld. I write separately because there are many aspects of the majority opinion that I cannot join. I especially disagree with the majority's own creation of confusion about how a plaintiff may establish a cognizable claim in a private action under the CPA and the majority's attempt to resolve this so-called "confusion."

The majority incorrectly states that Quality Loan Service Corporation of Washington (Quality) "argues . . . that only an act or practice the legislature has declared to be 'unfair' is unfair for purposes of the CPA." Majority at 13. Quality does not make any such argument. Quality quite clearly recognizes that under the CPA, the first two elements of the cause of action can be established either by showing a "per se" violation *or* by showing an unfair or deceptive act or practice that has the capacity to deceive a substantial part of the public. Suppl. Br. at 3. Similarly, Quality's Response to Amicus Memorandum of Washington State Attorney General, at 4-6, clearly shows Quality's understanding of the correct analysis. Quality *never* makes the argument that the

No. 87105-1

majority says that it does; its briefing indisputably shows that the majority is simply wrong.

Unfortunately the majority's misstatement of Quality's argument leads it to a discussion of whether there must be a legislative determination of the unfair or deceptive act or practice and to the conclusion that a court can also make such a determination. But it is well-settled that both legislatively designated and court-determined unfair or deceptive acts or practices may support private CPA actions, as explained fully in *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wn.2d 778, 785-86, 719 P.2d 531 (1986), and its progeny. If in fact Quality had actually made the argument that the majority says that it makes, all that the majority would need to do would be to cite *Hangman Ridge* and point out that it has been settled for over a quarter century that both the court and the legislature have this authority.

Regrettably, the majority itself creates the problem that it purports to resolve. As noted, the majority ascribes an argument to Quality that has not been made. Then the majority exacerbates the problem by attempting to show a split in the case law about whether a court can determine whether an act or practice is unfair or deceptive, but the cases relied on by the majority to show the supposed split are not in conflict.

The majority begins with this seemingly straightforward description of two ways in which a plaintiff can establish the first two elements of a CPA claim:

> "The [first] two elements may be established by a showing that (1) an act or practice which has a capacity to deceive a substantial portion of the public (2) has occurred in the conduct of any trade or commerce. Alternatively, these two elements may be established by a showing that the alleged act

2

No. 87105-1

> constitutes a per se unfair trade practice. A per se unfair trade practice
> exists when a statute which has been declared by the Legislature to
> constitute an unfair or deceptive act in trade or commerce has been
> violated."

Majority at 14 (quoting *Hangman Ridge*, 105 Wn.2d at 785-86). Thus, the first of the
two ways that a plaintiff can establish the first two elements is by producing evidence
that shows the act or practice, whatever it is, has the capacity to deceive a substantial
portion of the public and that this act or practice occurred in trade or commerce. This
method does not require a legislatively declared unfair act or practice. Rather, a court
considers the evidence produced and makes the determination whether the plaintiff has
established the requisite unfair or deceptive act or practice occurring in trade or
commerce.

The second method of proving the first two elements is to prove an act or practice
that violates a statute, where the legislature has declared that violation of the statute is an
unfair act or practice in trade or commerce. If the plaintiff establishes the statutory
violation, the plaintiff establishes the first two elements of a private CPA claim per se.

The majority maintains that confusion exists about the meaning of the above
quoted language from *Hangman Ridge* and cites two sets of cases in an attempt to show
that courts have split on the issue whether only a legislative designation of an unfair act
or practice can support a CPA claim. Majority at 14-15. But in the cases cited where the
courts supposedly read *Hangman Ridge* to require a statutorily based violation the courts
in fact recognized that the first two elements can be established by evidence *without* any
legislative declaration of an unfair or deceptive act or practice.

3

No. 87105-1

The first case is *Henery v. Robinson*, 67 Wn. App. 277, 834 P.2d 1091 (1992). The majority offers in the parenthetical attached to this case that the court "reject[ed] plaintiff[s'] CPA action against the seller of a defective mobile home because they could not show legislatively declared unfair or deceptive practice." Majority at 14.

However, in *Henery*, the court correctly stated that under *Hangman Ridge*, "[t]he plaintiff may establish the first two elements by showing *either* that the alleged act constitutes a per se unfair trade practice *or* that it occurred in the conduct of trade or commerce and has a capacity to deceive a substantial portion of the public." *Henery*, 67 Wn. App. at 289 (emphasis added). The court then correctly stated that "[a] defendant commits a per se unfair trade practice when his actions violate a statute describing an unfair or deceptive act in trade or business." *Id.* The court concluded that the evidence did not show that the defendants committed a per se unfair trade practice under RCW 46.70.180 and thus no per se CPA violation occurred. The court then turned to the alternative method of proof and the question whether there was evidence that "the defendants engaged in an unfair or deceptive act or practice which has a capacity to deceive a substantial portion of the public." *Henery*, 67 Wn. App. at 290. The court examined the record and concluded that plaintiffs' evidence was insufficient. *Id.* at 291. Therefore, because there was no basis for a per se claim based on violation of a statute and because the plaintiffs also failed to produce evidence otherwise satisfying the first two elements of a CPA claim, the court reversed an award of attorney fees based on a CPA claim. *Id.*

4

No. 87105-1

Obviously, the court in *Henery* did *not* read *Hangman Ridge* to say that only a legislatively based unfair or deceptive act or practice would suffice.

The next case the majority cites is *Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179, 1186 (W.D. Wash. 2010). Majority at 14. Here, the majority's parenthetical explanation tells us that the court rejected the "CPA action against phone company for imposing an early termination fee on the ground that the legislature had not declared it 'a per se unfair trade practice.'" Majority at 14 (citing *Minnick*, 683 F. Supp. 2d at 1186 (internal quotation marks omitted) (quoting *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 334, 779 P.2d 249 (1989)).

However, this is not an accurate explanation of what occurred in *Minnick*, either. There, the plaintiffs urged a per se claim but did not base it on a legislative determination. Rather, relying on pre-*Hangman Ridge* case law, the plaintiffs argued a CPA claim based on violation of a common law principle, not violation of a statute. The court correctly recognized the ways the first two elements of a CPA claim can be satisfied, set out in *Hangman Ridge* and quoted above. *Minnick*, 683 F. Supp. 2d at 1186. Then, as to per se declarations of unfair acts or practices, the court observed that in *Hangman Ridge* the court held that a per se claim can be made out only with respect to practices that the legislature had declared unfair and rejected the premise that there can be court-determined *per se unfair trade practices*. *Id.* Because the plaintiffs did "not identif[y] a Legislatively recognized per se unfair practice that would state a claim," and given that the plaintiffs had argued a per se violation, this disposed of plaintiffs' CPA claim. *Id.*

No. 87105-1

To show the "conflict" between these cases and others, the majority then cites two cases that, the majority says, "*properly*, did not read *Hangman Ridge* as establishing the only ways the first two elements could be met." Majority at 15 (emphasis added). The parenthetical explanations of these two cases are to the effect that in these cases the courts did not require a legislatively determined unfair or deceptive act or practice.

But cases that do not require a legislative determination do not show that any confusion exists. Such decisions would not conflict with the cases just discussed because the courts in those cases recognized that *Hangman Ridge* contains alternative methods of proof. Further, in accord with *Hangman Ridge*, when the plaintiff's evidence establishes that particular acts or practices are unfair or deceptive acts or practices occurring in trade or commerce, a judicial determination may be made that the first two elements of the private cause of action are satisfied. Thus, not requiring a legislatively determined unfair or deceptive act or practice is entirely consistent with *Hangman Ridge* and not in conflict with the first set of cases the majority cites.

In any event, the second set of cases the majority cites are not particularly relevant. The first, *State v. Kaiser*, 161 Wn. App. 705, 254 P.3d 850 (2011), majority at 15, does not address how a private plaintiff must prove a CPA claim at all. Instead, *Kaiser* was an action brought by the attorney general to enforce the CPA under RCW 19.86.080. The second case cited, *Magney v. Lincoln Mutual Savings Bank*, 34 Wn. App. 45, 57, 659 P.2d 537 (1983), majority at 15, was decided three years before *Hangman*

6

No. 87105-1

*Ridge* was issued. *Magney* therefore cannot show any confusion supposedly engendered by *Hangman Ridge*.

The majority does not show any confusion about whether courts may determine whether an act or practice is unfair or deceptive.

Nonetheless, the majority attempts "[t]o resolve" the supposed "confusion" about what acts or practices can be actionable in an action under the CPA. Majority at 16. This "resolution" is itself confusing and unnecessary. The majority says:

> [W]e hold that a claim under the Washington CPA may be predicated upon a per se violation of statute, an act or practice that has the capacity to deceive substantial portions of the public, or an unfair or deceptive act or practice not regulated by statute but in violation of public interest.

Majority at 16.

To recap, what precedent establishes is that to prove a private-action CPA claim the plaintiff must establish an "unfair or deceptive act or practice." *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 30, 948 P.2d 816 (1997); *Hangman Ridge*, 105 Wn.2d at 785. A per se violation occurs when the legislature declares in a statute that certain acts or omissions constitute violations of the CPA. For example, RCW 19.190.030 makes it a per se violation of the CPA to violate our state's commercial electronic mail act, chapter 19.190 RCW. *See State v. Heckel*, 143 Wn.2d 824, 828, 24 P.3d 404 (2001). If the plaintiff establishes a violation of this act, the first two elements of the CPA claim are established.

A violation can also be based upon unfair or deceptive acts in the absence of such a legislative declaration. Here, the plaintiff could base the action on conduct that did deceive the public, but is not required to do so. Instead, as *Hangman Ridge* says,

7

No. 87105-1

showing that the conduct had or has the capacity to deceive a substantial a substantial

portion of the public is sufficient.  Thus, under *Hangman Ridge* there is no doubt that

courts can determine that particular acts or practices violate the CPA.

       But confusion may be the result of the majority's statement that a CPA claim may

be predicated on "unfair or deceptive act[s] or practice[s] not regulated by statute but in

violation of public interest."  Majority at 16.  The required public interest impact was

addressed in *Hangman Ridge*, where this court noted that in *State v. Reader's Digest*

*Ass'n*, 81 Wn.2d 259, 501 P.2d 290 (1972), *modified by Hangman Ridge*, 105 Wn.2d

778, the court had concluded that lotteries were unfair under the CPA because lotteries

were prohibited by state statute and the state constitution.  The court had stated that

"'[w]hat is illegal and against public policy is per se an unfair trade practice.'"  *Hangman*

*Ridge*, 105 Wn.2d at 786 (quoting *Reader's Digest*, 81 Wn.2d at 270).

       The court concluded, however, that such judicial determinations of per se

violations would no longer be recognized.  First, the use of "'public policy'" in the

context of an "'unfair trade practice'" was a reference to "'public interest'" and the court

replaced this aspect of a CPA claim by a separate element requiring impact on the public

interest.  *Hangman Ridge*, 105 Wn.2d at 786 (quoting *Reader's Digest*, 81 Wn.2d at 270).

Second, in the more than thirteen years between the time *Reader's Digest* had been

decided and *Hangman Ridge*, the legislature had declared violations of numerous

consumer protection statutes to constitute unfair or deceptive acts or practices for

No. 87105-1

purposes of the CPA. *Id.* at 786-87. These legislative designations defined the relation between conduct made illegal by statute and the CPA. *Id.* at 786.

The court directed that consideration of the public interest occurs as a third element of the private cause of action and requires that in every private CPA action the consumer must show that the unfair or deceptive acts or practices affect (or impact) the public interest. *See id.* at 787; *accord Bain v. Metro. Mortg. Group, Inc.*, 175 Wn.2d 83, 117-18, 285 P.3d 34 (2012). This element is required in part because RCW 19.86.920 states the legislature's intent that the CPA not be construed to prohibit acts or practices not injurious to the public interest. *Hangman Ridge*, 105 Wn.2d at 788.

Basing a CPA violation on violation of public policy as the majority suggests is thus in tension with *Hangman Ridge*. It is also incompatible with the legislature's enactment addressing the role of the public interest in the private CPA action. The legislature has recently codified the requirement that the unfair act or practice be injurious to the public interest and specifically set out how this element may be satisfied. RCW 19.86.093 provides that

> a claimant may establish that the act or practice is injurious to the public
> interest because it:
>> (1) Violates a statute that incorporates this chapter;
>> (2) Violates a statute that contains a specific legislative declaration
> of public interest impact; or
>> (3)(a) Injured other persons; (b) had the capacity to injure other
> persons; or (c) has the capacity to injure other persons.

The statute applies to all causes of action that accrue on or after its effective date of July 26, 2009. LAWS OF 2009, ch. 371, § 3.

No. 87105-1

The first two subsections of this statute reflect the court's view in *Hangman Ridge*, 105 Wn.2d at 791, that the public interest element can be satisfied per se where the plaintiff shows violation of a statute that contains a specific legislative declaration of public interest impact. RCW 19.86.093(1)-(2). Subsection (3) bases public interest impact on actual injury and capacity to injure. Significantly, capacity to injure is not the same thing as capacity to deceive. Capacity to injure can establish the public interest element under the statute. Capacity to deceive a substantial portion of the public may be relevant in establishing the first two elements of the claim in the absence of a legislative determination that the challenged acts or practices are per se unfair or deceptive trade practices.

Given the court's rejection in *Hangman Ridge* of "public interest" or "public policy" as part of the first two elements of the private CPA claim, and the legislature's express statutory directions for how public interest impact is to be established, the public policy aspect of the private CPA claim is already sufficiently addressed. Given that there is no confusion as identified by the majority, there is no need to alter *Hangman Ridge*'s explanation of how the first two elements of the private CPA claim may be established. There is no reason to suggest an amorphous "public interest" basis for the first two elements of the claim.

Given the majority's identification of issues that are not truly raised here and that are in any event already resolved, its misreading of *Hangman Ridge*, and its puzzling

10

No. 87105-1

attempt to resolve "confusion" that does not exist, the majority should not be read as altering the settled analysis in *Hangman Ridge* and its progeny.

Next, the majority appears to believe there is a question whether either an unfair or a deceptive act or practice can be the basis for a CPA claim. As is apparent from the discussion above, I believe the statutory language clearly provides that either may be sufficient to describe the character of an act or practice that may be challenged under the CPA.

The majority repeatedly refers to the fiduciary duty of the trustee. In the present case, the trustee owed fiduciary duties because among other things the nonjudicial foreclosure sale occurred early in 2008. However, the judicially imposed "fiduciary" standard applies, at the latest, only in cases arising prior to the 2008 amendment of RCW 61.24.010. The 2008 amendment expressly rejected the "fiduciary" standard. *See* LAWS OF 2008, ch. 153, § 1, *codified at* RCW 61.24.010(3) ("[t]he trustee or successor trustee shall have no fiduciary duty or fiduciary obligation to the grantor or other persons having an interest in the property subject to the deed of trust") (effective June 12, 2008). In 2009, the legislature amended the statute again, deleting language stating that the trustee had to act impartially and replacing it with: "The trustee or successor trustee has a duty of good faith to the borrower, beneficiary, and grantor." LAWS OF 2009, ch. 292, § 7.[1]

The majority nevertheless seems to perpetuate a "fiduciary" standard that incongruously is merged with other standards. The majority states "[a]n independent

---

[1] The majority mistakenly says that the "duty of good faith" was added to the statute in 2008. Majority at 6 n.3. This change was made in 2009.

11

No. 87105-1

trustee who owes a duty to act in good faith to exercise a fiduciary duty to act impartially to fairly respect the interests of both the lender and the debtor is a minimum to satisfy the statute, the constitution, and equity." Majority at 20. I cannot agree with this broad amalgam of standards that actually have appeared at different times in RCW 61.24.010. While the majority acknowledges at one point that the statute presently states a "good faith" standard, majority at 6 n.3, the majority then muddies the waters considerably.

I also cannot agree with the extensive dicta appearing in footnotes. As examples, the majority discusses whether failure to seek a presale injunction waives all claims even though Quality did not seek review of the Court of Appeals' rejection of the waiver argument. Majority at 12 n.7. The majority also appears to question the nonjudicial foreclosure act on due process grounds, while assuming that an independent state constitutional due process analysis must be applied. Majority at 20-21 n.11. However, until issues such as these are squarely before the court the majority should not speculate about how this court might rule after we have engaged in the careful, considered decision-making process that results in holdings of this court.

Despite a number of disagreements with the majority, I concur in the result, because I believe that Quality's failure to exercise its own judgment on the matter of whether the sale should be postponed and its deferral to the beneficiary on this matter was an unfair or deceptive act or practice that supports Puget Sound Guardians' private CPA action. I agree that the jury award under the CPA should be reinstated.

12

No. 87105-1

Madsen, C.J.

13

*Klem v. Wash. Mut. Bank*, No. 87105-1

No. 87105-1

FAIRHURST, J. (concurring)—I concur in the majority's clarification that the judiciary retains the power to determine that an act is unfair within the meaning of the Consumer Protection Act, chapter 19.86 RCW, and the result it reaches in this case. However, this court has long avoided analysis of constitutional issues when it can avoid doing so. Footnote 11 needlessly, and likely incorrectly, appears to cast doubt on the deed of trust act, chapter 61.24 RCW.  Majority at 20 n.11. Consequently, I join the majority opinion except for footnote 11.

*Fairhurst, J.*